# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT

OF PENNSYLVANIA

* * * * * * * *

DENISE DIXON,                          *

    Plaintiff                      *   Case No.

    vs.                            *   3:17-CV-1827

PENNSYLVANIA DEPARTMENT OF     *

CORRECTIONS, JOHN F. WETZEL,   *

ROBERT SMITH, W FRANTZ,        *

WENDY NICHOLAS, GARY LOWE,     *

MR. MINNIG, MR. SCHAEFFER, ITW*

FOOD EQUIPMENT GROUP, LLC, MS.*

ANTHONY, TAMMY RISHEL, MS.     *

YOUNG, LESLIE BLAIR-MORRISON,  *

CYNTHIA FREELAND, CORRECT CARE*

SOLUTIONS, LLC and CHRISTOPHER*

OPPMAN                         *

    Defendants                     *

* * * * * * * *

DEPOSITION OF

DENISE DIXON

April 18, 2019

Any reproduction of this transcript is prohibited

without authorization by the certifying agency.

```
 1                         DEPOSITION

 2                            OF

 3    DENISE DIXON, taken on behalf of the Defendants

 4    herein, pursuant to the Rules of Civil Procedure,

 5    taken before me, the undersigned, Seth R. Baier, a

 6    Court Reporter and Notary Public in and for the

 7    Commonwealth of Pennsylvania, at the Law Offices of

 8    Jeffrey Paul, Esquire, 124 East Chestnut Street,

 9    Lancaster, Pennsylvania, on Thursday, April 18, 2019

10    beginning at 9:30 a.m.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                    A P P E A R A N C E S

 2

 3    JENNIFER J. TOBIN, ESQUIRE

 4    Tobin Law Offices, LLC

 5    702 North Third Street, Suite 71

 6    Philadelphia, PA  19123

 7        COUNSEL FOR PLAINTIFF

 8

 9    KAREN ROMANO, ESQUIRE

10    Commonwealth of Pennsylvania

11    Office of Attorney General

12    Strawberry Square

13    15th Floor

14    Harrisburg, PA  17120

15        COUNSEL FOR DEFENDANTS FROM DEPARTMENT OF

16        CORRECTIONS

17

18    MICHAEL HAMILTON, ESQUIRE

19    Weber Gallagher

20    4 PPL Place

21    5th Floor

22    Pittsburgh, PA  15222

23        COUNSEL FOR DEFENDANT, CORRECT CARE SOLUTIONS,

24        LLC

25
```

4

1                    I N D E X

2

3  WITNESS: DENISE DIXON

4  EXAMINATION

5     By Attorney Romano                    7 - 177

6  EXAMINATION

7     By Attorney Hamilton              177 - 191

8  EXAMINATION

9     By Attorney Tobin                 191 - 193

10  RE-EXAMINATION

11     By Attorney Romano               193 - 194

12  DISCUSSION AMONG PARTIES            194 - 195

13  CERTIFICATE                               196

14

15

16

17

18

19

20

21

22

23

24

25

5

1                        EXHIBIT PAGE

2

3                                        PAGE

4   NUMBER        DESCRIPTION           IDENTIFIED

5   Exhibit 1    12/3/15 Inmate Grievance      113

6   Exhibit 2    6/1/16 Inmate Grievance       125

7   Exhibit 3    1/7/16 Request to

8                Staff Member                  130

9   Exhibit 4    9/16/15 Request to

10               Staff Member                  142

11  Exhibit 5    Declaration of Denise Dixon   164

12  Exhibit 6    1/14/16 Inmate Grievance      168

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1                      <u>OBJECTION PAGE</u>

2

3    <u>ATTORNEY</u>                              <u>PAGE</u>

4    Tobin              158, 164, 179, 182, 184

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7

1                  S T I P U L A T I O N

2  ------------------------------------------------------

3  (It is hereby stipulated and agreed by and between

4  counsel for the respective parties that reading,

5  signing, sealing, certification and filing are not

6  waived.

7  ------------------------------------------------------

8                  P R O C E E D I N G S

9  ------------------------------------------------------

10                    DENISE DIXON,

11  CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND

12  HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS

13  FOLLOWS:

14                        ---

15                    EXAMINATION

16                        ---

17  BY ATTORNEY ROMANO:

18       Q.    Good morning.  Could you please state

19  your full name for the record?

20       A.    Denise Antoinette Dixon.

21       Q.    Hi, Ms. Dixon.  We didn't get a chance to

22  meet off the record.  I'm sorry.

23            My name is Karen Romano.  I'm from the

24  Office of the Attorney General, and I represent the

25  Department of Corrections' Defendants.

8

1      We're her today to take your deposition.

2 Have you ever given a deposition before?

3      A.   No, ma'am.

4      Q.   Okay.

5      I'm sure your Counsel went through it

6 with you, but let me give just some ground rules to

7 make things go a little smoother.

8      I just want to know what you remember as

9 we sit her today.  So I'm going to be asking you a

10 number of questions, some that go back in time a

11 while.  So if you don't remember the answer or you

12 don't know, that's fine.  Just tell me that.

13      Okay?

14      A.   Okay.

15      Q.   I may ask you to make some sort of an

16 estimate if you can and that's fine, but just let us

17 know that you're estimating or you're sort of

18 guessing if you are.  I don't want you take wild

19 guesses if you don't actually know the answer.

20      A.   Okay.

21      Q.   I don't know how long we'll be here

22 today, but at any point if you want to take a break,

23 whether it's to use the restroom or talk to Ms. Tobin

24 or just get away from me for a few minutes, that's

25 fine.  Just let me know.  I'm happy to accommodate

9

1   that.

2       A.    Thank you.

3       Q.    I would just ask that if I'd asked you a

4   question that you please answer it before the break.

5           Is that okay?

6       A.    Yes, ma'am.

7       Q.    We're in a pretty small room so I suspect

8   you'll be able to hear me today, but if at any point

9   you don't hear a question, please let me know.

10  Likewise, if you don't understand a question please

11  let me know.  I'll be happy to rephrase it or repeat

12  it as many times as we need to to make sure you

13  understand what I'm asking you.

14          Okay?

15      A.    Okay.

16      Q.    If you do answer a question I'm going to

17  assume that you both heard me and understood the

18  question.  Is that fair?

19      A.    Yes.

20      Q.    Okay.

21          I'm trying to think what else.  Are you

22  under the influence of any medications or substances

23  that would impact your ability to hear my questions,

24  understand them and answer them truthfully as we sit

25  here?

10

1       A.    No.

2       Q.    Okay.

3            Have you ever been known by any other

4  names?

5       A.    No.

6       Q.    What is your current address?

7       A.    239 Cherry Street, Columbia, PA 17512.

8       Q.    Who do you live there with?

9       A.    Me and my grandfather, James Arthur

10  Anderson.

11      Q.    How long have you been living at that

12  address?

13      A.    A year.

14      Q.    Where were you living prior to that?

15      A.    My father.

16      Q.    What is that address?

17      A.    212 South Second Street, Columbia, PA.

18  17512.

19      Q.    And what is your father's name?

20      A.    Churry Dixon.

21           COURT REPORTER:  What was the first

22  name please?

23           THE WITNESS:  Churry.

24           COURT REPORTER:  Churry?

25  BY ATTORNEY ROMANO:

11

1       Q.      I have a date of birth for you of

2  December 19th, 1990.

3               Is that correct?

4       A.      Yes, ma'am.

5       Q.      Could you briefly just tell us your

6  educational background?

7       A.      I graduated at McCaskey High School.  I

8  was 17.  I attended nursing school at McCaskey.  Then

9  I graduated and went on to do college courses for

10  early child education.

11       Q.      Did you receive any degrees for that

12  early education?

13       A.      No, ma'am.

14       Q.      What about in nursing?

15       A.      No, ma'am.

16       Q.      Do you hold any sort of nursing

17  certificate or license or anything of that nature?

18       A.      No.

19       Q.      One instruction I forgot to give you and

20  you haven't done, but I know it will probably come

21  up.  Our court reporter is taking down everything we

22  say.  So he can only take down one of us at a time,

23  so please be sure to let me finish my question, both

24  so we know you heard it and understood it, but also

25  so he can get a clear record.  And I'll do the same

12

1   with you and let you give out your full answer.

2            He can also only take down verbal

3   responses.  So he can't take down a nod of the head

4   or a shrug of the shoulders.  So if you can keep your

5   answers verbal we'd appreciate it.  Things like uh-

6   huh and uh-uh are hard to translate later.  So if a

7   yes or a no is appropriate we'd appreciate it if you

8   would give that sort of answer.

9            At some point you may nod or say uh-huh

10  and I might follow up and say to you was that a yes?

11  I'm not trying to be rude.  I just want to make sure

12  we get a clear record?

13            Okay?

14       A.   Yes.

15       Q.   Okay.

16            Sorry about that.  I knew there something

17  I forgot to ask you.

18            Are you currently employed?

19       A.   Yes.

20       Q.   Where at?

21       A.   The Eden Resort.

22       Q.   What is the Eden Resort?

23       A.   A hotel.

24       Q.   Is that - where is that located?

25       A.   212 Eden Road.

13

1          Q.     In what city?

2          A.     Lancaster, Pennsylvania.

3          Q.     And what do you do there?

4          A.     A banquet server.

5          Q.     How many hours a week do you work?

6          A.     It's only 15 to 20 right now.

7          Q.     How long have you been working at the

8    Eden Resort?

9          A.     Going on a year.

10         Q.     I'm sorry.  Going on a year did you say?

11         A.     Six to nine months, I believe.

12         Q.     So who is your supervisor there?

13         A.     Sarah.

14         Q.     Do you know Sarah's last name?

15         A.     It's so hard to pronounce.

16         Q.     Do you know how to spell it or a rough

17   idea.

18         A.     Zira - Zirazinski.

19         Q.     Okay.

20                According to the Answers to

21   Interrogatories, let me show you these before I refer

22   to them.  Have you ever seen that document before?

23         A.     Yes, ma'am.

24         Q.     Okay.

25                Do you know what it is?

14

1       A.    Yes.

2       Q.    What is it?

3       A.    It was the - the paperwork from the

4  machine.

5       Q.    Okay.

6             If you could flip to the last page there.

7       A.    All right.

8       Q.    Is that your signature on that

9  verification page?

10      A.    Yes, ma'am.

11      Q.    Okay.

12            And did you review those answers after

13 your attorney had them typed up?

14      A.    Yes, ma'am.

15      Q.    Okay.

16            ATTORNEY ROMANO:  For the record, I

17 was showing her the Plaintiff's responses and

18 objections to ITW Food Equipment for its

19 Interrogatories.

20 BY ATTORNEY ROMANO:

21      Q.    I'm going to refer to some of this

22 information a little bit just to kind of move things

23 along a little quicker.  I just wanted to verify that

24 you have, in fact, provided this information,

25            So I'm looking at your employment history

15

1  listed there, and after Eden Resort it lists Public

2  Partnership in Glen Allen, Virginia.

3        A.     Uh-huh (yes).

4        Q.     Yes?

5        A.     Yes, ma'am.

6        Q.     What is that?

7        A,     It's a home health aide center.

8        Q.     When - this says you worked there from

9  approximately May of 2018 to September of 2018.

10              Is that correct?

11        A.     Say it - could you just repeat it?

12        Q.     Sure.  May of 2018 to September 1st of

13  2018?

14        A.     Yes, ma'am.

15        Q.     Okay.

16              What did you do as a home health aide?

17        A.     I took care of Lucy Anderson.

18        Q.     Was this in a facility or in this

19  individual's home?

20        A.     Individual's home.

21        Q.     How many hours a week did you work?

22        A.     Twenty-five (250, 25 hours.

23        Q.     This address that's provided on Lake

24  Brook Drive, is that the address of Public

25  Partnership, the company?

16

```
 1          A.    Yes.

 2          Q.    Yes?  Okay.

 3                Who was your supervisor at that job?

 4          A.    It didn't - we didn't have a - it's like

 5    we got assigned to different patients.

 6          Q.    Okay.

 7                Who did the assignments?

 8          A.    Public Partnership.

 9          Q.    Okay.

10                Was there a certain person there that you

11    reported to to get your assignments?

12          A.    No.  I went through the patient actually

13    to get the job.  He was in contact with them.

14          Q.    Okay.

15                This was somebody that you knew already?

16          A.    One of my girlfriends knew him.

17          Q.    Okay.

18                Why did you leave that job?

19          A.    He needed - he needed people that were

20    certified to take care of him.

21          Q.    What were your duties?  What sort of

22    things did you do?

23          A.    Like sweep, clean, change his catheter,

24    take out the trash.

25          Q.    What type of cleaning were you doing?
```

1    A.    His - I'd clean his bathroom, clean his

2  kitchen, fix his movie shelves if he asked me,

3  rearrange his refrigerator.

4    Q.    And I'm sorry.  Let me bounce back to

5  your current job at Eden Resort.  You said you're a

6  banquet server.  What all does that entail?

7    A.    We cater to companies if they're having

8  like weddings or memorial services.

9    Q.    Do you actually serve things to

10  individuals at tables or are things set up like a

11  buffet?

12    A.    Both.

13    Q.    Okay.

14    Are you responsible to help set up and

15  tear down?

16    A.    Yes, ma'am.

17    Q.    Then are there events at the actual - are

18  all at the events at the hotel or are some of the

19  events located outside the hotel?

20    A.    At the hotel.

21    Q.    How many individuals currently typically

22  work with you for an event?

23    A.    Seven to ten.

24    Q.    Do you have any specific tasks that

25  you're assigned as part of that group or do you all

18

1    basically do the same things?

2        A.    We all do the same thing unless there's

3    like the Captain.  Then the Captain oversees us and

4    tells us what do and she sets up the buffet.

5        Q.    Do you ever work as the Captain?

6        A.    No, but I trained as the buffet.

7        Q.    I'm sorry?

8        A.    I'm just trained in different positions,

9    you know?

10       Q.    Okay.  Okay.  I'm sorry.

11             So let's bounce back.  Before Public

12   Partnership it says you worked in hot dog packaging

13   facility in Lititz?

14       A.    Yes.

15       Q.    And when you answered these, you didn't

16   remember their name.  Do you know what it is as

17   you're sitting here today?

18       A.    No.

19       Q.    Okay.

20             Where in Lititz is that located?

21       A.    Well, I went through a temp agency,

22   Allegiance Staffing.

23       Q.    I'm sorry, what was it?

24       A.    A-L-L-I-G-E-N-T (sic) -

25       Q.    Uh-huh (yes).

19

1        A.    - Staffing.

2        Q.    Okay.

3              What did you do at that packaging

4    facility?

5        A.    Take hot dogs off the conveyor and put

6    them in the - put them in boxes.

7        Q.    Your Answers to Interrogatories say you

8    worked there for approximately two weeks in August of

9    2018.

10             Is that right?

11       A.    (Indicates yes.)

12       Q.    Yes?

13       A.    Yes, ma'am.

14       Q.    Why did you leave that job?

15       A.    I didn't - it was too fast.  It was too

16   much for me.

17       Q.    Okay.

18             Too much in what sense?

19       A.    Taking the hot dogs off the conveyor, you

20   have to keep up with the pace or the hot dogs just

21   start going everywhere.

22       Q.    Okay.

23             I'm envisioning like I Love Lucy episode,

24   your hot dogs piling up.

25             Before that, it was the Comfort Inn in

20

1  Columbia?

2         A.    Yes, ma'am.

3         Q.    From December of 2017 to May 2018?

4         A.    Yes.

5         Q.    And it says you were part of the

6  housekeeping staff.

7               Yes?

8         A.    Yes.

9         Q.    What did you do as part of the

10  housekeeping staff?

11         A.    We cleaned the rooms, set the rooms so

12  the next customer can come in.  Clean the showers,

13  vacuum the floor, remake the bed, put condiments out

14  for the guests.

15         Q.    Anything other than cleaning guest rooms?

16         A.    Taking trash out.

17         Q.    When you would work cleaning the guest

18  rooms, was it something by yourself or was there

19  someone else assigned to work with you?

20         A.    By yourself.

21         Q.    Who was your supervisor at that job?

22         A.    Miranda.

23         Q.    Do you know Miranda's last name?

24         A.    No, ma'am.

25         Q.    Okay.

21

1              Why did you leave that job?

2        A.    Miranda got let go.  There's a new

3  management.

4        Q.    Were you terminated or did you quit?

5        A.    I just decided to quit and go to fulfill

6  my other job that I had.

7        Q.    Then next job listed is Y & S Candies in

8  Lancaster?

9        A.    Yes, ma'am.

10       Q.    And this says from roughly 2009 to 2011?

11       A.    Yes.

12       Q.    Okay.

13             It lists packaging.  What did you do

14  there?

15       A.    Inventory scans, like scan things that's

16  coming down the conveyor to access the code number.

17       Q.    I'm sorry.  I didn't catch the last part.

18       A.    To access the code number.

19       Q.    Who was your supervisor at Y & S?

20       A.    Derek.

21       Q.    Do you know Derek's last name?

22       A.    Santiago.

23       Q.    Why did you leave that position?

24       A.    I don't remember, ma'am.

25       Q.    Before that, we have RR Donnelley.  This

22

1    says it's now called LSC Communications -

2        A.    Yes.

3        Q.    - in Lancaster?  And what did you do at

4    RR Donnelley?

5        A.    I did - I tried fork lifting, to get

6    certified for my fork lifting, but it was a no go.

7        Q.    Okay.

8              You never got certified?

9        A.    Yeah.  It was just publishing.  Then I

10   went back to the warehouse for publishing.

11       Q.    Okay.

12             That takes us back to 2009, it looks

13   like.  Have you worked anywhere else since 2009 that

14   we haven't talked about?

15       A.    No.

16       Q.    Your Answers to Interrogatories indicate

17   you were incarcerated at SCI-Muncy from approximately

18   2011 to 2013 and July of 2015 to November 2017.  What

19   was the last job you held before you went back to

20   Muncy in 2015?

21       A.    I didn't have one then.

22       Q.    Okay.

23             According to the Answers to

24   Interrogatories, I don't have any employment listed

25   between the time you left Y & S Candies in 2011 and

23

1    the time you went to Comfort Inn in 2017.  Is that
2    accurate?
3              A.    Yes.
4              Q.    Okay.
5                    Since you were released from SCI-Muncy in
6    2017, have you worked anywhere other than the Comfort
7    Inn, that hot dog facility, Public Partnership and
8    Eden Resort?
9              A.    Yes, ma'am.
10             Q.    Where else?
11             A.    Sauder's Eggs.
12             Q.    Where is that located?
13             A.    Lititz Pike.
14             Q.    When did you work there?
15             A.    In between one of my jobs, but I didn't
16   like it.
17             Q.    Do you know about how long you were
18   there?
19             A.    Probably two weeks.
20             Q.    Okay.
21                   What did you do there?
22             A.    Packaging eggs.
23             Q.    Who was your supervisor?
24             A.    Rich.
25             Q.    Do you know Rich's last name?

24

```
1           A.    No.

2           Q.    Do you know what other jobs that was

3     between?

4           A.    I believe the Comfort Inn.

5           Q.    Before or after the Comfort Inn?

6           A.    After.

7           Q.    Okay.

8                 Any other jobs you've worked since your

9     release in 2017?

10          A.    And Golden Corral.

11          Q.    Okay.

12                When did you work at Golden Corral?

13          A.    I don't know, between one of my jobs with

14    the - yeah, in between one of my jobs.

15          Q.    Okay.

16                About how long were you there?

17          A.    Three months.

18          Q.    Okay.

19                What did you do?

20          A.    Banquet work and server.

21          Q.    Okay.

22                Who was your supervisor there?

23          A.    I forget her name.

24          Q.    Okay.

25                What location of Golden Corral was that?
```

25

1          A.      Lincoln Highway.

2                  ATTORNEY ROMANO:  Jennifer, am I

3      correct, there's no sort of wage-loss claim here.

4                  Right?

5                  ATTORNEY TOBIN:  There's not.

6                  ATTORNEY ROMANO:  Okay.

7                  Then I'm not going to get into any of

8      her wages.

9      BY ATTORNEY ROMANO:

10         Q.      Anywhere else that you've worked since

11     your release in 2017 that you can think of?

12         A.      No.

13         Q.      Okay.

14                 I want to talk about your time with the

15     Pennsylvania Department of Corrections.  When was the

16     first time that you were incarcerated by the

17     Department of Corrections?

18         A.      2011.

19         Q.      Okay.

20                 Were you ever housed anywhere other than

21     SCI-Muncy?

22         A.      Lancaster County Prison.

23         Q.      Lancaster County.  Okay.

24                 And other state facility besides

25     SCI-Muncy?

26

1          A.     No, ma'am.

2          Q.     Okay.

3                 2011 what were the charges that brought

4     you to jail that time?

5          A.     Receiving stolen property - you can look

6     on the - ain't it on the paperwork?

7          Q.     Yeah.  I'm just curious what you remember

8     as we're here today?

9          A.     I forget, ma'am, because -.

10         Q.     Okay.

11                Do you know when you actually arrived at

12    SCI-Muncy?

13         A.     I believe 2011.

14         Q.     Okay.

15                And how did that incarceration end?  Did

16    you serve your whole sentence or were you released

17    early?

18         A.     I had triple RI.

19         Q.     Okay.

20                Do you know the date that you got

21    released?

22         A.     No.

23         Q.     Okay.

24                The information I have indicates it was

25    around December 23rd of 2013.  Does that sound -

27

1          A.    Yeah.

2          Q.    - about right?

3                During that - that first incarceration at

4    SCI-Muncy, did you have a cellmate?

5          A.    Yes.

6          Q.    Do you recall who it was?

7          A.    No.  I have so many.

8          Q.    Okay.

9                Did you have a job during that

10   incarceration?

11         A.    Yes.

12         Q.    What did you do?

13         A.    Central kitchen.

14         Q.    All right.

15               What were your duties in the central

16   kitchen back in 2012/13 time period?

17         A.    Dishwasher, fill in and the window.

18         Q.    What do you mean when you say the window?

19         A.    To send food out the window.

20         Q.    Who was your supervisor back then?

21         A.    Wheeler.

22         Q.    Wheeler?

23         A.    Yes.

24         Q.    Robert Wheeler?

25         A.    Yeah, I don't know if it's Robert.

28

1      Q.    Okay.

2            What kind of hours did you work in the

3      kitchen?  What times of day?

4      A.    Swing shift.

5      Q.    It varied?

6      A.    Yeah.  Monday and Wednesday 1:00 to 7:00

7      and weekends I think 5:00 to 1:00.

8      Q.    5:00 a.m. to 1:00 p.m.?

9      A.    I believe, yes.

10     Q.    And when you said Monday, Wednesdays it'd

11     be 1:00 p.m. to 7:00 p.m.?

12     A.    Yes, ma'am.

13     Q.    Were those the only days you worked in

14     the kitchen back in the 2012/'13 time period?

15     A.    And I worked swing shift.  I mean, it was

16     the a.m. shift before.

17     Q.    Okay.

18           What was that - what were those hours?

19     A.    Monday to Friday 5:00 a.m. to 1:00.

20     Q.    Okay.

21           Did you have any other supervisors back

22     then other than Mr. Wheeler?

23     A.    Uh-huh (yes).  Excuse me.  Mr. Rein.

24     Q.    Mr. who?

25     A.    Mr. Rein and Mr. Lyols.

29

1          Q.    Do you know how you spell those names?

2          A.    Rein, I believe is R-E-I-N.  And Lyols is

3    L-Y-O-L-S, I think.

4          Q.    Okay.

5                Do you know these individuals, any of

6    them, what their actual job title was?

7          A.    No.

8          Q.    Okay.

9                Back in 2012 or `13, how many people

10   would work on crew with you in the kitchen?

11         A.    On the whole crew within our shift or -?

12         Q.    Yes.  On your shift?

13         A.    Ten to 15.

14         Q.    Do you remember the names of any of the

15   other inmates that worked with in the kitchen back

16   then?

17         A.    Yeah, Normita Jackson.

18         Q.    And I'm talking specifically about your

19   first time at SCI-Muncy, back in 2012/'13 time

20   period.

21         A.    Oh, no.  There was -.

22         Q.    Okay.

23                We'll talk about the second time.  I want

24   to try and keep them separate -

25         A.    Okay.

30

1       Q.      - as best we can.

2       A.      All right.

3       Q.      You said back then you worked on the

4   dishwasher.  What did you do?

5       A.      Run cups, well, run the utensils, stack

6   the clean trays, spray the dirty dishes and dump

7   trash.

8       Q.      We're going to talk about this a lot

9   later, but I'm going to touch on it a little bit now.

10   The allegations in your case relate to problems with

11  the dishwasher at SCI-Muncy.  Was it the same

12  dishwasher in 2012 and `13 as it was in 2015?

13      A.      Yes.

14      Q.      Okay.

15              Were there any problems with the

16  dishwasher from your perspective in the 2012/2013

17  timeframe?

18      A.      Just the door and the sprayer once in a

19  while.

20      Q.      Okay.

21              Tell me about the door back in 2012 or

22  `13.

23      A.      The door, the middle door on the right

24  side, is jammed.

25      Q.      Can you give me a little bit of a

31

1   description of the dishwasher?  You said the middle

2   door.  How many doors are there?

3          A.     Three.

4          Q.     Okay.

5                 Are they all right in a row across from

6   each other?

7          A.     There'd be one big one and a last - it's

8   all connected, but it'd be one big one then the

9   middle smaller one and then a little window one.

10         Q.     Okay.

11                The middle door when you open it, what's

12  inside there?

13         A.     The machine, the inside of the machine.

14         Q.     Okay.

15                Is that where you load dishes in or -?

16         A.     That's where the dishes come through the

17  conveyor.

18         Q.     Okay.

19                How does that door open?

20         A.     There's like a leverage at the bottom and

21  you pull it up, and then there's a leverage - there's

22  like a hook that's supposed to pop out to connect to

23  the leverage once it goes all the way up.

24         Q.     When you say lifted up, is it a door that

25  like lifts up and out or does it just slide up?

32

1          A.     Slide up.

2          Q.     It slides up in the machine like a garage

3     door would?

4          A.     No, it don't slide in the machine.   It

5     just slides straight up.   It'll stick straight up and

6     then there's a hook that's in the back of the door.

7     Once the door comes to a certain height there's going

8     to be a hook in the back of the door and it'd come

9     forward.   So basically the hook it what's leaving the

10    door stand straight up.

11         Q.     Understood.

12                So the door that slides up, it doesn't

13    ever change direction?

14         A.     No.

15         Q.     Am I right?

16         A.     Uh-huh (yes).

17         Q.     Okay.

18                Now, you had said, I think you said a

19    hood - a hook, I think you had said, should pop out

20    or is supposed to pop out.   Tell me about that.

21         A.     Once you put the door up, there is going

22    to be like - it's like a little metal - it looks like

23    a - I will call it a hook.   And basically once the

24    door is up, it'll hook over the latch of, you know,

25    the door.

33

1   Q. Okay.

2    Was that hook functional when you were

3 there in 2012 or `13?

4   A. No.

5   Q. Okay.

6    Was there ever a time that you worked in

7 the central kitchen that that hook worked?

8   A. No, not since I've been there, -

9   Q. Okay.

10   A. - going there.

11   Q. I'm sorry.

12   A. I said, no, not since I've been going

13 there.

14   Q. Okay.

15    Why would you need to open that middle

16 door?

17   A. Utensils get caught in the machine.  That

18 allows the machine to like overheat or the water

19 starts coming out of the machine so there's something

20 stuck because they won't - nothing else  - it'd be

21 like a jam.  There's a jam in there somewhere.

22   Q. Okay.

23    Other than to clear a jam, would there be

24 any other reason why you would need to open that

25 middle door?

34

1      A.    No, not while the dishwasher's running.

2      Q.    Okay.

3            What about while it's not running?

4      A.    Just to clean it out.

5      Q.    Okay.

6            How often would that be done?

7      A.    Usually on the beginning of our shift and

8 after our shift.

9      Q.    What needed to be cleaned inside that

10 middle door?

11      A.    The buckets that catches the food and

12 silverware.

13      Q.    So what did that involve?

14      A.    Can you repeat your question?

15      Q.    Sure.  What did cleaning out those

16 buckets involve?

17      A.    We get a big bucket, you know, we got to

18 go, like put our body in the machine a little bit to

19 grab the bucket out.  And we - whatever's in the

20 bucket we empty out into big bucket.  So now the

21 machine is clean.  We take the bucket over to the

22 spray area so we can get all the other stuff that may

23 be stuck in the bucket.

24      Q.    Okay.

25            So other than emptying the buckets and

1    then cleaning the buckets at the sprayer area, did

2    you have to do any other cleaning inside that middle

3    door?

4         A.    Just like washing it with like a scrubby

5    and soap.

6         Q.    Okay.

7               How long did - would that take to wash

8    out the inside with the scrubby?

9         A.    Like less than five minutes.

10        Q.    How big was this area inside that middle

11   door?  How big was the door?

12        A.    I'm not good with measurements, but it

13   wasn't like a big door.  It was probably the size of

14   a picture frame if you know the size of a picture

15   frame, standing full length was probably two inches.

16        Q.    I'm going to guess that's about an 11 by

17   14 picture plus a frame.  I mean, I'm certainly no

18   expert on that, but -.

19               ATTORNEY HAMILTON:  I feel more 24/18

20   I think.  Twenty-four (24) by 18, yeah.

21               ATTORNEY ROMANO:  Okay.

22               ATTORNEY HAMILTON:  Sorry.

23               ATTORNEY ROMANO:  Okay.

24               It gives us an idea at least.

25   BY ATTORNEY ROMANO:

36

1     Q.    When you started working in the central
2   kitchen - well, let me back up.  You said there were
3   problems with the sprayer as well.  What was the
4   problem with the sprayer?
5     A.    No pressure.
6     Q.    Okay.
7           The buckets that you would have to empty
8   out that were inside the middle door of the
9   dishwasher, how - what - how big of buckets are we
10  talking about?
11    A.    Just like probably from right here
12  upwards (indicates).
13    Q.    Are we talking bigger than like a normal
14  household bucket that you would just, you know, carry
15  around in one hand and use to wipe off a floor?
16    A.    Well, those buckets were actually bigger.
17    Q.    Okay.
18    A.    Because this one's just like a, like a
19  rectangle, but just bigger indents like down.
20    Q.    Okay.
21    A.    So it's like a bucket - you just pull it
22  out and it has a handle on there.
23    Q.    And you could lift it with one hand?
24    A.    Yes.  You could lift the bucket with one
25  hand.

37

1      Q.    Okay.

2            When you started working in the central

3   kitchen in 2011, `12, whatever year that was, did you

4   receive any training?

5      A.    No.

6      Q.    Who showed you what you needed to do

7   while you were working there?

8      A.    Normita Jackson.

9      Q.    Was she an inmate?

10     A.    Yes.

11     Q.    Did you receive any training or

12  instruction from the supervisors?

13     A.    No.

14     Q.    Who showed you how to clean that middle

15  door area of the dishwasher?

16     A.    Normita Jackson and Felicia Dawson the

17  first time, Felicia Dawson.

18     Q.    Okay.

19           And what did they tell you?

20     A.    Well, they initially just gave me a

21  position.

22     Q.    What do you mean?

23     A.    Like somebody is the sprayer, somebody is

24  the dumper, somebody's going to run cups and

25  somebody's going to be at the bottom to catch the

38

1   clean dishes that come out of the conveyor.

2        Q.    Okay.

3        A.    So that's initially how the training

4   started because they would like, different days they

5   would rotate the position.  So that's how I learned

6   how to like work the dishwasher.

7        Q.    Okay.

8              So you said that that hook on the door

9   was never working while you were there.  Could you

10  hold the door up while you took out the bucket with

11  the other hand?

12       A.    Because the door is jammed at the

13  right-hand side, we lift the machine up, the door up

14  to a certain degree.  It like tilts and it'd hold

15  itself up.

16       Q.    Okay.

17       A.    But the hook don't all the way latch onto

18  it.  It's just like right at the end of the middle,

19  the metal part.  It don't catch the whole hook.

20       Q.    Okay.

21             The hook was actually there?

22       A.    Yes, it's there.

23       Q.    Okay.

24             You've mentioned something in some of

25  your pleadings about a screwdriver.

39

```
1          A.      Uh-huh (yes).

2          Q.      Was this, was a screwdriver used back in

3    2011, `12, -

4          A.      Yes.

5          Q.      - `13, during the first time?

6          A.      Yes.

7          Q.      Okay.

8                  Tell me what the screwdriver was used

9    for.

10         A.      The screwdriver is used to - on top the

11   metal frame on a dishwasher, so we can lift the door

12   up.

13         Q.      Okay.

14                 I don't understand that.  Could you say

15   that again?

16         A.      Okay.

17                 The door on the dishwasher, the second

18   door on the dishwasher is broke, so in the right-hand

19   side of the dishwasher the metal part that's through

20   the - that's out.  It would be like the door, the

21   frame under the door, it's caved in, so it gets

22   hooked onto the back of the dishwasher.  You know,

23   the - what the door is leaning on, it gets caught on

24   that part, so it don't allow the dishwasher door to

25   come up.  So we would have to get the screwdriver,
```

40

1    stick the screwdriver in like the space of the metal

2    door, and the space of what the metal door is leaning

3    on attached to the machine on, to un-pop the dent so

4    we can lift the door up.

5         Q.    Okay.

6               And we're still talking about the middle

7    door?

8         A.    Yes.

9         Q.    Okay.

10              I want to make sure I understand this.

11   I'm going to try and kind of repeat it here and

12   please correct me if I'm wrong on this.

13              What I'm envisioning is that you're

14   telling me that's there's a metal door and it has a

15   frame around it, and there's a dent in the middle of

16   the frame which causes the door to - sort of sticks

17   underneath the door.

18        A.    Yes.

19        Q.    So you have you to somehow use a

20   screwdriver to sort of free that up before you can

21   open it?

22        A.    Yes.

23        Q.    Is that right?

24        A.    Yeah.

25        Q.    Okay.

41

1          ATTORNEY TOBIN:  Could I just ask to

2    clarify?

3          ATTORNEY ROMANO:  Yes.

4          ATTORNEY TOBIN:  Is it the door that's

5    dented or the frame around the door that's dented?

6    Do you remember?

7          THE WITNESS:  It's on the right hand

8    - it's on the top of the right hand of the machine.

9    So the machine door is dented.  I don't believe the

10   other part is because the machine door is what we

11   have to pop open, like put it more against that side

12   of the door to un-jam it up.

13         ATTORNEY TOBIN:  Okay.

14         THE WITNESS:  So the door frame is

15   what's jammed down.

16   BY ATTORNEY ROMANO:

17       Q.    Who first showed you this technique with

18   the screwdriver?

19       A.    Mr. Wheeler.

20       Q.    Mr. Wheeler showed you that.  Do you know

21   when that was?

22       A.    The first time during my incarceration.

23       Q.    All right.

24             Where would you get the screwdriver?

25       A.    In a safety, a safety cabinet.

42

1      Q.    Would you need to go to a supervisor to

2  access the safety cabinet?

3      A.    Yes.

4      Q.    Once you got the door to open, did you

5  need the screwdriver anymore?

6      A.    No.

7      Q.    Did you sustain any injuries while

8  working in the central kitchen during your first

9  incarceration at SCI-Muncy?

10      A.    No.

11      Q.    Were you aware of anyone else getting

12  injured while working on the dishwasher during your -

13  while you were incarcerated the first time?

14      A.    No.

15      Q.    During the first time you were at

16  SCI-Muncy, 2011, `12, `13 timeframe, did you file any

17  grievances regarding the condition of the dishwasher?

18      A.    No.

19      Q.    Did you file any grievances during that

20  first incarceration relating to the fact that you had

21  to use the screwdriver to open the dishwasher?

22      A.    No.

23      Q.    Did you file any grievances during the

24  first incarceration complaining that you were working

25  in an unsafe dangerous environment?

43

1      A.    No.

2      Q.    My records indicate that you actually

3  didn't file a single grievance during your whole

4  first incarceration.

5            Is that right?

6      A.    Yes.

7      Q.    Okay.

8            Did you ever send any - do you know what

9  I mean when I say a Request to Staff slip?

10     A.    Yes.

11     Q.    Okay.

12           Did you ever send a Request to Staff slip

13  to anyone regarding the condition of the dishwasher

14  during your first incarceration?

15     A.    No.

16     Q.    Did you ever send a Request to Staff slip

17  complaining that you were working in dangerous

18  conditions during your first incarceration?

19     A.    No.

20     Q.    When you first came to SCI-Muncy the

21  first time, were you provided with copies of any of

22  the Department of Corrections' policies?

23     A.    Yes.

24     Q.    Do you know what policies?

25     A.    SCI-Muncy's.  I think there was a

44

1    procedure.  It was two handbooks.

2          Q.    Okay.

3                All right.

4          A.    I don't know what it was.

5          Q.    That's all right.

6                Were you ever made aware of where in the

7    facility you could access Department policies?

8          A.    No.

9          Q.    Okay.

10               Were you aware that there was a grievance

11   procedure during your first incarceration?

12         A.    No.

13         Q.    Did you have access to the law library

14   during your first incarceration?

15         A.    Yeah.  Everybody has access to it, but I

16   never went to it.  I didn't even know where it was

17   located at.

18         Q.    Okay.

19               Do you recall who your counselor was

20   during your first incarceration?

21         A.    No.

22         Q.    Do you recall who your unit manager was?

23         A.    Mr. Stevens.

24         Q.    Do you recall what unit you lived on

25   during your first incarceration?

45

1   A.  B8.

2   Q.  The entire time?

3   A.  Yes.

4   Q.  Okay.

5     Do you remember what your inmate number

6 was during your first incarceration?

7   A.  OT5426.

8   Q.  Okay.

9     Let's go forward now to the second time

10 you were at SCI-Muncy.

11   A.  Uh-huh (yes).

12   Q.  Do you know when you arrived the second

13 time?

14   A.  2015.

15   Q.  Okay.

16     What were you arrested for that time?

17   A.  I overdosed.

18   Q.  The information I have indicates that you

19 actually arrived at Muncy around July 7th of 2015.

20 Does that sound right?

21   A.  Yes.

22   Q.  Before that, from May to July, were you

23 in the county, a county facility?

24   A.  Yes.

25   Q.  Was that Lancaster County again?

46

1          A.     York.

2          Q.     York?  Okay.

3                 Was SCI-Muncy the only state facility you

4    were housed at during that incarceration?

5          A.     Yes.

6          Q.     Did you have a cellmate that time?

7          A.     Yes.

8          Q.     Do you recall who it was?

9          A.     Angela - I forget her name.  Angela

10   Sinetta.

11         Q.     Okay.

12                Was she your cellmate the entire time or

13   did you have different cellmates?

14         A.     I had different ones.

15         Q.     Okay.

16                Any others that you can recall?

17         A.     Shareese Jones, Leticia Burgess, Stasha

18   Smith, Angela Waldren, Sydney Fredericks, Simone -.

19                     THE WITNESS:  May I use the bathroom

20   shortly?

21                     ATTORNEY ROMANO:  Sure.  You can go

22   right now.  We'll take a break.

23                     THE WITNESS:  Thank you.

24                          ---

25   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

47

```
 1                      ---
 2              ATTORNEY ROMANO:  Okay.
 3              Are you ready to go back?
 4              THE WITNESS:  Yeah.
 5              ATTORNEY ROMANO:  All right.
 6              We'll go back on the record.
 7  BY ATTORNEY ROMANO:
 8      Q.    You were telling me about the cellmates
 9  that you had back in your 2015 to `17 incarceration
10  at SCI-Muncy.  Are there any other cellmates you can
11  recall?
12      A.    No, I don't think.
13      Q.    Okay.
14              Do you know who your counselor was during
15  that incarceration?
16      A.    Every block I moved to had a different
17  counselor.
18      Q.    Okay.
19              What blocks did you live on?
20      A.    M Unit, J Unit, BV, no.  Yeah, BV and E
21  Unit.
22      Q.    Okay.
23              Do you remember any of the counselor's
24  names?
25      A.    No.
```

48

1          Q.    At the time that you say you were injured
2    in 2015 do you know what unit you were living on at
3    that point in time?
4          A.    BV.
5          Q.    Do you recall who your counselor was
6    then?
7          A.    A chubby guy.  Mr. Warner.  W, Mr.
8    Warner.
9          Q.    Okay.
10               Do you know who your unit manager was on
11   BV?
12         A.    Stevens, Mr. Stevens.
13         Q.    Is that the same Stevens you referenced
14   on your first incarceration?
15         A.    Yes.
16         Q.    Okay.
17               Do you know how long after your injury it
18   was before you were moved off of BV unit?  I mean,
19   was it a matter of days, weeks, months, anything you
20   can remember?
21         A.    No, I don't recall.  Shortly after, but I
22   don't remember the timeframe.
23         Q.    Okay.
24               Do you know why you were moved?
25         A.    Because it was a kitchen block.

49

1          Q.     What do you mean it was a kitchen block?

2          A.     Like the CK workers are more found to be

3     housed on that block.

4          Q.     Oh, okay.

5          A.     Because it's closer to the CK kitchen.

6          Q.     When you say CK you mean the central

7     kitchen?

8          A.     Yes, ma'am.

9          Q.     And I guess I didn't ask this.  What's

10    the - the purpose or the function of central kitchen

11    at SCI-Muncy?

12         A.     To feed the inmates and employees.

13         Q.     Okay.  Okay.

14                So your worked in the central kitchen

15    again your second time?

16         A.     Yes.

17         Q.     Okay.

18                Did you request that position when you

19    started there or when you came back?

20         A.     Yes.

21         Q.     Did - your job duties the second time,

22    were they any different than they were the first

23    time?

24         A.     No.

25         Q.     Okay.

50

1              What did you 0 or what hours were you

2    working in the central kitchen at that time?  Did

3    they - were they still swing shifts or was there a

4    set time?

5         A.    During what time, ma'am?

6         Q.    Back in 2015?

7         A.    I think I did morning and swing shift.

8         Q.    Okay.

9              What were the hours for morning shift?

10        A.    6:00 a.m. to 1:00.

11        Q.    Okay.

12             Who worked in the kitchen with you?  Do

13   you remember any of the other inmates during your

14   second incarceration?

15        A.    For the morning shift or the swing shift?

16        Q.    Let's do the morning shift.

17        A.    Felicia Dawson, Kristen - Christy

18   Crabtree, Ms. Ivory.  I don't know her last name.

19   No, I don't remember.

20        Q.    Okay.

21             Who was your supervisor in the central

22   kitchen during the second incarceration?

23        A.    In the morning?

24        Q.    Yes.

25        A.    Mr. Wheeler.

51

1      Q.    Okay.

2            And who was your supervisor on the swing

3      shift?

4      A.    Mr. Wheeler.

5      Q.    Okay.

6            And what were - tell me the hours for

7      swing shift.

8      A.    1:00 p.m. to 7:00.

9      Q.    How often did you work morning shift

10     versus swing shift?

11     A.    Like during my 2015 to 2017 stay there, I

12     worked morning shift before, and then I worked swing

13     shift too.  But it wasn't like one day I worked 5:00

14     a.m. the next day I worked swing.  It was like one 0

15     probably for three months I worked for morning shift

16     and then -.

17     Q.    Understood.

18           At the time that you were injured, what

19     shift were you working?

20     A.    Swing shift.

21     Q.    Okay.

22           When you came back to SCI-Muncy in July

23     of 2015, were you again given a copy of an Inmate

24     Handbook?

25     A.    Yes.

52

1      Q.    Were you give copies of any other

2  Department of Corrections' policies?

3      A.    No.

4      Q.    Did you again have access to the Law

5  Library?

6      A.    Yes.

7      Q.    Were you given any instruction regarding

8  where policies - where you could review copies of

9  policies?

10     A.    No.

11     Q.    Were you aware that there were copies of

12  policies on the housing units?

13     A.    No, ma'am.

14     Q.    Do you know what your inmate number was

15  your second time at SCI-Muncy?

16     A.    It was the same number because I was

17  paroled.

18     Q.    Okay.

19           Other than the injury to your arm that

20  we're here about today, did you suffer any other

21  injuries while you were at SCI-Muncy the second time?

22     A.    No, ma'am.

23     Q.    How long after you came back to SCI-Muncy

24  in July of 2015 was it before you started working in

25  the kitchen?

53

1       A.      Probably like three weeks later.

2       Q.      You said that you requested that job.

3  How did you do that?

4       A.      Well, Normita Jackson and some of the

5  girls worked in the kitchen, and they said to ask

6  Wheeler, to write a request to Wheeler and see if he

7  could pull me for the kitchen.

8       Q.      When you say write a request, do you mean

9  a Request to Staff slip?

10      A.      Yes.

11      Q.      How - where did you get those forms?

12      A.      In the front.  Either the COs going to

13 give them to you or one of the inmates.  If you ask

14 one of the inmates, they'll have extra to give them

15 to you.

16      Q.      How did you know about Request to Staff

17 slips?

18      A.      The - Felicia Dawson told me, like this

19 how you fill it out and who to send it to, to get a

20 job, to employment.

21      Q.      Did you work any jobs at SCI-Muncy in

22 2015 before you went to the central kitchen?

23      A.      No.

24      Q.      While working in the central kitchen in

25 SCI-Muncy in 2015, did you have any supervisors other

54

1    than Mr. Rein or Mr. Wheeler?

2          A.    Yes, Mr. Schaeffer.

3          Q.    When was Mr. Schaeffer your supervisor?

4          A.    I don't what - when he got promoted, but

5    sometime during when I was working in the kitchen.

6          Q.    Okay.

7                Was he your supervisor only on a specific

8    shift?

9          A.    I think out of one day he was there with

10   us.

11         Q.    Okay.

12               So he didn't replace Mr. Rein or Mr.

13   Wheeler?

14         A.    No.

15         Q.    He was in addition to them?

16         A.    Yeah.  He just got a promotion, I guess.

17         Q.    Okay.

18               Do you know what any of their job titles

19   were?

20         A.    No.

21         Q.    Okay.

22         A.    I just knew they were supervisors.

23         Q.    Okay.

24               What - as a supervisor -

25         A.    Uh-huh (yes).

55

1      Q.    - what was their role with respect to

2  you?

3      A.    To oversee everything went well in the

4  kitchen.

5      Q.    Were they there with you while you worked

6  in the kitchen?

7      A.    Yes.

8      Q.    Could you go to them if there was a

9  problem with your work?

10     A.    Yes.

11     Q.    In 2015 when you went back to work in the

12 kitchen, were you given any sort of orientation or

13 instruction as to how to do the job?

14     A.    No.

15     Q.    Were there corrections officers in the

16 kitchen as well while you were working there?

17     A.    Blue shirts.

18     Q.    How many?

19     A.    Probably four.

20     Q.    Was it typically, you know, you would see

21 the same people repeatedly, same corrections officers

22 or did it vary all the time?

23     A.    No, the same ones.

24     Q.    Okay.

25           Who would you see?  Let's talk about

56

1    morning shift first.  Who would you see?

2         A.    Mr. Burrows, Jordan.

3         Q.    I'm sorry.  Mr. Burrows?

4         A.    Mr. Burrows, Mr. Jordan, a little lady I

5    don't her name we call her little lady, Ms. Lyles.  I

6    think her name Ms. Lyles, but -.

7         Q.    Okay.

8         A.    That'd be all.

9         Q.    Okay.

10             What about on swing shift?

11        A.    Ms. Keister and Mr. Tuan -

12        Q.    I'm sorry what's the -?

13        A.    Tuan.

14        Q.    Tuan?

15        A.    Uh-huh (yes).

16        Q.    Okay.

17        A.    Mr. Burrows, Ms. Anthony and there was

18   some little lady that stood in there, but I don't

19   know her name.

20        Q.    Okay.

21             What, what would the COs be doing in the

22   kitchen while you were working?

23        A.    The blue shirts are - oh, excuse me.  The

24   blue shirts are also assigned to - like if there's

25   people working in the front there's a blue shirt

57

1    overseeing them.  There's a blue shirt that's like

2    cooking with the other inmates on cooking area and

3    prep area.  And there's a CO that's in the back with

4    the inmates in the employee lounge.

5          Q.    With inmates in what?

6          A.    There's another blue shirt that be in the

7    back of the gate with the employees -

8          Q.    Okay.

9          A.    - in the - like in the employee lounge

10   instead of the inmates.

11         Q.    Okay.

12               Where would the fourth one be at?

13         A.    In the office.

14         Q.    Okay.

15         A.    Just floating around, you know.

16         Q.    When you say the front, what do you mean?

17         A.    The front where the - we put bread,

18   sugar, ketchup, whatever we might be eating, whatever

19   condiments we need for the day, it goes on a tray.

20   We add additional butter and bread and it'd be like a

21   line assembly.  One person would put meat on, the

22   cheese, the eggs or whatever is for the menu, and

23   then we like hand it down and there's one person

24   that's in the window and would push the trays out the

25   window for the people that's coming through the meal

58

1    line.

2         Q.    Okay.

3               So the front is where the meal trays are

4    prepped and then served?

5         A.    Yes.

6         Q.    Okay.

7               Then where is the cooking area/prep area

8    that you described?

9         A.    The cooking area is right beside the

10   dishwasher so it's like the front window would be

11   like right here (indicates) and then it'd be like

12   probably like six feet - no.  Probably like 20 feet

13   away there will be the cook area and it just contains

14   like three big pots, a counter.  That's it.

15        Q.    And as you're gesturing talking about it

16   you sort of indicating the central kitchen area would

17   be back and to the left from the -

18        A.    Yeah.

19        Q.    - from the front area.

20        A.    Yes.

21        Q.    Okay.

22              Is this all one big room or are there

23   walls separating the front area from the prep area?

24        A.    One big room.

25        Q.    Then you talked about a blue shirt being

59

1    in the back with the inmates or the employee lounge.

2    Where would those areas be?

3         A.    Well, you've got to go through a gate and

4    basically only the blue shirts have the key to the

5    gate, and there's probably three inmates working back

6    there.  One's in the hallway bagging up, let's say,

7    like diabetic bags, pregnancy bags -

8         Q.    Uh-huh (yes).

9         A.    - and then there's two that's working

10    serving the COs.  So a blue shirt is just overseeing

11    that, you know, all the employees are happy in the

12    kitchen and back.

13         Q.    Did the COs provide you with any

14    instruction regarding your work?

15         A.    Yes.

16         Q.    They did.

17         A.    As in like where we're positioned for the

18    day.

19         Q.    Or how to do your job?

20         A.    No.

21         Q.    Okay.

22         Did you work on the dishwasher during the

23    second incarceration?

24         A.    Yes.

25         Q.    Okay.

60

1          Were you doing the same things as you

2   described the first time, the emptying the buckets

3   and scrubbing out the inside?

4          A.    Yes.

5          Q.    Okay.

6                Was the condition of the dishwasher

7   itself any different when you returned in 2015 than

8   it was when you left in 2013 or was it the same?

9          A.    It was the same.

10         Q.    Was the screwdriver still being used to

11  open the door?

12         A.    Yes.

13         Q.    Where would you get the screwdriver

14  during the second time?

15         A.    The cook's safety cabinet.

16         Q.    Once the door was opened, was a

17  screwdriver needed for anything else in 2015?

18         A.    No.

19         Q.    All right.

20                Let's talk about your injury.  Do you

21  know the date that you got injured?

22         A.    I believe October 6th, 2015.

23         Q.    Okay.

24                Do you know what shift you were working

25  in the kitchen that day?

61

```
 1        A.    Swing.

 2        Q.    So that would have been 1:00 p.m. to 7:00

 3   p.m. shift?

 4        A.    Yes.

 5        Q.    Okay.

 6              Do you know who your supervisor was that

 7   day?

 8        A.    I just remember seeing Schaeffer there.

 9        Q.    Okay.

10              Do you recall what blue shirts were on

11   duty during that shift?

12        A.    Ms. Anthony, Mr. Tuan.  I don't remember

13   nobody else.

14        Q.    Okay.

15              Do you remember where Ms. Anthony was

16   stationed?

17        A.    She was on the cook side.

18        Q.    Okay.

19              And what about Mr. Tuan?

20        A.    He was just leaning on the desk.

21        Q,    Okay.

22              Am I correct there were other corrections

23   officers there, you just don't remember who they are?

24        A.    Yes.

25        Q.    Okay.
```

62

1          And would there have been four total like
2   you described before?
3          A.    Yeah, there's four.  There is normally
4   four there.
5          Q.    Do you recall who the other inmates were
6   working with you on that swing shift on October 6th,
7   2015?
8          A.    Yes.
9          Q.    Who were they?
10         A.    Ayisha Brown, Katia Taylor, Normita
11  Jackson, Desiree Johnson, Jamika Williams.
12         Q.    Okay.
13                Looking at your Answers to
14  Interrogatories, it says any people present in the
15  kitchen.  It says Mr. Antoine and it says not sure of
16  spelling.  Is Mr. Antoine the same as Mr. Tuan that
17  we talked about?
18         A.    Yes.
19         Q.    Okay.
20                And you don't know how his name is
21  spelled?
22         A.    No.
23         Q.    Okay.
24                Can you describe him for me?
25         A.    Antoine?

63

```
 1        Q.    Yes.
 2        A.    He's black.  He's like six one.  He's
 3   like 500 pounds.
 4        Q.    Okay.
 5              Bald, hair, glasses, anything else that
 6   helps identify him?
 7        A.    Short haircut, no glasses, brown eyes.
 8        Q.    Okay.
 9              We should be able to track him down.
10              Okay.
11              Where was Ayisha Brown working in the
12   kitchen that day?
13        A.    Cafeteria.  In the inside where they eat
14   at -
15        Q.    Okay.
16        A.    - like the chow hall.
17        Q.    Okay.
18        A.    Inside the chow hall.
19              Where was Katia Taylor working?
20        A.    In the back.
21        Q.    Where was Normita Jackson working?
22        A.    Dishwasher.
23        Q.    Where was Desiree Johnson working?
24        A.    Dishwasher.
25        Q.    And where was Jamika Williams working?
```

64

1      A.    He was working in the chow hall - she was

2  working chow hall.

3      Q.    Okay.

4           Where were you working?

5      A.    Dishwasher.

6      Q.    Okay.

7           You talked about different people being

8  in different locations along the dishwasher.  Where -

9  between you and Ms. Johnson and Ms. Jackson, where

10  were you each stationed?

11      A.    Can I say one more thing?

12      Q.    Yeah.

13      A.    There was one more person that was that

14  was doing dishwasher with me.  Her name was Latasha

15  Sorano.

16      Q.    Okay.

17           Where were each of you stationed along

18  the dishwasher?

19           Normita and Des - I don't know where they

20  was at during my incident.

21      Q.    Okay.

22      A.    But I know that was working in CK.

23      Q.    Okay.

24           So you said that this would have been

25  swing shift starting at 1:00 p.m.  Do you recall what

65

1    you had done earlier that day before you went to

2    work?

3              A.    No.

4              Q.    Do you remember the day anything out of

5    your normal routine happening?

6              A.    No.

7              Q.    Okay.

8              Were you having any problems with your

9    right arm before you went to work at 1:00 p.m. on

10   October 6th, 2015?

11             A.    No.

12             Q.    Had you been treated in the medical

13   Department for symptoms with your right arm prior to

14   going to work at 1:00 p.m. on October 6th, 2015?

15             A.    I don't remember.

16             Q.    Okay.

17             How long after you started your shift at

18   one o'clock was it before you were injured?

19             A.    I would say 1:00 count clear, so we're

20   just coming in from morning shift being there.  So we

21   had to have been clearing the machine out so probably

22   within 30 or an hour of me being there.

23             Q.    Okay.

24             Tell me about that.  When you would come

25   on at 1:00 p.m. what was the first thing you guys

66

1  would do when you came into central kitchen?

2      A.    We would - everybody would - everybody

3  had to sit in the chow hall and wait 'til everybody

4  gets there so they could take attendance and see

5  who's there and who's at program and who went

6  anywhere.  And then after they get their count, they

7  say go ahead.

8           We all go to our positions and if there's

9  like cups, dishes that the first shift didn't get to

10 run through yet because they call count clear on

11 their shift so they had to hurry up and get back to

12 their shift, their housing units.

13          We would just clean up everything as if

14 we was cleaning for the night.  Just so we could

15 start dinner -

16     Q.    Okay.

17     A.    - the next eatery.

18     Q.    Was that normal that there would be

19 dishes left to be cleaned from first shift?

20          Yes?

21     A.    Yes.

22     Q.    Okay.

23          Was it normal when you worked morning

24 shift that you guys would have dishes left as well -

25     A.    Yes.

67

```
 1          Q.     - for the afternoon shift?

 2                 Okay.

 3                      THE WITNESS:  But I'm sorry you guys.

 4                      ATTORNEY ROMANO:  That's okay.

 5                      THE WITNESS:  I have to use the

 6   bathroom.

 7                      ATTORNEY ROMANO: Absolutely.

 8                      THE WITNESS:  I drank coffee.  I'm so

 9   sorry.

10                            ---

11   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

12                            ---

13   BY ATTORNEY ROMANO:

14          Q.     Okay.

15                 So I think what I was starting to talk

16   about how long after you got on shift were you

17   injured.  And I think what you started to tell me is

18   that you were cleaning up from first shift so you

19   think it was probably the first like 30 to 60

20   minutes.  That's what you said?  I don't want to put

21   words in your mouth?

22          A.     Between - hold on a minute.

23          Q.     Sure.

24          A.     In the first hour within an hour and a

25   half of me being there.
```

68

1      Q.     Okay.

2             Can you walk me through what you

3    remember, what you were doing and how you were

4    injured?

5      A.     There was a bin of soda pitchers so we

6    had just got done - Ayisha Brown was doing the soda

7    pitchers under the window so we can put them on cart

8    so that we can run them through the dishwasher.

9             So we helped the CK out there in the

10   cafeteria run their dishwasher, their dishes.  So

11   basically it was like doing all the scraps.  Like

12   things that was just laying around we had to also run

13   them too.  So after we got done wash - running

14   everything that was in the kitchen that needed

15   cleaned as far as for the dishwasher to clean it, we

16   did.  We was about to let the 0 well, we did let the

17   machine drain to clean the machine out.

18     Q.     Was it normal to clean the shift - or I'm

19   sorry to clean the dishwasher out in the middle of a

20   shift?

21     A.     Yes.

22     Q.     How many times a shift would you let it

23   drain to clean it?

24     A.     When we first got there if there was - if

25   there was dishes still around and if they needed us

69

1  to run the dishes before and then after guaranteed.

2  But sometimes we wouldn't have to, but most of the

3  time before and after.

4      Q.    Before and after what?

5      A.    Like our shift.  Before like every - when

6  we first got there at 1:00 we're washing dishes that

7  belonged to morning shift.  Okay.

8          So once we get morning shift dishes out

9  of the way.  We turn the machine off, break it down,

10 clean it out then turn it back on, let if recycle.

11 And we wait until it's our turn.  Now the whole DOC

12 SCI-Muncy's coming for chow.  They're coming for

13 their meal, so now - you know, dinner is our

14 responsibility, but we also sometimes have to wash

15 lunch if it's left over.  So we break the machine

16 down at least twice while we're there.

17     Q.    Okay.

18         What about at the end of your shift?  Do

19 you clean it again?

20     A.    After the main line, after dinner is done

21 we clean it.  That's the second time we clean it.

22     Q.    Okay.

23         What time is lunch served at SCI-Muncy in

24 2015?

25     A.    Roughly begin at like 11:00, between

70

1    11:30, between 11:00, 11:30.

2          Q.     Okay.

3                 And what time does lunch end?

4          A.     Before the 12:30 count.

5          Q.     Okay.

6                 What time is dinner served?

7          A.     After the 5:00 count clear.

8          Q.     And what time does dinner end?

9          A.     Roughly 45 or an hour after.

10         Q.     Okay.

11                When you would work morning shift, would

12   you clean the dishwasher at the end of that shift?

13         A.     If we volunteered to stay after one

14   o'clock, one o'clock count clear.

15         Q.     How many times was the dishwasher cleaned

16   on morning shift?

17         A.     One, hopefully.

18                ATTORNEY ROMANO:  I'm sorry.  Could we

19   go off the record for one second?

20                            ---

21   (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)

22                            ---

23   BY ATTORNEY ROMANO:

24         Q.     Okay.

25                I was asking you about how many times the

1   dishwasher was cleaned on morning shift.

2        A.    One sometimes.

3        Q.    Okay.

4              When?

5        A.    During 12:30 and one o'clock, whoever

6   volunteers to stay back to clean it.

7        Q.    Okay.

8              On October 6th of 2015, did anyone stay

9   back from morning shift to clean?

10       A.    I mean, I don't know if they stayed back.

11  I'm pretty sure some people stayed back, but -.

12       Q.    Do you remember anybody that had stayed

13  over from morning shift that day?

14       A.    Uh-uh (no).

15       Q.    No?  Okay.

16             You talked about the dishwasher door and

17  you tried to give us a rough idea of the size

18  indicating the pictures up on the wall here.

19       Q.    How heavy was it?  Could you lift it up

20  with one hand?

21       A.    I don't know.  I never tried to do it.

22       Q.    What do you mean, you never tried to do

23  it.  When you opened the door, -

24       A.    Uh-huh (yes).

25       Q.    - could you open it with one hand or did

72

1    you have to use two?

2         A.    Oh, like slide the door open?

3         Q.    Yes.

4         A.    Yes.  I slide, could slide it with one

5    hand.

6         Q.    Okay.

7               Did it slide easily or did you have to

8    use force?

9         A.    You have to use a little force to get it

10   up.

11        Q.    Okay.

12              But not so much that you need two hands?

13        A.    Yeah.

14        Q.    Correct?

15        A.    Yeah, that's correct.

16        Q.    Okay.  Okay.

17              So walk me through October 6th, 2015.

18   You get to the central kitchen.  Walk me through what

19   you're doing until the point where you get injured.

20        A.    So we have all the buckets back there.

21   There's yellow barrels with cups in it, thrown in

22   with orange silverware.  We're like getting the racks

23   to put everything in the order that where it goes.

24   Like the cups we're putting in a cup rack to send

25   through.  The dishes, we're putting them on flats to

1   send them through.  We're collecting the central

2   kitchen, the chow hall area we're collecting their

3   pitchers because there's a pitcher of water that go

4   on every table in the chow hall.  So we're running

5   pitchers also.

6          Then we're done me and Stasha are ready

7   to break the machine down and clean the buckets out.

8   So she's cleaning the, the disk, like the disk frame

9   up there where the dishes come through the window at.

10  She's cleaning that surface off and the walls with

11  the scrubby.

12      Q.    I'm sorry.  Who did you say that was?

13      A.    Stasha Sorano.

14      Q.    Okay.

15            Thank you.

16      A.    Uh huh (yes).  And I'm opening all the

17  doors so I can get ready to drain the machine.  So I

18  already hit the hook off the machine to drain it.

19  There's like a little leverage.  Like when you look

20  inside the machine that the second door is open, or

21  the first one.  There's going to be like a little

22  leverage you hit down and that's what let's all the

23  water out, go out of the machine.

24            So we already did that part.  I was

25  taking the bucket - I already took the first bucket

74

1    out of the first machine.  I was taking the second

2    bucket out and I reached in like the whole body and

3    because there was like stuff - there was like

4    silverware on the bottom of the machine.

5              So I like went to go get the stuff with

6    my left hand, the loose knives and stuff and I was

7    coming up sort of like this (indicates).  With my

8    right hand, I grabbed the bucket to get the bucket

9    and I guess like from my hand like leaning on the

10   door, and the door not - I wasn't leaning on the door

11   per se, but like one side of the machine and I guess

12   I gave it like a little shift and then the door just

13   came slamming down on my forearm.

14        Q.    Okay.

15              We're going to break down here a little

16   bit.

17        A.    Uh-huh (yes).

18        Q.    You said you'd already taken the first

19   bucket out.

20        A.    Uh-huh (yes).

21        Q.    Okay.  That was a yes?

22        A.    Yes.  I'm sorry.

23        Q.    Okay.

24              What had you done with the first bucket

25   in?  Had you already gone and cleaned it out or did

1    you just take it out of the machine?

2         A.    Pardon me.  I took it out of the machine

3    and dumped into the big barrel of trash and got like

4    the loose silverware out of it because Wheeler makes

5    a big deal of that.

6              So I was taking the silverware out and

7    putting the loose things that was in the machine we

8    had like a little that we was putting it in so later

9    on when the machine ran we could just send it on

10   down.  But I was emptying the first bucket out, and I

11   sat it over there so Stasha could spray it and get

12   ready to sit back in the machine once I was I done

13   cleaning it.

14             So that's when it happened when I was

15   working on the second bucket.

16        Q.    Okay.

17             You said that you leaned your - I think

18   you said something about your body in the machine and

19   I've having trouble picturing this.  Are you down?

20   Are you standing up or are you sitting down?

21        A.    I'm standing - standing up and I'm just

22   briefly like leaning over.  More leaning over with my

23   left side of my body so I can like reach everything

24   that's on the bottom of the machine.

25        Q.    This door, how high off the floor would

76

1   the bottom of this door be when it's shut?

2       A.   It's like a - the door is like on some

3   kind of base.  So like this is the base (indicates)

4   and then the base kind of like sticks and - some kind

5   of big motor thing that's underneath.  But on the

6   base, the door is like probably this high (indicates)

7   and then it starts the door.  It comes up.  But the

8   door is like onto the machine, attached to the

9   machine, but there's like a base that's like this

10  high up, that when you look inside the door that's

11  where the lever, the leverage is at to run the

12  machine.

13      Q.   How - I'm sorry to interrupt you.  How

14  far off the floor.  Maybe I'll do it this way?  How

15  tall are you?

16      A.   I'm five, four.

17      Q.   Okay.

18          To open the dishwasher door would you

19  have to bend over?

20      A.   No.

21      Q.   Okay.

22          Would your arm - where your arm be if you

23  started to open the door if you're standing straight

24  up, straight in front of you -

25      A.   Straight up.

1      Q.    - down?

2      A.    Just like 20 degrees from in front of me.

3      Q.    Okay.

4            And how high up?  Did you have to raise

5      your arm over your head to open it up?

6      A.    Yeah.  Yeah.

7      Q.    Okay.

8            Could you still reach to touch the door

9      when you got it fully opened or did you need some

10     sort of a ladder or stool?

11     A.    No.  The door would stay open.  The door

12     would lean - the door would stay open because of the

13     latch.

14     Q.    Okay.

15     A.    I wouldn't be able to reach the whole

16     door, but me just lifting the door just to get it all

17     the way to be able to hold itself up.  I would just

18     have to extend my hand outwards.

19     Q.    And then could you still reach to then

20     close it again -

21     A.    Yes.

22     Q.    - while standing flat footed?

23     A.    Yes.

24     Q.    Okay.

25           How did you - were you the one who opened

78

1    up that middle on October 6th, 2015?

2        A.    No.

3        Q.    Who opened the door to the dishwasher?

4        A.    Stasha.

5        Q.    Did you see her do it?

6        A.    Yeah.

7        Q.    Did she use a screwdriver?

8        A.    Yes.

9        Q.    Do you know who she got it from?

10       A.    I believe Tuan.

11       Q.    Did she only use the screwdriver while

12   she was opening the door?

13       A.    Yes.

14       Q.    Okay.

15             So when you get to the dishwasher to

16   empty the buckets, the door's already open?

17       A.    Yes.

18       Q.    Okay.

19             Where's the screwdriver at this point?

20       A.    I believe she had given it back to a blue

21   shirt.

22       Q.    Okay.

23       A.    Because we was both like right there

24   getting the - but she just happened to give her I.D.

25   to get the screwdriver.  We both walked over, she

79

1   popped because we just happened to be having a little

2   conversation you know, while we was in the mix of it,

3   but -.

4       Q.    And to get the screwdriver - you just

5   said something important.  You have to provide an

6   I.D. to a staff member to get the screwdriver.

7           Right?

8       A.    Uh-huh (yes).

9       Q.    Yes?

10      A.    Seven out of ten.

11      Q.    Understood.

12          So you emptied out these first buckets,

13  you gave them to Stasha to go ahead and spray out.

14  So you go back in and said that you were - your body

15  was in the machine and that's what I wasn't

16  understanding.  Can you explain that to me a little

17  bit?

18      A.    May I - excuse me - I just hope I don't

19  trip you.

20      Q.    Yes, absolutely.

21      A.    So the machine door is up.  So it's like

22  the bottom of the machine would be like levered right

23  here (indicates).  So I'm like inside the machine

24  sideways on my left side more getting the things

25  that's on the bottom of the dishwasher or like the

80

1    sides.  You know, things that's not inside the

2    bucket, things that we have to pull out anyway.  So

3    I'm getting those things and then I must have like

4    when I went to go grab the right - the bucket that's

5    in the middle, when I let the latches go, I went to

6    go grab the bucket, and I was like pushing my body my

7    weight up and that's when the door just came down.

8         Q.    Okay.

9               When you went to push your weight up,

10   what did you push on?

11        A.    The frame of the dishwasher.

12        Q.    Side frame using your left arm?

13        A.    Yes.

14        Q.    Okay.

15              The way you were just describing, I want

16   to make sure the record's clear when we read it.

17        A.    Uh-huh (yes).

18        Q.    You were showing that you lift up the

19   door in front of you above your head.  But then you

20   have to like lean in and down as if you were reaching

21   into like a chest freezer.

22        A.    To move the bucket?

23        Q.    To get the bucket.  It's not straight in

24   front of you when you look in the door?

25        A.    No.

81

1      Q.    Right?  It's down?

2      A.    It's down.

3      Q.    Okay.

4            Could you reach down to the bucket

5      without using any sort of a stepstool or ladder?

6      A.    Yes.

7      Q.    You could reach the bucket while your

8      feet were still flat on the floor?

9      A.    Yes.

10     Q.    Okay.

11           Short girl problems.  I know what's it

12     like to lean over a machine and your feet are

13     dangling.

14           Okay.

15           So how much of your body, when you're

16     saying it's in the machine, you're leaning over, but

17     you're not actually in the machine?

18     A.    No, no.

19     Q.    Okay.

20           So you lean over to get the bucket and as

21     you're coming up you shift your left arm on the

22     outside of the machine?  Is that right?  On what

23     would be the side of the door area?

24           Correct?

25           And you pushed, sort of pushed your

1    weight back up to stand up?  Is that right?

2         A.    Yeah, yes.

3         Q.    Okay.

4               At what point did the door fall?

5         A.    The bucket got caught.  The bucket got

6    caught a little bit so I guess when I went to go lean

7    my body up - if I would have pulled it straight out

8    it would have came out, but because I hit it from - I

9    tried to pull it I guess from an angle to come out.

10   It was stuck.  So when I shook it like to grab the -

11   I don't know what the - like the bucket was inside.

12   I went to go reach with it with my right hand.

13              So I'm pulling like leaning up off of the

14   dishwasher like talking to Stasha and like more

15   engrossed we was talking and I'm like, yeah, talking

16   and I grabbed the bucket.  I didn't grab it straight

17   up.  I grabbed it like to come out this way so the,

18   the rim around it had got stuck to the hole.  There's

19   like little holes all in the bucket.  The metal part

20   had got stuck to the hole.  So when I went to like

21   jam - pull it with my right hand really hard the

22   machine door shifted and came down.

23        Q.    Okay.

24              You were using your right hand to grab

25   the bucket?

83

1          Correct.

2      A.     Yes.

3      Q.     Were you pulling your bucket at the same

4  time that you had your left hand on the outside of

5  the machine?

6      A.     No.

7      Q.     No.  Okay.

8          What were you doing when you put your

9  left arm on the machine?

10     A.     I used the left side of the machine to

11  like when I was further down in the machine just to

12  like pull my body up so I can get like a better

13  standing on my feet because I was like a little

14  uneven in there like trying to get things.  All

15  wobbly so once I got everything and I was throwing

16  it, I threw it in the bin.  And then like I went,

17  that's when my hand, my left hand was free.  It was

18  on the dishwasher, but I wasn't like pressing on it.

19  I don't think I was pressing on it.  But then I went

20  to go grab the bucket.

21     Q.     Okay.

22          I just want to clarify one thing you said

23  before.  When you stand - stood up and were

24  demonstrating that for us you said the bottom of the

25  dishwasher and you indicated on your body.  You were

84

1    sort of indicating about your hip area.  Is that

2    about right?

3        A.    Yeah, just like probably like my belly

4    button area.

5        Q.    Okay.

6              So tell me what happened when the door

7    fell?

8        A.    The door fell.

9        Q.    And so let me clarify.  When we say fell,

10   it closed?

11       A.    Yeah, it closed.

12       Q.    Okay.

13       A.    Like the door slammed down.

14       Q.    Okay.

15       A.    Once it closed I like - I grabbed my arm.

16   Well, I grabbed the door with my left hand and was

17   like trying to pull, push it up.  So once I pushed it

18   up I like went to Stasha and was like crying and

19   telling her that the freaking door just fell on my

20   freaking arm.  And she came over to where I was at -

21   well, where I was positioned at.

22       Q.    Where on your arm did it hit you?

23       A.     It hit me like right - the crease of my

24   forearm.  It hit me like right here (indicates).

25       Q.    Okay.

85

1          You're wearing a brace on your right arm
2   today.
3          A.    Yes.
4          Q.    Can you show me on your left arm just so
5   I can get a better picture?  Like in your elbow area
6   or below that?
7          A.    Like right - okay.  So the crease of my
8   arm is right here.  It hit me like a little above it
9   because it felt like a -.
10          Q.    What do you mean when say the crease of
11   your arm?  Where your elbow bends?
12          A.    Yeah.  Okay.
13                Where the elbow bends -
14          Q.    Uh-huh (yes).
15          A.    - like a little above it.
16          Q.    A little above it?
17          A.    Yeah.
18                ATTORNEY TOBIN:  So closer to your
19   heart and farther away from your hand?
20                THE WITNESS:  Yes.
21   BY ATTORNEY ROMANO:
22          Q.    Okay.
23                Were you able to get the door lifted up
24   pretty quickly?
25          A.    Yes.

86

1          Q.     Okay.

2                 What were you wearing that day?

3          A.     CK whites, a white short sleeved shirt

4     and white pants.

5          Q.     Where the door hit your arm, was it below

6     your sleeve?

7          A.     Yes.

8          Q.     Okay.

9                 Did you - did you have any sort of a cut

10    or a scratch or anything on your arm.

11         A.     Yes.

12         Q.     Yes?  Can you describe that for me?

13         A.     It was like a bruising, like a bruise.

14    It was bruised and my arm swelled up really bad.

15         Q.     How much did it swell?  Did your sleeve

16    still fit?

17         A.     Well, it was the bottom of my sleeve.

18         Q.     Okay.

19         A.     It was like my, the back of my elbow was

20    really swollen and like the sides were really

21    swollen.

22         Q.     Okay.

23                So you said after the door closed and you

24    opened you went and told Stasha what happened.  What

25    did you do next?

87

1     A.    I went to the bathroom and was crying.

2     Q.    Okay.

3           What'd you do after that?

4     A.    And then Stasha went -.

5     Q.    I'm sorry.  Can I back you up one second?

6  Before you - to leave to go to the bathroom while

7  you're working, do you need to clear that with a

8  corrections officer or supervisor?

9           No?

10    A.    No.

11    Q.    Okay.

12          So you go to the bathroom.  Then what

13 happens?

14    A.    I go in the bathroom and get myself

15 together because I don't want everybody to see me

16 crying.  So then I came out and I told Tuan that I

17 just need to - CK door just slammed down on my arm.

18 And he was like, well, you have to go find Schaeffer.

19 And I was like - oh, yeah, then he told me I have to

20 go find Schaeffer.

21    Q.    Okay.

22          What happened next?

23    A.    Then I went to go look for Schaeffer and

24 then meanwhile me looking for Schaeffer, you know,

25 the inmates are coming up to me like, well, what

88

1   happened?  Are you okay?  And I'm like where's

2   Schaeffer at, trying to tell Schaeffer that I wanted

3   to leave to go to medical.  And so Ms. Anthony came

4   out from around the side and said that I'm not going

5   nowhere, that I'm always trying to lie and manipulate

6   to leave the kitchen.  And I told her I'm willing to

7   come right back.  I just need to go to medical.

8        Q.    Do you know where Ms. Anthony came from?

9        A.    She could have been in one of the

10  refrigerators in the back.

11       Q.    Do you know?

12       A.    No.  I don't actually know for sure.

13       Q.    Okay.

14             She was not in the dishwasher area when

15  you were actually injured?

16       A.    No.

17       Q.    Okay.

18             And Mr. Schaeffer wasn't in the area when

19  you were actually injured?

20       A.    No.

21       Q.    Tell me everything you can remember about

22  that conversation with Ms. Anthony.

23       A.    I remember asking her, me holding my arm.

24  I had ice.  Stasha had got me a bag of ice, and I had

25  the ice on my arm and I remember asking Ms. Anthony

89

1    can I please go to medical?  And she was like, no,

2    you're not going to medical.  We're busy in here.  So

3    I'm like I don't care.

4          I remember we got into a very heated

5    conversation because I really wanted to go to

6    medical.  And her perceptive, she just said that I

7    didn't want to come back to work.  So I'm - I'm like

8    I don't care about that, you know, my freaking arm is

9    really swollen.  And not one time did she like stop

10   to look at my arm or anything.  She just kept telling

11   me I wasn't going to medical.

12         Q.    Okay.

13               What happened after that?

14         A.    Then one of the girls came and telling

15   me, hey, Schaeffer's back here, Schaeffer's back here

16   on the back, on the gate where the employees eat at.

17   So Schaeffer was coming through the gate with Katia

18   and I asked Schaeffer - well, I told Schaeffer what

19   happened after he told me to calm down a little bit.

20   I told him what happened and he told me to go wait by

21   the back door, that he was going to send me to

22   medical.

23         Q.    Okay.

24               What happened next?

25         A.    The he gave me a pass to go to medical.

90

```
 1              THE WITNESS:   And you guys make - but
 2   I really got to go to the bathroom again.
 3                   ATTORNEY ROMANO:   That's fine.
 4                   THE WITNESS:   I'm sorry.
 5                           ---
 6   (WHEREUPON, A SHORT BREAK WAS TAKEN.)
 7                           ---
 8   BY ATTORNEY ROMANO:
 9        Q.    Back on the record.
10              You had just told me about how Mr.
11   Schaeffer gave you a pass to go to medical.  About
12   how long after the door shut on your arm were you
13   given the pass to go to medical?
14        A.    Within 30 minutes.
15        Q.    Did you go to medical?
16        A.    Yes.
17        Q.    Who did you see?
18        A.    I don't remember.
19        Q.    Do you know whether it was nurse or a
20   doctor or a physician's assistant?
21        A.    No, I don't.  I don't know their
22   different jobs.
23        Q.    Okay.
24              What, what did they do for you?
25        A.    She just felt my arm, told me I had
```

1    inflammation in my arm, gave me a icepack and told me

2    to go back to my unit that I had a lay in.

3         Q.    That you had what?

4         A.    A lay in.

5         Q.    Okay.

6               What did you tell the person in medical

7    when you got there?

8         A.    I told her that the dishwasher door just

9    came down on my forearm.  She asked me was I okay?  I

10   told her I'm okay.  If there was - wait, did she ask

11   me something?  I forget exactly what she said that

12   day.  But I know that I basically wanted to go back

13   to the kitchen with the girls and she was like no you

14   can't go back to the kitchen because you have

15   inflammation in your arm.

16        Q.    How many times were you in medical on

17   October 6th, 2015?

18        A.    Once.

19        Q.    Once?  Okay.

20        A.    Well, once that I remember.

21        Q.    Okay.

22              Just the one time after, right after the

23   injury?

24        A.    Yes.

25        Q.    Okay.

92

1              You said that you wanted to go back to

2     work.  Was this during that same, this initial visit?

3          A.    Yes.

4          Q.    Okay.

5              And you said they told you were not going

6     back to work that day?

7          A.    Yes.

8          Q.    Right?  Did they - how did that work at

9     SCI-Muncy if medical says you can't go back to work?

10    Do they write some sort of a slip that says you can

11    or when you can go back?

12         A.    I guess they e-mail it to - they call and

13    - because once we get to go down there the - once I

14    was able to go down there Schaeffer either radioed

15    the infirmary or he called the infirmary to let them

16    know that I was coming down.  So once I came down,

17    she was already waiting for me in the hallway.

18              So when I went down there I seen her, and

19    then I believe she calls Schaeffer and tells him you

20    know, what I say.

21         Q.    How long were you in medical that day?

22         A.    Less than 30 minutes.

23         Q.    You said you were given an icepack?  Were

24    you given any other, anything else?

25         A.    And I believe a Motrin or a Tylenol.

93

1       Q.    Okay.

2             So what happened after you left medical?

3       A.    I went to my housing unit and I forget

4  what CO I had there, but I know later on that day I

5  wasn't allowed to go to chow -.

6       Q.    You were or were not?

7       A.    I was not allowed?

8       Q.    Okay.

9             Why not?

10      A.    Because of my lay in.

11      Q.    So did the ice help at all?

12      A.    Right then and there, yeah.

13      Q.    What about the pain medicine you were

14  given did that help at all?

15      A.    No.

16      Q.    Okay.

17            When did you go back to work after that

18  day?

19      A.    I believe it was next day.  I don't know

20  long the lady left me a lay in for.

21      Q.    Okay.

22            Were you able to perform your regular job

23  duties when you went back to work?

24      A.    No.

25      Q.    Okay.

94

1           Tell me about that.

2      A.    I wasn't able to extend my right arm all

3  the way out.  So when the dishes came in the window

4  for me to like dump the trays, the rest of the food

5  into the trash and before I got the trays to

6  whoever's spraying, it hurt it once I grabbed the

7  tray to like bang it on the top, on the side of the

8  trash can to get the food off.  I was not.  I wasn't

9  able to do it anymore because it really hurt it, the

10  extending, the bending forward thing because to my

11  perspective it was still swollen.

12      Q.    Okay.

13           I want to make sure I'm clear on - the

14  record is clear on what you were just doing.  When

15  you were talking about shaking the trays and

16  extending your arm, you had your arm just a little

17  bit behind you and you were bending your arm at the

18  elbow and straightening it out?

19           Is that right?

20      A.    Yes, because that's how the - like the

21  window right here and the trays just fly through the

22  window.  So we have to grip the end of the tray, hit

23  it on the trash can and then slide to the person

24  who's spraying them.  You know, it's some kind of

25  routine going on so we won't get backed up, so the

95

1    window won't pack all the dishes on there.

2              So we grab one of the trays and you have

3    to like hit it against the trash can so all the food

4    can come out, hopefully one time so it won't, so you

5    can keep going.  So that repetitive bending forward

6    and the tingling sensation in my arm, I wasn't able

7    to do that.  And the long period of holding the hose

8    up, I wasn't able to do that position either.

9         Q.    I'm sorry.  The long period of holding

10   what up?

11        A.    The hose.

12        Q.    The hose.  Okay.

13              When did you get - you just said

14   something about a tingling sensation, when did that

15   start?

16        A.    Probably like three, two to three days

17   after.

18        Q.    Okay.

19              Are you right or left handed?

20        A.    I'm right handed.

21        Q.    Okay.

22              Did you have additional treatment at

23   SCI-Muncy for your arm?

24        A.    Yes.

25        Q.    Okay.

96

1          When did you go back to medical after

2     that first day?

3          A.    Sometime in November.

4          Q.    If you want to be seen by medical, what

5     do you do?

6          A.    Well, on your block you have sick call, a

7     sick call slip.  So we're initially supposed to write

8     the sick call slips out and put them in the medical

9     box.  So when the medical team come and pick them up

10    they can take them back to the infirmary.

11         Q.    Okay.

12         A.    Is that what you did to be seen in

13    November?

14         Q.    That's what I did to be seen so many

15    times.  But sometimes it's like it's a aim or miss.

16    You submit these sick calls and it's like - I don't

17    know who's in charge seeing if you get approved to

18    come to sick call or if you don't.  But sometime you

19    go the next day and you'll go to sick call or you'll

20    wait one to two days so your appointment can be

21    triaged.

22         Q.    Okay.

23              I know you're not going to remember every

24    individual visit or whatever, but can you generally

25    tell me about the treatment that you had for your arm

97

1    at SCI-Muncy?

2         A.    I have got physical therapy.  Then

3    eventually they started allowing me to go to

4    Geisinger to be seen there by a doctor.  And I went

5    to Geisinger also for physical therapy.

6         Q.    Do you know who treated you in medical at

7    SCI-Muncy?

8         A.    Dr. Freeland.

9         Q.    Do you know anyone else that you saw?

10        A.    Nurse Young and Rishel.  I think it's

11   Rishel.

12        Q.    When did you see Nurse Young?

13        A.    I don't know.  I seen her a couple times.

14        Q.    What did Nurse Young do for you?

15        A.    I don't know if she's the one who set up

16   my appointment for my x-ray or if she was the one

17   initially when I went down there.  She gave me ice

18   and Tylenol.

19        Q.    As you were having this therapy, were

20   your symptoms getting any better?

21        A.    No, ma'am.  They was getting worse.

22        Q.    Were you fully participating in therapy?

23        A.    Yes.

24        Q.    Were you doing everything they asked to

25   do?

98

1        A.    Yes.

2        Q.    When you say your symptoms got worse,

3   what do you mean?

4        A.    I started using like sensations in my

5   fingers.  My fingers would go like - if I'm writing,

6   my fingers would go like completely numb.  And just

7   like I was not able to like extend my arm all the way

8   out.  So it gets like these lightning bolts in it

9   once I like get to working it for a certain amount of

10  time.  It starts really like tightening up.

11       Q.    Did you continue to work your job in the

12  kitchen?

13       A.    Uh-huh (yes).  Yes.  I continued to work

14  all my jobs.

15       Q.    Okay.

16             Did there come a point where you stopped

17  working in the kitchen?

18       A.    I think I got fired.

19       Q.    Okay.

20             Do you know when?

21       A.    No.  I mean, like, oh, like, at least

22  two, three months, at least two months, I think,

23  after the incident.

24       Q.    Why did you get fired?

25       A.    I think I bumped Wheeler.  Me and Wheeler

99

1   was playing, and I think he for - like, it wasn't

2   like bumped.  It was like thrown at me and me,

3   Williams, and Krasheer was throwing ice at each

4   other.

5        Q.   Who fired you?

6        A.   Wheeler, I believe, fired me.

7        Q.   Were you given a misconduct -

8        A.   Yes.

9        Q.   - for the ice incident?

10       A.   Yes.

11       Q.   Who wrote the misconduct?

12       A.   I believe Wheeler.

13       Q.   Okay.

14            What happened with the misconduct?

15       A.   I think I lost the job.

16       Q.   Did you go to see the Hearing Examiner?

17       A.   Yeah.  I had to go see Mr. Stevens.

18       Q.   That was your unit manager?

19       A.   Yes.

20       Q.   Okay.

21            So it was resolved with your unit

22  manager.  You didn't go through a formal hearing?

23       A.   No.  I didn't go through a formal

24  hearing, no.

25       Q.   Okay.

1              ATTORNEY TOBIN:  Make sure you wait

2     until she's done asking the question before you start

3     your answer.

4              THE WITNESS:  Okay.

5     BY ATTORNEY ROMANO:

6         Q.    Did anyone at SCI-Muncy give you a

7     diagnosis as to what was wrong with your arm?

8         A.    No.

9         Q.    What about anyone at Geisinger?

10        A.    I forget the doctor's name.  He just said

11    frozen, he said frozen tendon.  He just said I had a

12    frozen tendon.

13        Q.    Okay.

14              When did you get released from SCI-Muncy

15    the second time?

16        A.    November 27th.

17        Q.    Of?

18        A.    2017.

19        Q.    At that point in time, what was the

20    condition of your arm?

21        A.    Still the same.

22        Q.    Did you continue treatment once you were

23    released?

24        A.    Yes.  I actually got this dynasplint from

25    - since I've been released.

101

```
 1          Q.    Okay.
 2                What did you call it?
 3          A.    A dynasplint.
 4          Q.    Dynasplint?  Okay.
 5                Who prescribed that?
 6          A.    My doctor at North Pointe Boulevard, at
 7    Geisinger.
 8          Q.    At Geisinger?
 9          A.    At North Pointe Boulevard, Dr. Griska.
10          Q.    Dr. what?
11          A.    Griska.
12          Q.    I have some - your Counsel provided some
13    records from Orthopedic Associates of Lancaster.  Is
14    that the practice?
15          A.    Yes, that's the one.
16          Q.    When did you start seeing them?
17          A.    I don't remember, after I came home.
18          Q.    Okay.
19                How frequently do you go?
20          A.    Not that much, not that much.  I mean, I
21    went a couple times, but every time that I missed my
22    appointment it's due to me working.  I take care of
23    my 72 year old grandfather.  So I did miss several of
24    my appointments.
25          Q.    Okay.
```

102

1           Have they given you a diagnosis?

2      A.    Yes.

3      Q.    What'd they tell you?

4      A.    I have oster (sic) - some kind of

5 arthritis in my elbow.

6      Q.    How long have you had the dynasplint that

7 you're wearing?

8      A.    Two months.

9      Q.    How often do you wear it?

10     A.    I wear it every day.  I work during the

11 daytime, so I usually wear it at nighttime or on my

12 days off, I wear it up to three hours.  Then I take

13 it off for 30 minutes so I can like shake my arm out

14 because it gets a little numb.  Then I put it back

15 on.

16     Q.    What sort of treatment have you had since

17 your release?

18     A.    Physical therapy, just physical therapy.

19     Q.    Okay.

20           Did you miss any of those sessions?

21     A.    Yeah, I probably did.

22     Q.    Has anyone recommended surgery?

23     A.    Dr. Griska was recommending it at first,

24 but now he said he's against it because I'm 28 years

25 old.  I'm not going to be able to lift more than five

103

1    pounds, so he's against it now.

2         Q.    Okay.

3               Other than the splint, are you currently

4    going through any other treatment?

5         A.    No.  I go back to see my doctor on the

6    3rd.

7         Q.    May 3rd?

8         A.    Yeah.

9         Q.    When you were given that splint, did they

10   give any sort of a timeframe as to how long you'd be

11   wearing it?

12        A.    Six months, but it's at your own pace,

13   though.

14        Q.    What do you mean by that?

15        A.    It's up to you to push yourself.

16   Basically she said it's actually to push yourself.

17   There's like a leverage, and there's different

18   degrees of - my arm will be at.  And the more I

19   decrease the degrees, it stretches my arm so it's

20   like to my own pace how much I can take the stretch,

21   the constant stretch.

22        Q.    Okay.

23              And when you say it changes the stretch,

24   you mean how much your arm is bent at the elbow?

25        A.    Yes.

104

1     Q.    Yes?  Okay.

2           And I see there's like a dial on the

3    outside.  Is that what you use to adjust?

4     A.    Yes.

5     Q.    Okay.

6     A.    And then I use these dials just to like

7    to push it up, to bring my brace up or down.  So I

8    will unloosen these.

9     Q.    And you say these, there are some knobs -

10    A.    Yeah.

11    Q.    - that are like down towards your wrist?

12    A.    The knobs then it would -

13    Q.    Okay.

14          You don't have to take it off.

15    A.    No.  Okay.

16    Q.    Since you were prescribed that brace,

17   what'd you say, about two months ago -

18    A.    Uh-huh (yes).

19    Q.    - have you changed the setting so that

20   your arm is more extended?

21    A.    Yes.

22    Q.    Do you know how much or how many times or

23   -?

24    A.    Well, I go above 20 degrees extending it

25   out, and then I take it back to at least 60 to try to

105

1    get it all the way bent back.  I gained - actually I

2    gained 13 degrees in my arm since I had the brace on.

3         Q.    Okay.

4               Do you have - what symptoms do you have

5    now in your arm?

6         A.    Tingling, numbness, stiffness.

7         Q.    Do those symptoms come and go or are they

8    there all the time?

9         A.    I mean, all the time.  They're there all

10   the time now, and like and now my wrist is getting

11   worse.  Like it's hard for me to hold something for a

12   certain amount of time.

13        Q.    You continue to work.

14              Correct?

15              Yes?

16        A.    Yes.

17        Q.    Has your doctor told you that you can't

18   work?

19        A.    No.  She just said take it easy.

20        Q.    Has she given you any formal

21   restrictions?

22        A.    No.

23        Q.    Okay.

24              Does your doctor know what type of work

25   you do?

106

1      A.      Yeah.  I said I do banquet.  And she just

2   said be very careful lifting them trays because

3   repetitively lifting the trays can eventually hurt my

4   arm, too.

5      Q.      Okay.

6              Who's currently paying for your medical

7   treatment?

8      A.      The government.

9      Q.      Through Medicaid?

10     A.      Yes.

11             ATTORNEY ROMANO:  Jennifer, do you

12   know is there a lien or -?

13             ATTORNEY TOBIN:  I don't know yet.

14             ATTORNEY ROMANO:  Okay.

15   BY ATTORNEY ROMANO:

16     Q.      Have you paid any bills out of pocket

17   yourself?

18     A.      No, ma'am.

19     Q.      Do you know if you have any unpaid bills?

20     A.      No, I don't know yet.

21     Q.      Okay.

22             You haven't gotten notice of any?

23     A.      No.

24     Q.      Okay.

25             Prior to October 6th, 2015, during that

107

1    second incarceration, -

2           A.    Uh-huh (yes).

3           Q.    - did you file any grievances with

4    respect to working in unsafe working conditions?

5           A.    I'm sorry.  Can you repeat the question?

6           Q.    Sure.  Between the time that you started

7    working in the central kitchen in 2015 and the day

8    you were injured, did you file any grievances

9    complaining about working in dangerous conditions or

10   unsafe conditions?

11          A.    Yes.

12          Q.    When?

13          A.    After I grieved it to - I did grieve it

14   and I spoke upon it with Lieutenant Sissly.  And I

15   grieved it and then I grieved it to Mr. Stevens.

16          Q.    When did you first file a grievance

17   about -?

18          A.    In what?

19          Q.    Let me back up.  What was the substance

20   of the grievance that you filed?

21          A.    Well, I just wrote my grievance to Mrs.

22   Shrimp and said - well, wait, that was like the later

23   one.  First I wrote it to Mr. Stevens and was just

24   saying - I explained my hand and CK's dishwasher.  I

25   hadn't been able to get an x-ray.  They didn't do

108

1    nothing.  My arm is still inflamed.

2         Q.    And you submitted that on a grievance

3    form?

4         A.    Yes.

5         Q.    Okay.

6               Do you know when?

7         A.    It had to be like less than a week after.

8         Q.    What was the procedure for filing a

9    grievance at SCI-Muncy?

10        A.    Well, the right procedure was I was

11   supposed to initially write the grievance to Mrs.

12   Shrimp.  And then once I get Mrs. Shrimp reply back,

13   write the grievance, hold her grievance and then

14   write the grievance to Mr. Smith and wait for Mr.

15   Smith's response back.  And then write the grievance

16   to Mechanicsburg with all of our - from all of our

17   responses in one envelope and send it like that.

18        Q.    Okay.

19              Where did you learn that procedure?

20        A.    I learned that procedure from an inmate.

21        Q.    Okay.

22              Is there a policy that you're aware of

23   that says that?

24        A.    I guess that's the right way it's

25   supposed to have went from the first time I ever

109

1  filed it.

2        Q.    Okay.

3              Where would you get the grievance form?

4        A.    At the desk wherever house unit your

5  officer's at, ask the officer for it.

6        Q.    Okay.

7              You talked about there being a box on the

8  unit for sick call slips.  Is there a box on the unit

9  for grievances?

10       A.    It's behind the desk.  It's behind the

11 desk where the CO sits.

12       Q.    But there is one?

13       A.    Yes.

14       Q.    You said that this was filed after your

15 injury?

16       A.    Yeah.

17       Q.    Did you file any grievances at all before

18 your injury?

19       A.    No.

20       Q.    Okay.

21       A.    I don't remember doing that.

22       Q.    Okay.

23              Prior to your injury, did you send any

24 request to staff's lists complaining about working in

25 dangerous conditions?

110

1          A.     No.

2          Q.     Okay.

3                 Were you aware of any other instances

4     where the dishwasher door closed on someone or closed

5     unexpectedly?

6          A.     Another inmate, Jamika Williams, said

7     that she pinched her hand in the dent pretty badly

8     for -.

9          Q.     I'm sorry.  So she pinched what?

10         A.     That she - excuse me - that she - that

11    she nicked her finger in the dent before cleaning it.

12    I believe she said cleaning it, but I know she nicked

13    her finger in the door.

14         Q.     When did she tell you that?

15         A.     Sometime after yard started -.

16         Q.     Before or after you were injured?

17         A.     After.  She was still in the CK after.

18         Q.     Okay.

19                Had you ever had any injuries to your

20    right arm before October of 2015?

21         A.     No.

22         Q.     Have you had any new injuries to your arm

23    since?

24         A.     No.

25         Q.     Did you ever review your medical records

111

1   at SCI-Muncy?

2          A.      Yes.

3          Q.      How would you go about doing that?

4          A.      You write a request slip to - I don't

5   know if I wrote to - was it Morrison?  I forget who I

6   write it to. I think I write it - I wrote it to Blair

7   Morrison just asking can I review my medical records

8   after Mr. Hunter told me that I was allowed -

9   permitted to go down to medical to read my own

10  records.

11         Q.      How did you know you could do that?

12         A.      Mr. Hunter told me.

13         Q.      Mr. who?

14         A.      Hunter.

15         Q.      Who's he?

16         A.      He's a CO.

17         Q.      How many times did you actually review

18  your medical records?

19         A.      At least two or three times.

20         Q.      Did you find any errors?

21         A.      Yeah, that they had a left arm x-ray on

22  my file.

23         Q.      Anything else?

24         A.      No.

25         Q.      Did you tell anyone about that error?

112

1        A.     Yeah.

2        Q.     Who?

3        A.     Blair Morrison.  She said she was already

4    aware of it.

5        Q.     How did you inform her of this?

6        A.     Well, initially, I went to - I think I

7    had got triaged, and I went down there to sick call.

8    And I think the lady's name was Ms. Paez or

9    something.  She's the one who initially brung it to

10   their attention, that there was a left arm x-ray on

11   my file and not a right arm x-ray.

12              So when I spoke to Blair Morrison about

13   it, what made me go look at my records is because

14   it's like the inflammation didn't go down, and I'm -

15   being a left arm x-ray on my file, so that's what

16   made me want to inquire about my files.

17       Q.     Okay.

18              You said something about being triaged.

19   Tell me what you meant by that.

20       A.     Where you go inside of a room and speak

21   to the doctor like one on one.  Not the doctor.  It's

22   a nurse and then I guess she said she related the

23   message to the doctor immediately when it happened.

24       Q.     Okay.

25              Ms. Dixon, the records I have indicate

113

1   that the first time you filed a grievance was on

2   December 31st, 2015.  Do you disagree with that?

3       A.    Yeah.

4       Q.    When do you think you first filed a

5   grievance?

6       A.    Like a week after the incident happened.

7   Probably not even a week.

8       Q.    You talked about getting an inmate

9   handbook.  What's in that handbook?

10      A.    Just procedures and codes, dress, how

11  we're supposed to dress.  The way you're supposed to

12  act, and I know now that the grievance procedures,

13  the chain of command, how we're supposed to initially

14  do the grievance is in there.

15      Q.    Okay.

16            And you had that handbook.  You got that

17  when you came back to SCI-Muncy in 2015?

18      A.    Yes.

19      Q.    Okay.

20            I want to show you what we will mark as

21  Exhibit 1.

22                      ---

23      (Whereupon, Deposition Exhibit 1, 12/31/15

24      Inmate Grievance, was marked for identification.)

25                      ---

114

1          ATTORNEY ROMANO: Counsel, for the

2    record, what I've done with these grievances they're

3    stapled a little out of the Bates stamp order.  I

4    tried to put them in the order that the documents

5    would have - would have proceeded through.  I think

6    they are Bates stamped in reverse order.

7          ATTORNEY TOBIN:  Okay.

8          ATTORNEY ROMANO:  Just to make it a

9    little easier to follow.

10   BY ATTORNEY ROMANO:

11        Q.   Ms. Dixon, you can take a look at that

12   and tell me if you recognize that document?

13        A.   Yes.

14        Q.   What is it?

15        A.   A grievance.

16        Q.   Did you write this?

17        A.   Yes, ma'am.

18        Q.   In it, about the eighth line down, it

19   says it's like a pinched nerve or something.  Did

20   someone tell you that you had a pinched nerve?

21        A.   My - I forget who.  I honestly don't -.

22        Q.   Okay.

23        A.   Either I just wrote it because that's how

24   it was happening at the time.  I don't know.  Yeah, I

25   honestly don't - don't remember.

115

1    Q.    Okay.

2         A little further you say I wrote Blair

3    Morrison numerous requests, and she replies back

4    write a sick call.  Who is Blair Morrison?

5         A.    I guess somebody that oversees medical,

6    the head of medical.

7         Q.    Why did you write to Blair Morrison?

8         A.    I wrote to Blair Morrison because I

9    continuously kept writing sick calls, and it's like I

10   wasn't being seen for sick calls.  And I inquired to

11   inmates about like how do I go to be seen?  And then

12   they said you have to write to Blair Morrison.  So

13   this was probably around the time I just started

14   continuously harassing Ms. Blair Morrison - well,

15   writing her.

16        Q.    Okay.

17             You said that you asked other inmates.

18   Did you ever ask your counselor or your unit manager

19   how to go about doing these things?

20        A.    Yeah.

21        Q.    Would they help you?

22        A.    It was a dead end, but -.

23        Q.    Would they tell you the procedure?

24        A.    Mr. Stevens told me - I mean, Mr. - the

25   superintendent told me to write my grievance to Mr.

116

1    Stevens.  I don't know if he didn't - I don't know if

2    it's like specific grievance you write to specific

3    standards.  Like, if it's something real - about the

4    unit maybe you write that to a unit manager.  But I

5    don't know if he understood my case of me slamming my

6    arm in this door, but his response was you got a

7    grievance, write it to Mr. Stevens.  So for so long I

8    was writing Mr. Stevens my grievances.  So that's -

9    they would come back unanswered or they would just

10   come back.

11        Q.    What would do with those grievances after

12   you wrote them?

13        A.    Keep them.  Some of them I would keep

14   them.

15        Q.    No.  After you wrote them, what would you

16   do with them?

17        A.    I would - you mean so - to get to the

18   person who I wanted to get to?

19        Q.    You said you sent them to Stevens.  You

20   wrote them and after you wrote it out what would you

21   do with the paper?

22        A.    Oh, put them in Stevens' box.

23        Q.    Okay.

24              And then what would happen after that?

25        A.    And then days later I would get my paper

117

1   back folded up with Stevens' signature on it with no

2   next step on it or no reply back on it.

3         Q.    Did you ever ask Stevens about it?

4         A.    I mean, eventually, I asked him about it.

5         Q.    What did he say?

6         A.    They say little things like maybe you're

7   not doing it right, or give me your arm, I'll fix it

8   for you or you know, so it's a lot of playing.  It's

9   a lot of playing.  Maybe they were just trying to

10  make it and lighten the pain that I was going

11  through, make a joke about it, but -.

12        Q.    Okay.

13              I don't want you to speculate as to what

14  people were thinking or what they were doing.

15        A.    Yeah.

16        Q.    Did you ever specifically say to Mr.

17  Stevens, you know, I've written you these grievances

18  you know, you're not answering them or what are you

19  doing with them?  Did you ever specifically ask him

20  about it?

21        A.    Yes.

22        Q.    And what did he say?

23        A.    What grievance?  I don't know what you're

24  talking about.  Or he will say give me your arm and

25  I'll fix it for you.

118

1          Q.     You said something about a conversation

2     with the superintendent.

3          A.     Uh-huh (yes).

4          Q.     Who was that?

5          A.     Superintendent Smith.

6          Q.     When did you have a conversation with

7     him?

8          A.     I had a conversation with Superintendent

9     Smith about the kitchen door before my incident

10    happened, but it was just like a, you all fixing

11    everything else around here, come fix the door.   So

12    his reply back was the door is going to get fixed,

13    but later - and it's probably months later when the

14    incident happened, I also brung it to his - I started

15    writing him.

16         Q.     How do you know the dishwasher door was

17    broken?

18         A.     I mean, because you could just really

19    look at it and say, hey, the dishwasher door is

20    broke.

21         Q.     In what sense?

22         A.     The door is dented so we have to get a

23    screwdriver to fix the door.

24         Q.     Okay.

25                So that you're considering the dent is

1    that's what broken about it?  It's dented?

2        A.    Yeah, that dent.  That dent is a big

3    thing because that causes you not to be able to lift

4    it up or not to be able to close it all the way down

5    because if you close it all the way down, it gets

6    jammed to make us have to go get the screwdriver to

7    uncork it, so -.

8        Q.    That dent didn't contribute to your

9    injury though?

10            Correct.

11       A.    I'd say that dent contributes to my

12   injury only because if the door wasn't lopsided - if

13   the door wasn't broke - I cleaned the first

14   dishwasher out, the bucket, it was fine.  I went to

15   go clean the second bucket out and I don't know what

16   went wrong because the second - my opinion of where

17   it went wrong is because the door - once the door

18   gets all the way up it's un-sturdy.  It's leaning.

19   There's nothing like to initially catch the latch to

20   hold the door all the up.  As in the first one the

21   latch is - you could see the latch come out and it

22   hang onto the door.

23       Q.    What do you mean the first one?

24       A.    The first door on the dishwasher.

25       Q.    Do the doors open in the same way?

1          A.     The doors open exactly the same way on

2     the dishwasher.

3          Q.     You don't know what caused the door to

4     close on October 6th, 2015.

5                 Right?

6          A.     No.  I won't say I know for sure, like,

7     hey, it was the door that did it.

8          Q.     Okay.

9                 You said something about Superintendent

10    Smith telling you to submit a grievance to Mr.

11    Stevens.  Tell me about that conversation.

12         A.     I told Superintendent Smith that I'm not

13    getting nowhere with Blair Morrison, that I keep

14    writing her and she keeps telling me to write a sick

15    call.  And he said just to write the grievance and

16    then submit it to Mr. Stevens.

17         Q.     Okay.

18                So you were complaining about not being

19    seen in medical.

20                Right?

21         A.     Uh-huh (yes).

22         Q.     Yes?

23         A.     Yes.

24         Q.     Did you ever write a grievance

25    complaining about the dishwasher door is broken?

121

1      A.      Yes.  I mean, I didn't write it on a

2   grievance.  I wrote it on a Request Slip.

3      Q.      To who?

4      A.      To Superintendent Smith.

5      Q.      When was that?

6      A.      Probably sometime in November.

7      Q.      Okay.

8              If you turn to the second page of that

9   exhibit, have you ever seen this document before?

10     A.      I seen it once.  I got it back from

11   Mechanicsburg.

12              ATTORNEY TOBIN:  Just to ask a

13   clarifying question, this particular document you got

14   back from Mechanicsburg?  I just want to make sure

15   you understand -

16              THE WITNESS:  Yes.

17              ATTORNEY TOBIN:  - the date.

18              THE WITNESS:  Yes.  I didn't - I

19   didn't receive it no other - none of my grievances I

20   ever received it, but I initially seen this last

21   grievance - it was around the last time I did a

22   grievance all the way to Mechanicsburg.  And

23   Mechanicsburg wrote me back because they said I did

24   not put the other, Mr. Superintendent Smith's paper,

25   in their response, my response and Mrs. Shrimp's

122

1    response.

2    <u>BY ATTORNEY ROMANO:</u>

3         Q.    Okay.

4               Maybe I can help.

5               Turn to the last page.  Is that the

6    document you're referring to for Mechanicsburg?

7         A.    Yes.

8         Q.    Okay.

9               So I want to go back to that second page,

10   the middle page and that's signed by Ms. Shrimp at

11   the bottom.

12              Correct?

13        A.    Yes.

14        Q.    And has a date of January 6th, 2016.

15              Correct?

16        A.    Yes.

17        Q.    Okay.

18              And in the - it says the grievance is

19   rejected and then there's one reason checked off.

20              Correct?

21        A.    Yes.

22        Q.    And that's number two?

23        A.    Yes.

24        Q.    Okay.

25              That says the grievance was not submitted

123

1    within 15 working days after the events upon which

2    claims are based, need dates event happened.  Did I r

3    read that right?

4         A.    Yes.

5         Q.    Okay.

6               What - can you read what was written

7    under response at the bottom?

8         A.    Please advise the date the incident (sic)

9    happened and the date that you placed sick calls.

10   This information is needed in order to investigate

11   this grievance.  Thank you.

12        Q.    Did you ever resubmit the grievance with

13   that information?

14        A.    I probably didn't do it, per se, as they

15   told me to do it within here, because I never

16   received this paper.  But I know I started writing my

17   sick calls and my request slips, and then like the

18   duration of the time of me continuously doing it,

19   they became agitated and probably disrespectful to

20   somebody else reading them, but I did this.  But I

21   never received this one marked January 6th, 2016.

22        Q.    I'm sorry.  I didn't catch what you just

23   said.  Can you go back?  You were saying something

24   being disrespectful and I didn't catch that.  Could

25   you say it again?

124

1          A.     I said I - after the incident happened

2     and I continued to try to seek help from Blair

3     Morrison and Lieutenant Sissly and everybody, I just

4     keep getting doors closed on me.  My grievances and

5     my request slips and my sick calls, they started

6     becoming agitated.  Like I just was my freaking arm

7     hurts thanks to SCI-Muncy.  You guys don't care about

8     me.  My arm's stuck in this position.  You're not

9     helping me.

10          So I don't know if that was the reason

11     why like some of my request slips didn't come back to

12     me and just like -.  But I was writing request slips

13     and sick call.  I had sick call.  But I did not know

14     the right procedure to do my grievance the first

15     couple of times I did it.

16          Q.     That procedure is written in the

17     handbook.

18          Correct?

19          A.     Absolutely.

20          Q.     Okay.

21          A.     Would you like your paper back?

22          Q.     No.  You can keep that over there.

23          A.     Okay.

24          Q.     I'm going to show you what we will mark

25     as Exhibit 2.  Ms. Dixon do you recognize this

125

1    document?

2                              ---

3         (Whereupon, Deposition Exhibit 2, 6/1/16 Inmate

4         Grievance, was marked for identification.)

5                              ---

6                    THE WITNESS:  Yes, ma'am.

7    BY ATTORNEY ROMANO:

8         Q.    Okay.

9               This is a grievance form?

10        A.    Yes, ma'am.

11        Q.    And it's dated June 1st, 2016?

12        A.    Yes.

13        Q.    Is this your handwriting?  Did you write

14   this grievance?

15        A.    Yes.

16        Q.    Okay.

17              I want to refer you to the second page.

18   And it looks like you might be missing the second

19   page.  Did I give you that one?

20                    ATTORNEY TOBIN:  It's number 628499.

21   BY ATTORNEY ROMANO:

22        Q.    There it is.  Staple that for - I'm

23   sorry.  Go to the third page.  It looks like yours

24   got stapled out of order.  And the third page is Bate

25   stamped DEF DOC253.  Is that your handwriting as

126

1    well?

2           A.    Yes, ma'am.

3           Q.    Okay.

4                 Now, I want to refer you about halfway

5    down.  It says I've been to sick call at least 12

6    times do you see that?

7           A.    Yeah.

8           Q.    About the ninth line down.

9           A.    Yes.

10          Q.    Is that accurate, that you'd been seen

11   about that many times?

12          A.    Yeah.  Yes.

13          Q.    Okay.

14                If you can turn to the next page - and

15   I'm not sure what that page is - yes, the one that

16   has the Bates stamp DEF 252 at the bottom.

17                This is a - it looks like a memo from Ms.

18   Shrimp.  Have you ever seen this before?

19          A.    I don't remember.

20          Q.    Okay.

21                It says the attached appeal is being

22   returned to you with no further action.  You cannot

23   appeal a grievance until you have received the

24   initial grievance response.  Once you receive that

25   response, you then can appeal to the Superintendent.

127

1   The grievance for this grievance is not due until

2   6/24/16.  Did I read that correctly?

3        A.    Yeah.

4        Q.    Okay.

5              Bear with me one minute.  I've got a lot

6   of these, but I'm not going to go through them all

7   with you.

8              These grievances that you submitted, did

9   you write them yourself?

10       A.    Yes, ma'am.

11       Q.    You were able to continue to hand write

12  things in spite the condition of your arm?

13       A.    At first it wasn't so bad.  It'd just get

14  a little - it's got its moments.

15       Q.    Just what?

16       A.    I say it just has its moments.  Like

17  sometimes I'm writing it out and then sometimes the

18  handwriting would just be a little extra.

19       Q.    At SCI-Muncy, can you get pain medicine

20  off of Commissary, Tylenol or -

21       A.    Yes.

22       Q.    - ibuprofen?  Okay.

23             I'm not going to go through all these

24  grievances.

25             You mentioned that - how did you finally

128

1  learn the correct procedure for how to submit a

2  grievance?

3       A.    An inmate, her name's Angela Waldren, but

4  there's another it was - I was in M Unit at the time.

5  Living on M Unit and there was a inmate her name was

6  Angela Waldren and there was another lifer, but I

7  forget her name.

8             ATTORNEY ROMANO:  Jennifer, do you

9  have those Requests to Staff slips that you -?

10             ATTORNEY TOBIN:  Yeah.

11             ATTORNEY ROMANO:  The originals?

12             ATTORNEY TOBIN:  I do.

13  BY ATTORNEY ROMANO:

14       Q.    Are you ready, Ms. Dixon?

15       A.    Yes, I am.

16       Q.    Okay.

17       You mentioned writing some request slips

18  to Ms. Blair Morrison.  Do you know what her actual

19  job is?

20       A.    No.

21       Q.    Okay.

22       Do you know what - or strike that.

23       Did Ms. Blair Morrison respond to your

24  request slips?

25       A.    Some of them, yes, she did.  She just

129

1   would say put in to sick call?

2         Q.    Would you do that?  Would you put in to

3   sick call?

4         A.    Yes.

5         Q.    Okay.

6               And what would happen?

7         A.    Sometimes I would get seen.  Sometimes I

8   wouldn't get seen.  There were a lot of times I

9   wouldn't get seen, but I'd just keep writing her and

10  she would just keep saying put in sick calls.  Put in

11  a sick call.

12        Q.    Did you ever personally speak with Ms.

13  Blair Morrison?

14        A.    Yes.

15        Q.    You did?  When?

16        A.    She was coming from the infirmary and we

17  was on our way to lunch.  It was the first time - she

18  was on her way to lunch.  And she was walking.  She

19  had heels on, walking in the side of, the side we're

20  not allowed to walk on.  And I was like, hey, Ms.

21  Blair Morrison, my name is Denise Dixon.  I've been

22  writing you about my, about my forearm, not being

23  able to extend all the way out.  And she was like,

24  yeah, I'm well aware of that.  You need to write a

25  sick call.

130

1      Q.    Do you know about when that was?

2      A.    No.

3      Q.    Okay.

4            When you would your Request to Staff

5      slips, what would you do with it after you wrote it?

6      Where would you put it?

7      A.    There's a brown box on the wall that's

8      for the unit manager, the counselor and outside mail,

9      mail that's going - leaving the jail and

10     institutional mail.

11     Q.    Okay.

12           I'm going to show you what we'll mark as

13     Exhibit 3, is it?

14                           ---

15     (Whereupon, Deposition Exhibit 3, 1/7/16 Request

16        to Staff Member, was marked for identification.)

17                           ---

18                 ATTORNEY TOBIN:  Are we done with this

19     grievance?

20                 ATTORNEY ROMANO:  Yes.

21                 ATTORNEY TOBIN:  Thank you.

22     BY ATTORNEY ROMANO:

23     Q.    Ms. Dixon, do you recognize that

24     document?  And I'll give you - your counsel has

25     brought the original copies with you.  I can give you

131

1      the original if it's easier for you to read.

2           A.    Yeah.   Thank you.

3           Q.    Do you recognize that?

4           A.    Yes.

5           Q.    What is it?

6           A.    A request to staff.

7           Q.    Did you write this?

8           A.    Yes.

9           Q.    Okay.

10                And this is addressed to Nurse Rowe.   It

11     says head nurse.   Why did you write to Ms. Rowe?

12          A.    Actually, Ms. Rowe is in the medical or

13     in the infirmary.

14          Q.    And this is dated January 7th, 2016?

15          A.    Yes.

16          Q.    Okay.

17                And reading on the fourth line down, you

18     say I have been giving pain reliever and muscle

19     relaxers?

20          A.    Yes.

21          Q.    Is that accurate?

22          A.    Yes.

23          Q.    Okay.

24                And about five or six lines down more, it

25     says they gave me ibuprofen to relieve inflammation?

132

1         A.    Yes.

2         Q.    Okay.

3               And that's accurate?  You were given pain

4    relievers and Ibuprofen and muscle relaxers?

5         A.    Yes.

6         Q.    Okay.

7               It looks like - the response, it looks

8    like it was stamped.  It says this is an issue for

9    P.A. or M.D.  Please sign up for sick call.  Is that

10   accurate?

11        A.    Yeah.

12        Q.    Okay.

13              Did you take that advice and sign up for

14   sick call to see a P.A. or a doctor?

15        A.    Yes.

16        Q.    Okay.

17              Do you know what a P.A. is?

18        A.    Physician's Assistant.

19        Q.    Okay.

20        A.    You said that you weren't being seen by

21   medical.  Did you direct any request slips to

22   physician's assistants or doctors?

23        A.    Dr. Freeland.  I wrote a lot of request

24   slips to Dr. Freeland.

25        Q.    Okay.

133

1          I will let Dr. Freeland's counsel ask the

2     questions about that.

3          I didn't bring a copy of this.  Like I'm

4     just like - I think the copy couldn't be read, so I'm

5     going to just show you the original, but we can ask

6     about it.  We're not going to mark it.

7          So this is a Request to Staff slip.  It's

8     addressed to Mr. Frantz dated January 19th of 2016,

9     and there's writing on the front and back.  Ms.

10    Dixon, do you recognize that document?

11         A.    Yes.

12         Q.    Did you write that document?

13         A.    Yes.

14         Q.    Okay.

15         I was going to say how many lines down,

16    but mine is the typewritten version.  If you don't

17    mind me coming over here for one second - where is

18    it?  So I'm looking on here for one - about the sixth

19    line down.  It says I've been to sick call more than

20    six times regarding my arm.

21         A.    Uh-huh (yes).  Yes.

22         Q.    Is that right?  Is that accurate, that

23    you'd been to sick call at least six times by

24    January?

25         A.    Yeah.

134

1          Q.    Okay.

2          A.    Right there, six or more.

3          Q.    Okay.

4                What would they do for you when you went

5     to sick call?

6          A.    They looked at my arm and say, well,

7     we're already giving you - we're already giving you

8     Tylenol.  We'll schedule you in so Dr. Freeland can

9     see you.  You already got physical therapy.  What

10    else do you want next?

11         Q.    What else?  What did you want them to do

12    for you?

13         A.    Have me bend my arm straight.

14         Q.    All right.

15               ATTORNEY TOBIN:  Was that - was this

16    one - Karen, was this going to be Exhibit 4?

17               ATTORNEY ROMANO:  No, that was - I

18    didn't mark the last one because we don't have a copy

19    of it that you can read.

20               ATTORNEY TOBIN:  Okay.

21               You can put that one back in the stack

22    it was not -.

23               ATTORNEY ROMANO:  I think that was

24    three because that was the January 7th, `16 Request

25    to Staff.

135

1          ATTORNEY TOBIN:  Right.

2          ATTORNEY ROMANO:  So that was Exhibit

3   3.  I did not mark the one I just showed her, which

4   was the January 19th, 2016 to Mr. Frantz because the

5   copy can't be read.  It's the one that you

6   transcribed so -.

7          ATTORNEY TOBIN:  We'll just the

8   original?

9          ATTORNEY ROMANO: We'll just keep the

10   original in case we need it.

11   BY ATTORNEY ROMANO:

12       Q.    I'm going to show you another original

13   because the copy can't be read.  This is a January -

14   it's dated January 19th, 2016, a Request to Staff

15   slip and it's addressed to Mr. Smith?  Do you

16   recognize that document?

17       A.    Uh-huh (yes).  Yes.

18       Q.    Did you write that document?

19       A.    Yes.

20       Q.    Okay.

21             Do you mind if I come over there so I

22   can -

23       A.    No.

24       Q.    - show what I want to ask you about?

25             Okay.

136

1          So about halfway down it says since

2    October I wrote Blair Morrison, been to sick call

3    more than six times.  My family called you and Deputy

4    McKinley before he left.  Who is Deputy McKinley?

5          A.    I don't know.  Could you show me where

6    it's at?

7          Q.    Sure.

8          A.    If I could see the name -.

9          Q.    Starting right here.

10          A.    Uh-huh (yes).

11          Q.    And I went down those three lines.

12          A.    I don't know.  That's somebody I must

13    have talked to.  I don't even - officer - again, I

14    don't know.

15          Q.    Do you know who in your family talked to

16    Deputy McKinley?

17          A.    My aunt.

18          Q.    What's your aunt's name?

19          A.    Shakia Baer.

20          Q.    Do you know what she spoke to him - is

21    Deputy McKinley a man or a woman?

22          A.    I don't know.

23          Q.    Do you know what your aunt spoke to

24    Deputy McKinley about?

25          A.    When I was waiting - well, probably my

137

1    aunt - I had my aunt calling up here and my dad and

2    my mom calling up here.  So they was just calling to

3    see like what happened to my arm since I've been

4    incarcerated?  And why, to my understanding, am I not

5    seeking their medical attention.  And then there was

6    some, some people that talked to my family and told

7    them like I am seeking medical attention, but I'm

8    just probably not seeking everything that I want to

9    seek.  Like, you know, they're giving me Tylenol, ice

10   and stuff, but -.

11        Q.    So am I correct that you were getting

12   medical treatment, but you disagreed with the

13   treatment you were getting?

14        A.    I was getting Tylenol.  There was some

15   - I was getting Tylenol, but once I ran out of

16   Tylenol, they would just say like buy it on

17   Commissary.  And that was okay because I was getting

18   money while incarcerated, but what I was trying to

19   say to them is the Tylenol that they have on

20   Commissary, after a while it starts making me

21   nauseous and I kept vomiting and stuff.

22             So it wasn't working.  So that's why I

23   wrote Dr. Freeland and said like, I don't have a

24   problem with purchasing money off Commissary, but

25   it's actually hurting the lining of my stomach.  So

138

1    after I took - I was taking at least six or seven

2    Tylenols a day.  So after a while, the same thing

3    started hurting my stomach.  So that's why they start

4    giving me like Naproxen and different pain

5    medication.

6         Q.    Did you ever put in a sick call request

7    slip with respect to the vomiting or the stomach

8    issues?

9         A.    Being nauseous?

10         Q.    Yes.

11         A.    Yes.  I had wrote it somewhere that my

12    medication, the same Tylenol, is making me nauseous.

13         Q.    Okay.

14         Were you seen in medical for that?

15         A.    Uh-huh (yes).

16         Q.    Okay.  Yes?

17         A.    Yeah, I think they gave me Naproxen.

18         Q.    Okay.

19         And I'm going to read these last lines.

20    It says I got describes (sic) pain relievers,

21    Ibuprofen, muscle relaxers in November.  Did I read

22    that right?

23         A.    Uh-huh (yes).

24         Q.    Yes?

25         A.    Yes.

139

1       Q.    Okay.

2           And that's all accurate?  You were

3  prescribed those sort of treatment in November?

4       A.    Uh-huh (yes).

5       Q.    Okay.

6           And the response says you may use sick

7  call if you are in acute pain and need medical care,

8  or need medical care.

9           Correct?

10      A.    Uh-huh (yes).

11      Q.    Yes?

12      A.    Yes.

13      Q.    Okay.

14          So why - so I didn't ask you, but what

15  was written to Mr. Frantz.  Who's Mr. Frantz?

16      A.    Deputy Frantz.

17      Q.    Why did you write to him?

18      A.    Because I used to always like run into

19  him and tell him like, my arm hurt.  So either one of

20  the nurses said this to me, and it's pretty true.

21  And he was assisting me and he would help me like get

22  to go see Blair Morrison or he would help me receive

23  ice after PT.

24      Q.    Did you ever meet with Mr. Frantz?  Would

25  he talk to you about or explain what medical was

140

1    saying to you?

2           A.    Yes.

3           Q.    Okay.

4                 What did he tell you?

5           A.    He told me that medical says that my

6    physical therapy - and Blair Morrison and Dr.

7    Freeland had sat down and they feel that I'm not

8    putting my all into physical therapy.  That once they

9    get to a certain angle, that I'm not allowing them to

10   get past it.  He also said - he told me when - I

11   think at first they wasn't letting me go see a

12   doctor, outside doctor.  And then Frantz I brought it

13   to Frantz's attention, and then when I seen him again

14   he told me like, you're approved to go see a outside

15   doctor.  You just have to wait.  I can't tell you

16   when it is.

17          Q.    Okay.

18                Did there come a point where you had a

19   meeting with the people from medical about your care?

20          A.    Yes.

21          Q.    Who did you meet with?

22          A.    Blair Morrison, Dr. Freeland, Chris,

23   Chris from physical therapy, physical therapist and

24   there was one more person, I believe, in the room.

25          Q.    And what was the - what was discussed in

1   that meeting?

2        A.    Basically where I'm at as in like

3   physical therapy or why am I so guarded.  And I think

4   she told me that I was going to go out and see an

5   outside doctor that day.

6        Q.    Okay.

7              Did any doctor ever tell you that you had

8   rheumatoid arthritis?

9        A.    My doctor at Geisinger, my doctor at

10  Geisinger did, but Dr. Freeland didn't think I did.

11       Q.    Okay.

12             Has your current doctor ever given you an

13  opinion about that?

14       A.    Dr. Griska says I don't.

15       Q.    Okay.

16       A.    I have arthritis, but not that rheumatoid

17  arthritis.

18       Q.    Okay.

19             ATTORNEY ROMANO:  Jen, could just put

20  this back?  Thank you.

21  BY ATTORNEY ROMANO:

22       Q.    I want to talk a little bit about the

23  specific people that you sued, my specific clients

24  here.  Let me do this first.

25             Let me show you what we will mark as

142

```
1    Exhibit 4.
2              Do you recognize this document?
3                        ---
4         (Whereupon, Deposition Exhibit 4, 9/16/15
5         Request to Staff Member, was marked for
6         identification.)
7                        ---
8              THE WITNESS:  Yes.
9    BY ATTORNEY ROMANO:
10        Q.    What is it?
11        A.    A Request to Staff.
12        Q.    Is this your handwriting?
13        A.    Yes.
14        Q.    Okay.
15              And this Request to Staff was dated
16   September 6th, of 2015?
17        A.    Yes.
18        Q.    And it's to a Mrs. Byrant?
19        A.    Yes.
20        Q.    Who's Mrs. Bryant?
21        A.    The employment lady.
22        Q.    Okay.
23              And its subject is I would like to work
24   in the kitchen.
25              Correct.
```

143

1              A.     Yes.

2              Q.     Is this when you requested to go back to

3      work in the kitchen?

4              A.     Yes.

5              Q.     Yes?  Okay.

6                     Do you know how long after this it was

7      that you actually started working there?

8              A.     Probably like less than a week.

9              Q.     Okay.

10                    Were you ever placed on refused work

11     status for failing to show up to work in the kitchen?

12             A.     I don't believe so.

13             Q.     Okay.

14                    The document I have that indicates when

15     you were you suspended from your job in the kitchen

16     says it was November 24th of 2015.  Does that sound

17     about right, when you got fired?

18             A.     Did it say why I got fired?

19             Q.     I'll show you this, but at the moment I'm

20     just asking does that date sound accurate?

21             A.     I don't know.

22             Q.     Okay.

23                    I don't have a copy of it with me, but

24     you're welcome to see the form.  So does that date

25     sound about right to you?

144

1          A.      Yeah.

2          Q.      Okay.

3                  Did you have any other jobs at SCI-Muncy

4     after you got fired from the kitchen?

5          A.      Yeah.

6          Q.      Where?

7          A.      Plumbing, laundry, detail unit.

8          Q.      Did you ever work in maintenance?

9          A.      That's plumbing.

10          Q.      Okay.

11                  Did you request that job?

12          A.      Yes.

13          Q.      Did you ever get fired from any other

14     jobs at SCI-Muncy?

15          A.      Yeah.

16          Q.      Like what?

17          A.      Laundry.

18          Q.      Why did you get fired from laundry?

19          A.      For passing cigarettes to the Blues.

20          Q.      Okay.

21                  Any other jobs you got fired from at SCI-

22     Muncy?

23          A.      No, I don't think so.  The other one I

24     think I lost because I went RHU.

25          Q.      Why did you go to the RHU?

145

```
 1          A.    Different reasons.

 2          Q.    Okay.

 3                As a result of misconduct?

 4          A.    Uh-huh (yes).

 5          Q.    Yes?

 6          A.    Yeah.

 7          Q.    Just for the record.

 8                Did you ever file an appeal of a

 9    misconduct ruling?

10          A.    Yeah.

11          Q.    How do you know the procedure to do that?

12          A.    Daneisha Poole, some girl housed in RHU.

13          Q.    That's in the handbook as well, isn't it?

14          A.    I don't know.  I never read it in the

15    handbook.

16          Q.    All right.

17                I want to ask you about the specific

18    people you sued.  Let's start with Superintendent

19    Smith.  You said that you had some conversations with

20    him complaining about the dishwasher.

21          A.    Yes.

22          Q.    What specifically did you tell him?

23          A.    I told him that the dishwasher door is

24    broken, that we had to lift the dishwasher door up

25    with a screwdriver.  Then months later I wrote one to
```

146

1   tell him how I keep writing sick calls to Blair

2   Morrison and request slips to Blair Morrison and Dr.

3   Freeland, and I'm not getting no help, how they're

4   not calling me to come see them.

5       Q.    When was it that you told him the

6   dishwasher door was broken?

7       A.    I know it was like a month or two months

8   before the incident.

9       Q.    Okay.

10          Well, we just discovered you don't go to

11  work again in the kitchen until sometime in

12  September.

13      A.    Uh-huh (yes).

14      Q.    Right?  And you were injured in the

15  beginning of October.  Was it in that month that you

16  told Superintendent Smith?

17      A.    Yeah, but I also told you I talked to him

18  before about the door?

19      Q.    Before when?

20      A.    Before the incident happened with the

21  door.

22      Q.    Okay.

23          Why were you talking to him about that?

24      A.    Because we just would also stop and just

25  talk because he would just talk and there'd be like

147

1   20 inmates and everybody just talking to him about

2   anything that come to mind.

3          Q.    Okay.

4                And when you're saying that the

5   dishwasher door was broken you're talking about that

6   dent you told us about.

7                Right?

8          A.    Yeah.

9          Q.    All right.

10         A.    I think the hose wasn't working around

11   that time pacifically, and we was like all irritated

12   about that week, and we wanted Wheeler to send

13   somebody up to the kitchen to fix the dishwasher -

14   the sprayer.  So we was basically trying to tell

15   Superintendent Smith hopefully that would tell

16   somebody to come fix the sprayer for us.

17         Q.    So when you were complaining the

18   dishwasher was broken, you weren't complaining the

19   dishwasher - the sprayer was broken?  Yes?

20         A.    Uh-huh (yes).

21         Q.    Is that correct?

22         A.    Yeah, about the dishwasher door and the

23   sprayer.

24         Q.    Did you specifically mention the door to

25   him?

148

1      A.     Yeah, I mentioned the door to him too.

2      Q.     What did he say?

3      A.     He said okay.  It was like his words.  I

4   believe he said either somebody is going to come look

5   at or he already knows about, about it.  But I

6   believe he said somebody is going to come look at it.

7      Q.     Did you ever file a grievance about

8   Superintendent Smith?

9      A.     No, I don't think I did.

10      Q.     Let's talk about Deputy Frantz.  Did you

11   ever speak to Deputy Frantz about problems with the

12   dishwasher?

13      A.     After - after the situation happened, but

14   not before.

15      Q.     Your complaint alleges that he had

16   knowledge of the problems with the dishwasher.  What

17   is that based on?  Do you have any firsthand

18   knowledge that he knew there were problems with the

19   dishwasher before you were injured?

20      A.     Yeah, because they be in there, him,

21   Deputy McKee, Nicholas.  They come to the kitchen

22   with safety guy.

23      Q.     Who's the safety guy?

24      A.     Minnig.  I think his name's Minnig.

25      Q.     What would they do when they came to the

149

1    kitchen?

2         A.    Just inspect the kitchen, just walk

3    around, talk to the inmate, talk to the staff.

4         Q.    Did you ever hear someone tell them that

5    the dishwasher door was broken?

6         A.    I don't know, but I remember having a -

7    no, I didn't hear nobody tell him that day, but I

8    remember having conversations with Frantz regarding

9    the dishwasher door.

10         Q.    But you said that was after you were

11    injured?

12         A.    Yes.

13         Q.    Okay.

14              Did you ever file a grievance about

15    Deputy Frantz?

16         A.    No.

17         Q.    Let's talk about Ms. Nicholas.  Who is

18    Ms. Nicholas?

19         A.    I don't even know.  I don't know who she

20    is.  I only know that she comes for the -.

21         Q.    Do you know why you sued her?

22         A.    Yeah.

23         Q.    Why?

24         A.    Because she's - I felt like she was

25    supposed to help oversee the DOC, also the safety of

```
                                                              150
 1   the kitchen.

 2        Q.    Do you know what her job was?

 3        A.    I don't know all the job - like her job

 4   specifically.

 5        Q.    Do you know what her title was?

 6        A.    No.

 7        Q.    Did you ever file a grievance about Ms.

 8   Nicholas?

 9        A.    No.

10        Q.    Did you ever speak to Ms. Nicholas?

11        A.    No.

12        Q.    Does Ms. Nicholas work in the kitchen?

13        A.    No.  She don't work in the kitchen.

14        Q.    Deputy Frantz, does he work in the

15   kitchen?

16        A.    No.

17        Q.    Superintendent Smith, did he work in the

18   kitchen?

19        A.    No.

20        Q.    None of them were you supervisors?

21              Correct?

22        A.    In the kitchen, no.

23        Q.    So how about Mr. Lowe?  Who's Mr. Lowe?

24        A.    He's head of louse.

25        Q.    Louse?  How do you spell it?  Do you
```

1   know?

2        A.    I don't know how to spell it.

3        Q.    You sued a gentleman by the name of Gary

4   Lowe, L-O-W-E.  Do you know who he is?

5        A.    The guy - is it the big guy SCI CK

6   kitchen?

7        Q.    I've asked.  I don't know.  Do you know

8   who Gary Lowe is that you sued?

9        A.    I do know there's like three different

10  Lowes that work in the kitchen.

11       Q.    Okay.

12             You're the one who named - you filed your

13  lawsuit and name these defendants.  Do you know why

14  you sued this gentleman?

15       A.    Specifically, I don't know who he is.  I

16  would have to like - no.

17       Q.    Okay.

18             You said there's multiple Lowes in the

19  kitchen.  Tell me who they are and what they do.

20       A.    There's Mr. Lowe, Lau or Lowes.  Okay,

21  Lowes.  He - I just know he has a big desk all the

22  way in the back in the kitchen.  They say he's like

23  the big guy in the kitchen.  Then there's Ms. Lowe,

24  Ms. Lowe, she's in the back.  She only works in the

25  back.  And then a black guy, Mr. Lowe.

152

1      Q.     What race are the other two you

2  mentioned?

3      A.     One's black.  Two is black and one's

4  white.

5      Q.     Okay.

6             The first that you said and he sits at

7  the big desk in the back, is he black or white?

8      A.     He's white.

9      Q.     Okay.

10            And then you said Ms. Lowe.  There's a

11  woman?

12     A.     Yes.

13     Q.     Okay.

14            Is she black or white?

15     A.     She's black.

16     Q.     Okay.

17            And then you said there's a black guy,

18  Lowe; okay.  What's his position, do you know?

19     A.     Blue shirt.

20     Q.     He's a blue shirt?  Okay.  Does he work

21  in the kitchen?

22     A.     Yes.

23     Q.     Were any of these individuals your

24  supervisor in the kitchen?

25     A.     Mr. Louse - Mr. Lowe was.  The big guy in

153

1    the back was.

2          Q.    Okay.

3                You didn't mention him before when we

4    talked about your supervisors?  What was his role?

5          A.    He never came out and communicated with

6    us so I don't know who he is, but they said he's the

7    guy in charge of the kitchen, like Wheeler and them

8    have to answer to him.

9          Q.    Okay.

10               Did you ever have a discussion with him

11   about the dishwasher door?

12         A.    No, not about the door, per se.

13         Q.    Did you ever file a grievance against Mr.

14   Lowe?  And when I say him, I'm talking about the guy,

15   you said the big guy at the desk in the back.  Did

16   you ever file a grievance about him?

17         A.    No.

18         Q.    Tell us about Mr. Minnig, M-I-N-N-I-G.

19   Who is he?

20         A.    Minnig is - I guess I learned now that he

21   is the safety guy for SCI-Muncy.

22         Q.    Did you know who he was when you were

23   there?

24         A.    I know what he had to be safe - that he

25   would - it was his position because I only seen him

154

1    ever in like the chow hall, like by the steps or on

2    the walkway with like the different COs.

3          Q.    Okay.

4                Was he your supervisor in any way?

5          A.    No.  I don't believe he was.

6          Q.    Did you ever speak to him about the

7    dishwasher?

8          A.    Yes.

9          Q.    When?

10          A.    I talked to him before my incident.  He

11   came to fix the nozzle in the spray.  Him and

12   Detweiler's crew, a maintenance crew and I had spoke

13   - well, he was there with Detweiler's crew.

14   Detweiler really fixed the door, but Minnig was

15   there.  And I said Detweiler why you don't fix the

16   middle door?  And he said CK didn't put an order in

17   for me to fix it.

18                ATTORNEY TOBIN:  Could I just, for

19   clarification, ask a question?  You just said right

20   then Detweiler fixed the door.  Is that what you

21   meant?

22                THE WITNESS:  No.  Detweiler didn't

23   fix the - I said - I asked him, Detweiler, why don't

24   you fix the door?  He said - his reply back was I'm

25   not here to fix the door and CK didn't put a work

155

1    order in to have the door fixed.

2    BY ATTORNEY ROMANO:

3        Q.    Who is Detweiler?

4        A.    A maintenance crew boss.

5        Q.    Did you ever file a grievance about Mr.

6    Minnig?

7        A.    I don't think I did.

8        Q.    Did you ever file a grievance about Mr.

9    Detweiler?

10       A.    No.

11       Q.    And I think I've asked this, but I just

12   want to be clear because you said that you've

13   mentioned to these people, hey, why don't you fix the

14   dishwasher door?  Did you ever file a grievance

15   saying the dishwasher door is broken and has not been

16   fixed?

17       A.    No, ma'am.  At that time I didn't know

18   the grievances - what it was to work it.

19       Q.    Okay.

20             Let's talk about Secretary Wetzel.  Have

21   you ever met Secretary Wetzel?

22       A.    No.

23       Q.    Have you ever spoken to him?

24       A.    No.

25       Q.    Have you ever written to him?

156

1      A.    No.

2      Q.    Your complaint alleges that he's aware of

3  problems with the dishwasher - or I'm sorry, problems

4  with your medical treatment.  Do you have any

5  firsthand knowledge that he knows about the medical

6  treatment you did or did not receive?

7      A.    No.

8      Q.    Did you ever file a grievance regarding

9  Mr. Wetzel?

10     A.    No.

11     Q.    Mr. Oppmann, do you know who that is?

12     A.    Can you repeat the name, please?

13     Q.    Oppman, O-P-P-M-A-N?

14     A.    No.

15     Q.    Do you know why you sued him?

16     A.    No.

17     Q.    No?  Have you ever spoken to him?

18     A.    No.

19     Q.    Or written to him?

20     A.    No.

21     Q.    Your complaint alleges that he was aware

22  of the problems with your medical treatment.  Do you

23  have any firsthand knowledge that he knew anything

24  about the treatment you received?

25     A.    No.

157

1      Q.    Did you file a grievance against Mr.

2  Oppman?

3      A.    No.

4      Q.    Let's talk about Mr. Schaeffer.  You

5  talked about him before you said he was a supervisor.

6  Do you know what his job title was?

7      A.    I don't know, just supervisor.  He used

8  to be a regular blue shirt so he just got promoted to

9  supervisor.

10      Q.    Okay.

11            Do you know when that happened?

12      A.    No.

13      Q.    When you started back in the kitchen in

14  September of 2015, was he already supervisor then or

15  did it happen after that?

16      A.    I forget.

17      Q.    Okay.

18            You said he was your supervisor the day

19  that you were injured.

20      A.    Yes.

21      Q.    Right?  Did you ever speak to him about

22  problems with the dishwasher before your injury?

23      A.    No.

24      Q.    Do you have any firsthand knowledge that

25  he was aware of problems with the dishwasher door?

158

1          A.     Yeah.  I think he was aware of because he

2    had to give us - they had to give us the instrument

3    out of the safety cabinet to use it.

4          Q.     Okay.

5                 Well, you're talking about the

6    screwdriver though.  The screwdriver didn't

7    contribute to your injury.

8                      Right?

9                      You said it was already out of the

10   door.

11                     ATTORNEY TOBIN:  Objection to the form

12   and lack of foundation.  She doesn't -.

13                     ATTORNEY ROMANO:  That's fine.  I'll

14   withdraw that question.

15   BY ATTORNEY ROMANO:

16         Q.     Do you have any firsthand knowledge that

17   Mr. Schaeffer was aware - let me back up.

18                 Other than the inmate that you said got

19   her finger caught on the door, were you aware of

20   anyone else ever being injured because of the

21   dishwasher door?

22         A.     No.

23         Q.     Okay.

24                 Your complaint alleges that Mr. Schaeffer

25   was aware of these prior injuries.  Do you have any

159

1    firsthand knowledge that he knew of that injury?

2         A.    Of my injury with me in the dishwasher

3    door?

4         Q.    The other person with the finger?

5         A.    Oh, I don't know.  I never asked.

6         Q.    Okay.

7               Did you ever complain to him - before you

8    were injured, did you ever complain to him about the

9    fact that you had to work on the dishwasher door

10   despite the fact that you thought it was broken?

11        A.    No.

12        Q.    Did you ever file a grievance about Mr.

13   Schaeffer?

14        A.    No.

15        Q.    You said that when you told Mr. Schaeffer

16   about your injury and asked to go to medical he wrote

17   you a pass to go?

18        A.    Yes.

19        Q.    Correct?

20        A.    Yes.

21        Q.    Did you ever ask Mr. Schaeffer to go to

22   medical about your arm and he told you no?

23        A.    No.  He didn't tell me no.

24        Q.    Okay.

25              Let's talk about Ms. Anthony.  She's one

160

1    of the Corrections Officers?

2           A.    Yeah.

3                        THE WITNESS:   Can I be excused one

4    moment?

5                        ATTORNEY ROMANO:   Sure.

6                             ---

7    (WHEREUPON, A SHORT BREAK WAS TAKEN.)

8                             ---

9    BY ATTORNEY ROMANO:

10          Q.    I asked you about Ms. Anthony and you

11   kind of made a face?

12          A.    Oh, no.  I had to use the bathroom.  That

13   was part having to get up again.

14          Q.    Okay.

15                Who is Ms. Anthony?

16          A.    She's a blue staff.

17          Q.    Okay.

18                Corrections officer?

19          A.    Yes.

20          Q.    Was Ms. Anthony there during your first

21   incarceration?

22          A.    Yes, I believe so.  I want to say

23   strongly, yes.

24          Q.    Did you get along with Ms. Anthony?

25          A.    Yes.

161

1      Q.    She ever write you a misconduct?

2      A.    She wrote me probably one before, yeah.

3      Q.    Do you know what it was for?

4      A.    No.

5      Q.    Do you know when?

6      A.    No.

7      Q.    You told me about asking Ms. Anthony if

8  you could to medical right after your injury and that

9  she told you, told you no.

10     A.    Yes.

11     Q.    Was there ever any other time where you

12 asked her if you could go for medical treatment and

13 she told you no?

14     A.    No.

15     Q.    Okay.

16           So your allegation in your complaint that

17 she denied you medical treatment is based on that one

18 incident?

19     A.    Yes.

20     Q.    And you were in medical within a half

21 hour after your injury occurred?

22           Correct?

23     A.    Well, after I went to find another blue

24 shirt that would assist me to go because she wasn't

25 going to let me go.  She said no.

162

1          Q.    But your supervisor, Mr. Schaeffer, let

2    you go?

3          A.    Yeah.  Schaeffer let me go.

4          Q.    Did you ever file a grievance against Ms.

5    Anthony?

6          A.    No.

7          Q.    Okay.

8                So what about Ms. Young?  Who's she?

9          A.    A nurse.

10         Q.    You indicate in your complaint that she

11   denied you medical treatment.  How did she do that?

12         A.    Well, actually, I don't remember like off

13   the - like I only remember who she is.  It's like

14   blurring my things, but I feel like I had an

15   encounter with her right then and there and went to

16   my unit manager about it.  But to like say who she is

17   right now, I don't even know who she is.

18         Q.    By my review of the medical records.  You

19   saw Ms. Young in medical on November 2nd of 2015.

20   That is the only date that I show her name on your

21   records.  Do you know if you saw her more than one

22   time?

23         A.    I don't even know who she is.

24         Q.    Okay.

25               Do you know what treatment she provided

163

1   you?

2        A.     No.

3        Q.     Did you ever file a grievance about Ms.

4   Young?

5        A.     I don't think so.

6        Q.     Your complaint alleges - do you know what

7   happens to the notes that a nurse takes after she

8   takes them?  Do you know if anyone looks at them?  Do

9   you know any of those procedures?

10       A.     No.

11       Q.     No?

12              Do you have any firsthand knowledge that

13  - strike that.

14              Let's talk about Ms. Blair Morrison?  We

15  talked about the Request to Staff slips that you

16  wrote to her.

17       A.     Yeah.

18       Q.     And she would sometimes respond and tell

19  to put in a sick call?

20              Correct?

21       A.     Yes.

22       Q.     Did you ever file a grievance against Ms.

23  Morrison, Ms. Blair Morrison?

24       A.     No.

25       Q.     Okay.

164

1              The last document I want to show you I've

2     marked as Exhibit 5.

3                         ---

4        (Whereupon, Deposition Exhibit 5, Declaration

5        of Denise Dixon, was marked for identification.)

6                         ---

7     BY ATTORNEY ROMANO:

8        Q.    Ms. Dixon do you recognize this document?

9        A.    Yes.

10       Q.    Did you personally type this up?

11       A.    No.

12       Q.    On the second page is that your

13    signature?

14       A.    Yeah.

15       Q.    Did you provide the information for this

16    document?

17       A.    Yes.

18       Q.    Okay.

19             Do you know, how did that come about?

20             ATTORNEY TOBIN:  Objection to the

21    extent that calls for broaching attorney client

22    privilege.

23             ATTORNEY ROMANO:  Yeah.  So let me

24    correct that then.  I don't want you to tell me

25    anything your Attorney said to you, any conversation

165

1    you had with your attorney.  Okay.

2                  So let me sort of rephrase that

3    question.

4    BY ATTORNEY ROMANO:

5        Q.    Did you provide information to your

6    counsel and then this was typed up and presented to

7    you to review or were you there as it was being

8    typed?

9        A.    Both.

10       Q.    Okay.

11             Let's go through this.  Number three says

12   you filed grievance number 605287 on or about

13   December 31, 2015.

14             Correct?

15       A.    Yes.

16       Q.    And that was Exhibit 1 that we looked at,

17   I believe?

18             ATTORNEY TOBIN:  I think I have it.

19   It's the first one, yeah.

20             ATTORNEY ROMANO:  Okay.

21   BY ATTORNEY ROMANO:

22       Q.    Number four, you say the grievance was

23   returned to me through the inmate mail system at

24   SCI-Muncy.  And then five says that you don't receive

25   any information or documents stating why the

166

1    grievance was returned to me.

2              Is that right?

3        A.    Yes, ma'am.

4        Q.    Okay.

5              We looked at that rejection slip on page

6    two Bates stamped DEF dot DOC246 and it's checked as

7    to why it was returned to you.

8              Correct?

9        A.    Yes.

10       Q.    And there's an instruction about what

11   information is needed for you to properly submit the

12   grievance.

13             Correct?

14       A.    Yes.  But I never received the stamp date

15   to this grievance number.

16       Q.    Well, what did you get back?

17       A.    Just the first page of my writing and

18   then I got the signature of facility grievance

19   coordinator, Mr. Stevens' name in that spot.

20       Q.    Is Mr. Stevens the facility grievance

21   coordinator?

22       A.    I don't - they said Ms. Shrimp was, but

23   sometime Mr. Stevens will write back.  Like I have a

24   grievance somewhere in here - Ms. Lowe, I think.

25   There's a nurse or a P.A. or somebody on one of the

167

1    grievances.  So that's why I asked you earlier like

2    to the some of the grievance there's different levels

3    to the grievance whoever becomes the grievance

4    coordinator.

5           Q.    You say that you didn't know you could

6    appeal the grievance.  That's in the handbook.

7                 Right?

8           A.    Yes.

9           Q.    Okay.

10                This declaration doesn't mention filing

11   any grievance before December 31, 2015.

12                Is that right?

13          A.    Could you repeat your question, please?

14          Q.    Sure.

15                This document doesn't make mention of any

16   grievance that you filed before December 31st, 2015.

17                Correct?

18          A.    No, not on this paperwork it does not.

19          Q.    Okay.

20                Paragraph eight says you filed grievance

21   number 607412 on or about January 14th, 2016.  And

22   the next paragraph says in this grievance and in

23   later grievances I complained about the safety

24   problem with the broken dishwasher door.

25                Is that correct?

168

1          A.     Yes.

2          Q.     Okay.

3                 Paragraph 11 says after grievance 607412

4    was denied, I was told by SCI-Muncy staff members to

5    file the grievance appeal form with my unit manager

6    instead of with the superintendent's office.  So this

7    is what I did for this grievance and others.  Did I

8    read that right?

9          A.     Yes.

10         Q.     What staff members told you to file a

11   form with the unit manager?

12         A.     Superintendent Smith.

13         Q.     Give me one second.  I don't think we

14   looked at that grievance.  Let's mark this as Exhibit

15   6.

16                          ---

17      (Whereupon, Deposition Exhibit 6, 1/14/16

18      Inmate Grievance, was marked for identification.)

19                          ---

20   BY ATTORNEY ROMANO:

21         Q.     Ms. Dixon, do you recognize this

22   document?

23         A.     Yes.

24         Q.     And what is it?

25         A.     A grievance.

169

1       Q.    Did you write this?

2       A.    Yes.

3       Q.    Okay.

4           Can you read it to us?

5       A.    Oh, wow.  Okay.  One moment.

6           On January 14, 2016, I went to sick call

7 because I am still having problems bending my arm.

8 During the RNs and physicians looking through my

9 files, they noticed that my x-ray was wrong, that the

10 man who gave me my x-ray actually submitted my left

11 arm.  So this whole time since 11/11/2015, I've been

12 complaining about being in pain and medical kept

13 saying my x-rays say that I'm fine.  It's because

14 it's somebody else's x-ray.  My right arm is severely

15 in pain.  The dishwasher was broken in the middle

16 handler, so when I was cleaning it, it came down on

17 my arm.  Ms. Paez said I was going to be on a call

18 out tomorrow to get my x-ray done.  When I was

19 getting my x-ray done the first time, they never did

20 my left, so for them to have an x-ray of a left

21 forearm is unaccurate.  I am in severe pain and need

22 to be seen by a doctor.  I go for my new x-ray

23 supposedly 1/15/2016.

24       Q.    Okay.

25           And this is signed on the line that says

170

1    signature of facility grievance coordinator, R.

2    Shrimp with a slash and some initials and dated

3    January 20, 2016.

4              Correct?

5         A.    Yes.

6         Q.    Okay.

7              If you could turn to the second page

8    which is Bates stamped DEF dot DOC249, have you ever

9    seen this document before?

10        A.    Yes.

11        Q.    What is it?

12        A.    An Initial Review Response.

13        Q.    Okay.

14             This is the response denying your

15   grievance?

16             Correct?

17        A.    Yes.

18        Q.    Okay.

19             And it's signed by Ms. Blair Morrison?

20        A.    Yes.

21        Q.    And it says Ms. Dixon, I am in receipt of

22   your grievance and have the following response.

23             I reviewed your medical records.  You

24   were seen in the medical Department on the following

25   dates:  11/2/16, 11/6/15, 11/25/15, and 1/22/16.  The

171

1    last x-ray of your right elbow was completed on

2    1/15/16 and indicated soft tissue swelling, no

3    fracture, dislocation or joint effusion.

4              Ms. Dixon, you have been prescribed

5    Motrin 600 for pain.  Upon last medical review with

6    the provider on 1/22/16, a consult was placed for

7    physical therapy.

8              Ms. Dixon, medical care and services have

9    been provided to you for your medical concern.  This

10   grievance is lacking arguable facts and is therefore

11   denied.

12             Did I read that correctly?

13        A.   Yes.

14        Q    And it's dated January 29th, 2016.

15             Correct?

16        A.   Yes.

17        Q.   All right.

18             And the third page Bates stamped DEF dot

19   DOC 248, have you ever seen this document?  I think

20   you referenced earlier this is the document you got

21   back from Mechanicsburg?

22        A.   Yes.

23        Q.   Is that right?

24        A.   I don't know if it's this one, like this

25   one, but I remember I had that one that said that I

172

1    needed to submit all three of them.

2         Q.    Okay.

3              Did you write to - this label at the top

4    says Secretary's Office of Inmate Grievances and

5    Appeals.  Did you write to them?

6         A.    Yes.

7         Q.    Okay.

8              And it references - it says grievance

9    number and it lists five different grievances.  Did

10   you write five separate requests to the Secretary's

11   Office of Inmate Grievances and Appeals or just one

12   that related to all of them?  Do you know?

13        A.    No, I don't remember.

14              ATTORNEY ROMANO:  For the record, I

15   just noticed this yesterday.  I requested from that

16   office if they have copies of them.  So I will

17   produce them if I get them.

18              ATTORNEY TOBIN:  Okay.

19              Oh, so those aren't included in the

20   production as far as you know?

21              ATTORNEY ROMANO:  Let's go off the

22   record.

23                        ---

24   (WHEREUPON, AN OFF RECORD DISCUSSION WS HELD.)

25                        ---

173

1    BY ATTORNEY ROMANO:

2        Q.    Do you know whether you sent one request

3    relating to five different grievances all in one or

4    whether you sent five separate?

5        A.    Five together.  It wouldn't be like -

6    they wouldn't like pick out - like you mentioned this

7    in this grievance, this grievance, this grievance.  I

8    must have sent like all the grievance in one envelope

9    to them.

10       Q.    Okay

11             So it looks like they have crossed, x-ed

12   off box G which says you have not yet appealed this

13   issue to the facility manager?

14             Correct?

15       A.    Yeah, that's what it says.

16       Q.    There's some more there.  It says final

17   review will not be granted until you do so.  Upon

18   receiving a response from the facility manager at the

19   respective facility, you may once again submit a

20   timely written appeal to this office for final

21   review.

22             Be sure that your appeal to this office

23   includes all the necessary documents as outlined in

24   DC ADM 804.  If all documents are not received with

25   your appeal, it may be dismissed.  This response does

174

1   not grant you a right appeal if it would otherwise

2   have been untimely to pursue that appeal to the

3   Superintendent.

4           Did I read that correctly?

5   A.      Yes, ma'am.

6   Q.      Have you ever read DC ADM 804?

7   A.      Yeah, I read it in my grievance book.

8   Q.      Okay.

9   A.      When I first got there, I read my whole

10  book before.

11          Q.      When you first got there?

12  A.      Yes.

13  Q.      In 2012?

14  A.      Yes.

15  Q.      Again in 2015?

16  A.      Probably not.

17          Q.      Under the comments/actions taken, it

18  says, Ms. Dixon this is in response to your letter to

19  this office regarding your medical concerns.  You

20  indicate that you have filed the above referenced

21  grievances regarding these concerns.  Upon review,

22  records reflect that you have not appealed any of the

23  initial review responses/rejections to the

24  Superintendent.

25              In accordance with the DC ADM 804, if you

175

1   are not satisfied with the initial review

2   response/rejection that you received you have the

3   opportunity to appeal that to the Superintendent

4   within 15 working days.

5         Once you receive a response from the

6   Superintendent and if you are still not satisfied,

7   you may then appeal to this office for final review.

8   Since you used the grievance system to address your

9   concerns, they will not be readdressed in this forum.

10        Did I read that correctly?

11       A.    Yes.

12       Q.    And that's signed by Keri Moore dated

13   January 12th, 2017?

14       A.    Yes.

15       Q.    Paragraph 14 of your declaration, going

16   back to Exhibit 5, you said I did not know who was in

17   charge of safety issues in the central kitchen or who

18   was responsible to see if the policies and procedures

19   at the SCI-Muncy during the time when I was filing my

20   grievances -.

21             ATTORNEY TOBIN:  Okay.  Hold on.

22             I'm sorry.

23             ATTORNEY ROMANO:  I'm sorry.

24             ATTORNEY TOBIN:  I misplaced the - and

25   I don't know how that could happen.

176

1            ATTORNEY ROMANO:  Sorry.

2            ATTORNEY TOBIN:  Oh, here we are.

3   Sorry.

4   BY ATTORNEY ROMANO:

5       Q.    I was reading paragraph 14 on the second

6   page.  It says I did not know who was in charge of

7   safety issues in the central kitchen or who was

8   responsible for safety policies and procedures at

9   SCI-Muncy during the time when I was filing my

10  grievances so I did not include the names of these

11  people in my grievances.

12           Did I read that correctly?

13      A.    Yes, ma'am.

14      Q.    Now, you just told me about Mr. Lowes

15  that they told you he was the big guy in the back or

16  the big boss in the back.  So you knew he was in

17  charge -,

18      A.    I don't know his - pardon me - I didn't

19  know his, but nobody went to him for help.  Like he

20  didn't never come out the office.  If he came out the

21  office like he did a little sweep and went back in.

22  So he like didn't interact with us.  So for me just

23  to ask him a question, he was real like - I didn't

24  never ask him nothing.

25      Q.    Okay.

1          Did you ever file a grievance complaining

2   about the central kitchen supervisors or the central

3   kitchen staff?

4        A.   No

5        Q.   No?

6        A.   Didn't have a problem there, no.

7        Q.   Never had a problem there?  Okay.

8               ATTORNEY ROMANO:  Ms. Dixon, that's

9   all the questions I have, I think.  I'm going to look

10   through my notes, but I'll let Mr. Hamilton go ahead

11   and ask you some questions.

12               ATTORNEY HAMILTON:  Sure I've got

13   some, not nearly as many as previous counsel here,

14   but we'll get through it.

15                        ---

16                    EXAMINATION

17                        ---

18   BY ATTORNEY HAMILTON:

19        Q.   Ma'am, you mentioned someone named

20   Rishel?

21        A.   Rishel?

22        Q.   When you were asked about medical

23   providers, you said someone named Rishel.  Do you

24   know who that is?

25        A.   Oh, one of the ladies, a chubbier lady I

178

1    seen in medical before.

2           Q.    Okay.

3                 Do you know what her position was?

4           A.    No.

5           Q.    Do you know how many times you saw her?

6           A.    I think two times.

7           Q.    Do you know if Rishel is her first name

8    or last name?

9           A.    Probably her last name.

10          Q.    Do you know her first name?

11          A.    No.

12          Q.    Do you recall any medical care she

13   provided you?

14          A.    I'm actually getting her and somebody

15   else confused, but one of the ladies gave me the

16   Motrin and the ice, but I don't know which one it

17   was.  I don't know if was Rishel or Young.

18          Q.    You're aware you've sued Ms. Rishel.

19                Right?

20          A.    Uh-huh (yes).

21          Q.    And you've alleged that she violated your

22   constitutional rights.

23          A.    Uh-huh (yes).

24          Q.    Is that correct?  Can you tell me what

25   she did to violate your constitutional rights?

1          ATTORNEY TOBIN:  Objection, that's
2     argumentative.
3          ATTORNEY HAMILTON:  She signed the
4     verification for the complaint, so I don't think it's
5     argumentative.  I want to know the acts she's
6     alleging my client did to violate her constitutional
7     rights.  It's not argumentative I'm entitled to ask
8     that._ Note the objection, but I'd like her to answer
9     the question.
10          ATTORNEY TOBIN:  You can - you can
11    answer.  What did she do?
12          THE WITNESS:  Can I see a paper with
13    her name on it so I can like refresh my mind about
14    them because it's been so long?
15    BY ATTORNEY HAMILTON:
16          Q.   I'd rather not.  I mean -
17          A.   Oh.
18          Q.   - this is based upon your memory so if
19    you know what she did, fine, if you don't -.
20          A.   Oh. well, she in the - she's in there for
21    a reason, but I don't remember offhand.
22          Q.   So you don't know why you sued her?
23          A.   I mean, I do know, but not - but I just
24    can't answer that off the -.
25          Q.   Okay.

180

1           Did you ever file a grievance naming her?

2      A.   Yeah, I think I did.

3      Q.   How about Dr. Freeland?  Do you know what

4  her job was at SCI-Muncy?

5      A.   I just knew she was one of the doctors.

6      Q.   And you saw her multiple times.

7           Right?

8      A.   Yes.

9      Q.   Now, you told us that you wrote to Ms.

10  Freeland a bunch of times.

11          Right?

12          Yes?

13     A.   Yes.

14     Q.   Okay.

15          You're aware that's not the correct

16  process for getting to see Dr. Freeland.

17          Right?

18     A.   What is the right process?

19     Q.   You would - I think you told us a bunch

20  of times today people told you to put in a request

21  for sick call.

22          Right?

23     A.   I put in numerous sick calls to Dr.

24  Freeland.

25     Q.   And when you put in the sick call request

181

1    you got seen in medical.

2              Right?

3         A.    No.

4         Q.    You weren't seen in medical after sick

5    call slips?

6         A.    Sometimes.

7         Q.    Well, you told us, I believe, and you

8    wrote one of your grievances - and I'll give you the

9    exact dates - that you were seen at least 12 times by

10   June of 2016.

11             Is that right?

12        A.    Yeah, but that don't mean every time I

13   got seen was from Dr. Freeland.

14        Q.    Understood.

15             So for = and I believe you said in one of

16   your grievance from October of 2015 to January 2016,

17   you were seen in medical at least six times.

18        A.    Is that what it says?

19        Q.    That's what your grievance says.

20        A.    Okay.

21        Q.    We read it here today.

22        A.    All right.

23        Q.    Okay.

24             So we can agree then in roughly a two and

25   a half month period you were seen at least six times

182

1    in medical.  And that - yes?

2        A.    Yes, saying yes.

3        Q.    So that's at least twice a month you were

4    seen in medical.

5        A.    Yes.

6        Q.    Do you see your doctors now that often?

7        A.    No.

8        Q.    Can you tell me what Dr. Freeland did to

9    violate your constitutional rights?

10       A.    Well, -.

11            ATTORNEY TOBIN:  Same objection.

12   That's argumentative.

13            ATTORNEY HAMILTON:  That's fine, but

14   she can answer.

15            THE WITNESS:  I mean, just the delay,

16   and me having, seeking medical attention, me having

17   to continuously keep writing request slips, sick

18   calls to get down there just to be seen about my arm.

19   BY ATTORNEY HAMILTON:

20       Q.    Well, let's go through the medical care

21   you received.

22       A.    Uh-huh (yes).

23       Q.    Now when you first went to medical after

24   the incident you were given ice.

25            Right?

183

```
 1          A.    Yes.

 2          Q.    And you were given Motrin.

 3          A.    Yes.

 4          Q.    And they told you to keep your arm

 5   elevated and keep it moving.

 6          A.    Yes.

 7          Q.    Can we agree that's medical care?

 8          A.    To a degree.

 9          Q.    Now, can we also agree that at some point

10   you were given muscle relaxants?

11          A.    Yes.

12          Q.    And you were given additional pain

13   relievers?

14          A.    Yes.

15          Q.    And you were sent to Geisinger?

16          A.    Yes.

17          Q.    And you were given PT first at SCI-Muncy?

18                Correct?

19          A.    Yes.

20          Q.    And then Geisinger sent you for PT?

21          A.    Yes.

22          Q.    And medical sent you for at least, if not

23   two x-rays?

24          A.    Medical sent me for one x - well, that

25   one x-ray, the first time it was inaccurate and then
```

184

1    the second time I got the x-ray.

2         Q.    Okay.

3              So we can agree that all that's medical

4    care?

5         A.    Yes.

6         Q.    Okay.

7              And can we agree Ms. Dixon one of the

8    reasons we're here is we disagree with the medical

9    care you received?

10             ATTORNEY TOBIN:  Objection.  That's

11   argumentative.

12             THE WITNESS:  No, I don't -.

13             ATTORNEY HAMILTON:  I don't believe

14   it's argumentative.  I'm asking if she agrees or

15   disagrees with the medical care she received.

16             ATTORNEY TOBIN:  You're not asking

17   her.  I'm - you're not asking her about facts you're

18   asking her to agree with your argument that the

19   things that were done at Muncy that are called

20   medical care are indeed constitutional medical care.

21             ATTORNEY HAMILTON:  Well, your

22   speaking objection on the grounds of federal rules is

23   highly inappropriate at this point.  So if you have

24   an objection to the form, go ahead and state it.  I

25   am asking her whether she agrees or disagrees with

185

1    the medical cares she received.  That's an

2    appropriate question.

3                    ATTORNEY TOBIN:  You can answer the

4    question.

5                    THE WITNESS:  I don't agree with the

6    medical attention that I was given.

7    BY ATTORNEY HAMILTON:

8         Q.    Well, ma'am, after all the care you

9    received, no one's ever diagnosed you with a fracture

10   of your right arm.

11             Is that right?

12        A.    No.

13        Q.    And no one's ever told you you have a

14   torn tendon or a torn ligament in right arm?

15        A.    No.

16        Q.    And in fact, the only diagnosis that I've

17   seen - and you can tell me if I'm wrong - is

18   arthritis in your right arm?

19        A.    Yes.

20        Q.    You're not aware of any other diagnosis

21   with your right arm?

22        A.    Well, Dr. Freeland said my incident is

23   due to - it's like a sports injury, due to the trauma

24   of the dishwasher door falling on my arm.  It locked

25   my arm in that position.  So that's why the arthritis

186

1   gathered in my forearm.

2        Q.    Okay.

3              You told us earlier that the door didn't

4   actually hit your elbow.  It hit above your elbow.

5              Is that right?

6        A.    Well, I showed you it's my elbow - I

7   showed you like - okay.  Maybe I should take my shirt

8   off.

9              Okay.

10             So it hit there so I have a knot in my

11  forearm.  So the door smashed me right here

12  (indicates).  So this would be my forearm.  This is

13  where the door hit me at.   This is where it was.

14       Q.    Okay.

15             I want the record to reflect you pointed

16  to a spot above your elbow towards your bicep.

17             Correct?

18       A.    No.  I told you it's like a inch above

19  where the crease in my line (sic) is at.

20       Q.    Correct.

21             So let's - let's get some terms straight

22  on here.

23       A.    Uh-huh (yes).

24       Q.    So for our purposes, I consider the

25  forearm to be from the elbow down to the wrist.

1        A.     Down.  Oh, okay.

2        Q.     Okay.

3               So it did not strike you in the forearm?

4        A.     Okay.

5        Q.     Is that what you're saying?  I don't want

6   to put words in your mouth.  It struck you above the

7   elbow crease?

8        A.     Well, I always say my forearm because

9   this is the part that went instantly numb.  Like

10  nothing above my back or this part (indicates) been

11  hurting to me.  Like from the elbow down this is what

12  like - instantly the ache started.

13       Q.     I also want to know so - what position

14  was your arm in when it was struck.  And what I mean

15  is was your palm facing up?  Was your palm facing

16  down?  Was your palm facing the way you would shake a

17  hand?

18       A.     Like twisted upwards.

19       Q.     So more towards the way you would shake a

20  hand?

21       A.     No.  If you shook your hand like you put

22  your hand upwards.

23       Q.     Okay.

24              So your palm was facing upwards?

25       A.     Yes.

188

1       Q.    So did it strike inside of your elbow
2   crease?
3       A.    Yes.
4       Q.    Okay.
5             But above the elbow?
6       A.    Yes.
7       Q.    So there's a muscle there; right, the
8   bicep?
9       A.    Yes.
10      Q.    Did it hit you in the bicep?
11      A.    Yes.
12      Q.    Okay.
13            I apologize for being disjointed, but I'm
14   doing clean up, so I have to move and groove here and
15   pick out different things to ask you.
16      A.    Okay.
17      Q.    Now, while you were still at SCI-Muncy
18   you went out and saw an orthopedic surgeon as well?
19            Right?
20      A.    Yes.
21      Q.    You saw Dr. Walsh and Dr. Harker?
22      A.    Uh-huh (yes).
23      Q.    And that would have been in September of
24   2016 prior to your discharge?
25      A.    Yes.

189

```
 1          Q.      And they found no evidence of arthritis
 2    and no evidence of fracture.
 3                  Is that right?
 4          A.      Yes.
 5          Q.      And they advised you to continue with
 6    physical therapy.
 7          A.      Yes.
 8          Q.      They told you that you didn't need
 9    surgery.
10          A.      Well, it was a lot of bickering back
11    between him and Dr. Freeland.  He kept telling Dr.
12    Freeland I have rheumatoid arthritis and Dr. Freeland
13    tell him no, I don't.  He would retest me.  He
14    actually wanted to give me a cast, and he mentioned a
15    cast, he mentioned surgery before.  So Dr. Freeland
16    is aware of like my doctor at the time because they
17    always used to bicker and battle back and forth with
18    each other.
19          Q.      Okay.
20                  Is there anything you can point out to me
21    that one of your outside doctors said you have to
22    have this treatment and the medical team at SCI-Muncy
23    wouldn't let you have it?
24          A.      No.  They didn't never come up with
25    something solid and say like this is what want to
```

1  give to her.

2          Q.    Okay.

3                So we can agree then when you went to see

4  the outside physicians, they didn't come up with some

5  treatment that SCI Munch either hadn't already tried

6  or was in the process of trying?

7          A.    Yeah.  The outside treatment, they just

8  gave me cortisone shots.

9          Q.    Okay.

10               And did that help at all?

11         A.    No.

12         Q.    Do your physicians now treat you with

13  cortisone shots?

14         A.    No.

15         Q.    Now, we talked a little bit about when

16  you wear your brace and I just want to be clear on

17  that.  So do you wear it all day long or just for

18  various points of the day?

19         A.    Various points of the day.  I'll wear it

20  like - the days I'm not working I'll wear up to like

21  two to four hours then take it off.  Let it breath

22  and move around by itself for a little bit and then

23  and at night.  I wear every day at night.

24         Q.    Okay.

25               But you don't wear it to work?

191

1      A.    No.  I don't wear it to work.

2      Q.    Okay.  So okay, thanks.

3            ATTORNEY HAMILTON:  Ma'am, I think

4    that's all the questions I have for you.  I don't

5    know if Ms. Romano has any more she hasn't talked

6    about.

7            ATTORNEY ROMANO:  No, I don't.

8            ATTORNEY TOBIN:  I have just a few.

9                       ---

10                    EXAMINATION

11                       ---

12   BY ATTORNEY TOBIN:

13     Q.    Ms. Dixon, earlier Counsel asked you or

14   you testified that you put in sick call slips and

15   request slips and you got painkillers and muscle

16   relaxers.  Is that - you remember saying that?

17     A.    Yes.

18     Q.    If you got all of those things when you

19   went to sick call, why did you keep putting sick call

20   slips?

21     A.    Well, initially it was like I didn't

22   receive all of that at one time.  Like I didn't

23   receive ice for a long time.  Like they gave me the

24   ice that one day.  After that I wasn't allowed ice

25   for a while.  Deputy Frantz is actually the one who

1  went down there and told them like give her ice and

2  they give me ice.

3          My physical therapy, my physical

4  therapist, Chris, at Muncy said that I should be

5  prescribed ice and medicine. At first I didn't have

6  none of them. I didn't have the ice or I didn't have

7  the medicine. Once the medicine the first time ran

8  out, that was it and like I was - me continuously

9  writing request slips is like, hey, I need, - my

10 arm's in pain. I need pain medication. I need ice.

11 And then they got approval of my ice. They

12 eventually got approval and I had it morning and

13 night. And then I would see Freeland start helping

14 me more with you know, pain medication.

15         Q.    Okay.

16         A.    But at first there was nothing.

17         Q.    And you also testified earlier that you

18 didn't file grievances against specific people, the

19 specific individuals. You didn't put their names in

20 the grievances. Can you explain why?

21         A.    Well, if you could look at any of my

22 grievances and see a little why -. It's like, at

23 first it's just like I didn't know who specifically

24 am I supposed to write about it? I mean, grievances.

25 I just know that my arm got banged in the dishwasher

193

1    and I'm talking about the dishwasher door.  I didn't

2    know that I should have - maybe I should have wrote a

3    separate grievance and said how I was refused to

4    leave CK kitchen, you know.  Like, I didn't know

5    every situation has you can do a grievance.  Like, I

6    could do a grievance on a kitchen door.  I could do a

7    grievance on the person.  I could do a grievance on

8    like food in the kitchen.  At the time, it was like I

9    didn't know that.  I just know that my arm hurts.  It

10   got stuck in the kitchen door and somebody needs to

11   help me out with pain medication or something.

12        So that's what I was really seeking.  I was

13   just going, going out there so somebody could latch

14   onto and help me and maybe somebody could show me how

15   I'm supposed to do the writing of a grievance.

16                    ATTORNEY TOBIN:  That's all the

17   questions I've got.

18                    ATTORNEY ROMANO:  I just have one

19   follow up.

20                         ---

21                    RE-EXAMINATION

22                         ---

23   BY ATTORNEY ROMANO:

24        Q.    Ms. Dixon, your counsel has provided us

25   with copies of a number of Request to Staff slips.

194

1    You kept those forms?

2          A.    Yeah.

3          Q.    Did you keep any other forms from your

4    incarceration?

5          A.    I got to look through my box.  I said I

6    was going to, but it's already - like, I had

7    paperwork, but me in and out the RHU and you know,

8    you don't get nothing when you go to RHU.  The COs

9    get it.

10          And then when you get out, you get to go

11    through your stuff.  So if they packed it, they

12    packed it.  If they didn't, they didn't.  So no.  I

13    tried to save the majority of them, I - because they

14    didn't know I was saving them at the time.  But I

15    thought I was going to need to and I had been saving

16    them, but I probably didn't save everyone.

17          Q.    Did you save any grievance documents?

18          A.    I don't know.  I'd have to go through my

19    box and look.

20          Q.    Okay.

21          I'm going to ask that you please go

22    through and look for any other responsive documents -

23    any documents that you saved from your incarceration.

24                ATTORNEY TOBIN:  We'll do that.  If

25    you could do that, I'd appreciate it.

195

1          ATTORNEY ROMANO: I don't have any

2     further questions.

3          ATTORNEY HAMILTON: Neither do I.

4               * * * * * * * *

5          DEPOSITION CONCLUDED AT 1:10 P.M.

6               * * * * * * * *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

196

1  COMMONWEALTH OF PENNSYLVANIA  )

2  COUNTY OF DAUPHIN              )

3                    CERTIFICATE

4          I, Seth R. Baier, a Notary Public in and for

5  the Commonwealth of Pennsylvania, do hereby certify:

6          That the foregoing proceedings, deposition of

7  Denise Dixon, was reported by me on 04-18-19 and that

8  I, Seth R. Baier, read this transcript, and that I

9  attest that this transcript is a true and accurate

10 record of the proceeding.

11         That the witness was first duly sworn to

12 testify to the truth, the whole truth, and nothing but

13 the truth and that the foregoing deposition was taken

14 at the time and place stated herein.

15         I further certify that I am not a relative,

16 employee or attorney of any of the parties, nor a

17 relative or employee of counsel, and that I am in no

18 way interested directly or indirectly in this action.

19  Dated the 13th day of May, 2019

20

COMMONWEALTH OF PENNSYLVANIA

21  NOTARIAL SEAL
SETH R. BAIER, Notary Public
Harrisburg, Dauphin County, PA

22  My Commission Expires Aug. 25, 2019

Court Reporter

Seth R. Baier

23

24

25

Sargent's Court Reporting Service, Inc.
(814) 536-8908

DC-804
Part 1

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**1920 TECHNOLOGY PARKWAY**
**MECHANICSBURG, PA 17050**

| FOR OFFICIAL USE |
|---|
| 605287 |
| GRIEVANCE NUMBER |

**OFFICIAL INMATE GRIEVANCE**

| TO: FACILITY GRIEVANCE COORDINATOR | FACILITY: | DATE: |
|---|---|---|
| MRS. Shrimp | Muncy | 12·31·15 |

| FROM: (INMATE NAME & NUMBER) | SIGNATURE OF INMATE: |
|---|---|
| DENISE Dixon 875426 | Denise Dixon |

| WORK ASSIGNMENT: | HOUSING ASSIGNMENT: |
|---|---|
| N/A | JA·20 31 |

**INSTRUCTIONS:**
1. Refer to the DC-ADM 804 for procedures on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. List in Block B any action you may have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Provide a brief, clear statement of your grievance. Additional paper may be used, maximum two pages (one DC-804 form and one one-sided 8½" x 11" page). State all relief that you are seeking.

I Slammed My RIGHT FoREARM in the dish WASHER IN CK. I have PUT IN NUMEROUS SICKCALLS. The FIRST one they REplied ain't Nothing wrong with it! The Next SICK Call I noticed Swelling and I couldn't bend nor move it. MRS. Young gave Me ICE and Sent Me on My way. 2 months later I dROP another another SICK Call regarding my arm because now I'm losing all feelings in my right arm. It is So painful to even move. When I wake up in the morning I have to take my left arm and adjust my right arm to even get out of Bed. It's like a pinch nerve or Something. It is Constantly in Pain. I got a X-ray done but I Need to be taken out to a hospital to Seek Medical treatment! I wrote Blair Morrison Numerous request and She replies back with a Sickcall! Yep I did 3 month ago! My arm is Still inflammed, and not able to bend, Something is terribly wrong with it!

B. List actions taken and staff you have contacted, before submitting this grievance.
Nurse Young, Nurse Rouse, Sgt. Enders, LT Sissly, Major Larson, Blair Morrison, C/o Mayer, C/o Day

Your grievance has been received and will be processed in accordance with DC-ADM 804.

_____     _____
Signature of Facility Grievance Coordinator                    Date

WHITE Facility Grievance Coordinator Copy     CANARY File Copy     PINK Action Return Copy
GOLDEN ROD Inmate Copy

| EXHIBIT |
|---|
| 1 |

*DC-ADM 804, Inmate Grievance System Procedures Manual*
*Section 1 – Grievances & Initial Review*
Issued: 3/31/2014
Effective: 5/1/2014

*Attachment 1-A*

**GRIEVANCE REJECTION**
SCI-Muncy
P. O. Box 180
Muncy, Pa. 17756

This serves to acknowledge receipt of your grievance to this office. In accordance with the provisions of DC-ADM 804, "Inmate Grievance System", I have reviewed all documents provided as part of the grievance. Upon consideration of the grievance, it is the decision of this office to reject your grievance due to a failure to comply with the provisions of the DC-ADM 804, as specified below.

| Inmate Name: | Dixon, Denise | Inmate Number: | OT5426 |
|---|---|---|---|
| | | Unit Location: | J-A Unit |
| Facility: | SCI-Muncy | | |
| Grievance #: | 605287 | | |

| Decision: | Rejection |
|---|---|
| X | Your grievance is being rejected for the reason(s) outlined below. |

**Rationale:**

1. Grievances related to the following issues shall be handled according to the procedures specified in the policies listed and shall not be reviewed by the Facility Grievance Coordinator.
   a) DC ADM 008 PREA Policy
   b) DC ADM 801 Inmate Discipline/Misconduct Procedures
   c) DC ADM 802 Administrative Custody Procedures
   d) DC ADM 803 Inmate Mail and Incoming Publications, Section 3, E

[X] 2. The grievance was not submitted within fifteen (15) working days after the events upon which claims are based. Need date(s) event happened.

3. Grievance involves matter(s) that occurred at another facility and should be directed by the inmate to the appropriate facility.

4. The grievance was not signed and/or dated with correct commitment name, number, contained UCC references, or was not presented in proper format.

5. Grievance must be legible, understandable, and presented in a courteous manner.

6. The grievance exceeded the two page limit.  Description needs to be brief.

7. Grievance does not indicate that you were personally affected by a Department or facility action or policy.

8. Grievances based upon different events must be presented separately.

9. The issue(s) presented on the attached grievance is currently being reviewed and addressed. Prior grievance #.

10. Group grievances are prohibited.

11. Grievance disputes previous grievances, appeal decisions or staff members who rendered those decisions.

12. You are currently on grievance restriction.  You are limited to one grievance every 15 working days.  Last grievance # ___ was submitted on ___

13. You have not provided this Office with required documentation for proper review.

**Response:** Please advise the date the accident happened and the dates that you placed sick calls. This information is needed in order to investigate this grievance. Thank you.

| Signature: | R. Shrump /dkg |
|---|---|
| Title: | Facility Grievance Coordinator |
| Date: | 01/06/2016 |

cc:  Facility Grievance Coordinator
     DC-15
     File

DEF.DOC000246

2017

## Secretary's Office of Inmate Grievances & Appeals

Pennsylvania Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050

RECEIVED
JAN 26 ____
SUPT'S OFFICE
SCI-MUNCY

This serves to acknowledge receipt of information associated with your intent to appeal a grievance (identified below, if available) to final review, to communicate your concern(s) to the Secretary's Office of Grievances and Appeals, and/or to check the status of review related to your matter.

| Inmate Name: | Denise Dixon | | Inmate Number: | OT5426 |
|---|---|---|---|---|
| SCI Filed at: | Muncy | | Current SCI: | Muncy |
| Grievance # (if available): | 607412, 605287, 646943, 628499, 656786 | | | |

| | | |
|---|---|---|
| | a) You have already received final disposition/review on this issue through this Office. | |
| | b) This Office has no prior record of receipt of an appeal from you regarding this issue. | |
| | c) You have already filed a grievance to seek review and resolution of this matter. | |
| | d) You are encouraged to work through institutional channels to resolve your complaint initially.  If unable to resolve your complaint informally, be advised that DC-ADM 804 provides a mechanism for all inmates to seek formal resolution for concerns. | |
| | e) You failed to provide the official grievance number for identification purposes. | |
| | f) Your claim to have grieved and/or appealed this concern at the institutional level without response does not entitle you to direct appeal to final review.  Rather, contact the Grievance Coordinator or Facility Manager's office regarding the status of your appeal. | |
| X | g) You have not yet appealed this issue to the Facility Manager.  Final review will not be granted until you do so.  Upon receiving a response from the Facility Manager at the respective facility, you may once again submit a timely written appeal to this Office for final review.  Be sure that your appeal to this office includes all the necessary documents as outlined in DC ADM 804.  If all documents are not received with your appeal, it may be dismissed.  This response does not grant you a right to an appeal if it would otherwise have been untimely to pursue that appeal to the Superintendent. | |
| | h) Your grievance and/or correspondence is being filed without further action for the reason(s) specified in the Comments/Action Taken section below. | |
| | i) The following action has been taken in response to the inquiry, request, or concern communicated in your letter. | |

**Comments/Action Taken:**

Ms. Dixon this is in response to your letter to this office regarding your medical concerns.  You indicate that you have filed the above referenced grievances regarding these concerns.  Upon review, records reflect that you have not appealed any of the initial review responses/rejections to the superintendent.  In accordance with the DC ADM 804, if you are not satisfied with the initial review response/rejection that you received, you have the opportunity to appeal them to the superintendent within 15 working days.  Once you receive a response from the superintendent and if you are still not satisfied, you may then appeal to this office for final review.  Since you used the grievance system to address your concerns, they will not be re-addressed in this forum.

| Signature: | Keri Moore | | Title: | Assistant Chief Grievance Officer |
|---|---|---|---|---|
| Date: | 1/12/17 | | | |

KLM

cc:   DC-15/Superintendent Smith (Mun)
      Grievance Office

DEF.DOC000245

DC-804
Part 1
Rev 9/2010

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PA 17001-0598**

FOR OFFICIAL USE
_628 499_
GRIEVANCE NUMBER

**OFFICIAL INMATE GRIEVANCE**

| TO: FACILITY GRIEVANCE COORDINATOR Mrs. Shrimp | FACILITY: muncal | DATE: 6-1-16 |
|---|---|---|
| FROM: (INMATE NAME & NUMBER) DENISE DIXON OT5426 | SIGNATURE OF INMATE: _Denise Dixon_ | |
| WORK ASSIGNMENT: Inside grounds | HOUSING ASSIGNMENT: EB9 | |

INSTRUCTIONS:
1. Refer to the DC-ADM 804 for procedures on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. List in Block B any action you may have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Provide a brief, clear statement of your grievance. Additional paper may be used, maximum two pages (one DC-804 form and one one-sided 8½" x 11" page). State all relief that you are seeking.

I slammed my right forearm in the CK dishwasher in oct 2015. My physical therapist is recommend I get surgery on my arm. Theres a Nerve that is damaged and I got scared tissue blocking me from ultizing my arm. I have no mobility in my arm. my therapist recommend I see the doctor. I been writing doctor freeland since oct 2015. She doesn't reply back. my last time writting her was 5-25-16. I am being Neglected of proper medical care.

B. List actions taken and staff you have contacted, before submitting this grievance.
sickcall, Officer george, LT siep, LT Sissly, mr.smith (super) nurse young, P Therapist, sgt enders, Deputy McKee, Blair mooreson.

Your grievance has been received and will be processed in accordance with DC-ADM 804.

_R. Shrimp /dkg_
Signature of Facility Grievance Coordinator

_6/3/16_
Date

WHITE Facility Grievance Coordinator Copy    CANARY File Copy    PINK Action Return Copy
GOLDEN ROD Inmate Copy

EXHIBIT
2
PENGAD 800-631-6989

**DC-ADM 804, Inmate Grievance System Procedures Manual**
**Section 1 – Grievances & Initial Review**
Issued: 12/1/2010
Effective: 12/8/2010

**Attachment 1-A**

DEF.DOC000255

# INITIAL REVIEW RESPONSE
SCI-Muncy
PO Box 180
Muncy PA 17756

This serves to acknowledge receipt of your grievance to the assigned Grievance Officer. The response is as follows.

| Inmate Name: | Denise Dixon | Inmate Number: | OT5426 |
|---|---|---|---|
| Facility: | SCI-Muncy | Unit Location: | EB |
| Grievance #: | 628499 | Grievance Date: | 6.1.2016 |
| Publication (if applicable): | | | |

| Decision: | ☐ Uphold Inmate |
|---|---|
| | ☒ Grievance Denied |
| | ☒ Uphold in part/Denied in part |

*It is the decision of this grievance officer to uphold, deny **or uphold in part/deny in part** the inmate's initial grievance. This response will include a brief rationale, summarize the conclusion, any action taken to resolve the issue(s) raised in the grievance and, relief sought.*

| Response: | | *Frivolous* | |
|---|---|---|---|

Ms. Dixon:

I am in receipt of your grievance and have the following response:

You are scheduled with Dr. Freeland in the next few weeks for re-evaluation of your arm.
You have received physical therapy as ordered. The MD will determine the next steps that are appropriate for your treatment plan with you at this appointment.

This Grievance is lacking arguable facts and is therefore denied. You have received care and treatment for your injury and MD re-evaluation post PT has been scheduled.

| Signature: | |
|---|---|
| Title: | L. Blair-Morrison, CHCA |
| Date: | 7/6/16 |

cc:   Superintendent
      Facility Grievance Coordinator
      DC-15
      File

DEF.DOC000254



**SCI-MUNCY**
**APPEAL TO FACILITY MANAGER**
**GRIEVANCE**

| Inmate Number | NAME | HOUSING UNIT | DATE | GRIEVANCE# |
|---|---|---|---|---|
| OT5426 | DENISE DIXON | E B9 | 6-6-16 | 628499 |

I received my initial response from the Grievance Office/Coordinator on June/6/2016
and have the following appeal issues.

**Refer to DC-ADM 804, Grievance Appeal Procedures, for complete instructions.**

**Please provide a BRIEF (no longer than two pages) appeal statement.**

I slammed my right forearm in the CK dishwasher. Oct 2015
the incident occured. I have Not seen a doctor at all.
From Oct - Feb they had a left Arm Xray on file - I never
took a left arm x-ray. So when they finally took the x-ray of
my arm (Right). They said it was just swollen in the tissue. My
Physical Therapist is highly recommending that I get
Surgery on my forearm. I Am unable to bend it. I AM in
Constant pain. I wrote Dr. Freeland, Mr. Frantz, Mr. Smith,
LT Sissly, Medical. I been to Sick-call at least 12 times.
Dr. Freeland doesn't even write me back.
Mr. Frantz wrote me back on 6-6-16 and said he
Contacted RNS Holtzapple and she is going to talk to
Dr. Freeland. I have Not made improvement since I been
in (PT) Jbvisously something is seriously wrong with my
arm. The CK dishwasher was broke, we had to lift the
metal door with a screw driver. I Need to be
taken out to A Hospital to see a doctor Even
My Therapist says so!

INMATE SIGNATURE: _Denise Dixon_

**DC-ADM 804, Inmate Grievance System Procedures Manual**
**Section 2 – Appeals**
Issued: 12/1/2010
Effective: 12/8/2010

*Attachment 2-A*
DEF.DOC000253



**pennsylvania**
DEPARTMENT OF CORRECTIONS

Date:       June 13, 2016

TO:         Denise Dixon #OT5426
            E Unit

FROM:       R. Shrimp
            Superintendent's Assistant

RE:         **Attached Appeal to Grievance #628499**

        The attached appeal is being returned to you with no further action.

        You cannot appeal a grievance until you have received the initial
        grievance response. Once you receive that response, you then
        can appeal to the Superintendent.  The grievance response for
        this grievance is not due until 06/24/16.

cc:  File

2017

## Secretary's Office of Inmate Grievances & Appeals
Pennsylvania Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050

RECEIVED
JAN 2 6 ___
SUPT'S OFFICE
SCI-MUNCY

This serves to acknowledge receipt of information associated with your intent to appeal a grievance (identified below, if available) to final review, to communicate your concern(s) to the Secretary's Office of Grievances and Appeals, and/or to check the status of review related to your matter.

| Inmate Name: | Denise Dixon | Inmate Number: | OT5426 |
|---|---|---|---|
| SCI Filed at: | Muncy | Current SCI: | Muncy |

| Grievance # (if available): | 607412, 605287, 646943, 628499, 656786 |
|---|---|

| | | |
|---|---|---|
| | | a) You have already received final disposition/review on this issue through this Office. |
| | | b) This Office has no prior record of receipt of an appeal from you regarding this issue. |
| | | c) You have already filed a grievance to seek review and resolution of this matter. |
| | | d) You are encouraged to work through institutional channels to resolve your complaint initially.  If unable to resolve your complaint informally, be advised that DC-ADM 804 provides a mechanism for all inmates to seek formal resolution for concerns. |
| | | e) You failed to provide the official grievance number for identification purposes. |
| | | f) Your claim to have grieved and/or appealed this concern at the institutional level without response does not entitle you to direct appeal to final review.  Rather, contact the Grievance Coordinator or Facility Manager's office regarding the status of your appeal. |
| | X | g) You have not yet appealed this issue to the Facility Manager.  Final review will not be granted until you do so.  Upon receiving a response from the Facility Manager at the respective facility, you may once again submit a timely written appeal to this Office for final review.  Be sure that your appeal to this office includes all the necessary documents as outlined in DC ADM 804.  If all documents are not received with your appeal, it may be dismissed.  This response does not grant you a right to an appeal if it would otherwise have been untimely to pursue that appeal to the Superintendent. |
| | | h) Your grievance and/or correspondence is being filed without further action for the reason(s) specified in the Comments/Action Taken section below. |
| | | i) The following action has been taken in response to the inquiry, request, or concern communicated in your letter. |

| Comments/Action Taken: |
|---|

Ms. Dixon this is in response to your letter to this office regarding your medical concerns.  You indicate that you have filed the above referenced grievances regarding these concerns.  Upon review, records reflect that you have not appealed any of the initial review responses/rejections to the superintendent.  In accordance with the DC ADM 804, if you are not satisfied with the initial review response/rejection that you received, you have the opportunity to appeal them to the superintendent within 15 working days.  Once you receive a response from the superintendent and if you are still not satisfied, you may then appeal to this office for final review.  Since you used the grievance system to address your concerns, they will not be re-addressed in this forum.

| Signature: | Keri Moore | Title: | Assistant Chief Grievance Officer |
|---|---|---|---|
| Date: | 1/12/17 | | |

KLM

cc:   DC-15/Superintendent Smith (Mun)
      Grievance Office

DEF.DOC000251

RECEIVED JAN 1 1 REC'D

| Form DC-135A<br>**INMATE'S REQUEST TO STAFF MEMBER** | Commonwealth of Pennsylvania<br>Department of Corrections |
|---|---|
| | **INSTRUCTIONS**<br>Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently. |

1. To: (Name and Title of Officer)
   Nurse Rowe   HEAD NURSE

2. Date: 1/7/16

3. By: (Print Inmate Name and Number)
   DENISE Divox   OT5426
   *Denise Difox*
   Inmate Signature

4. Counselor's Name
   Mrs. Campbell

5. Manager's Name
   Mr. Farrell

6. Work Assignment   N/A

7. Housing Assignment   ~~5H 2001~~

8. Subject: State your request completely but briefly. Give details.

Excuse me I been having problems with my right arm for about 3 months Now. I can't bend it upwards or over my head. I Put numerous sick calls in and wrote Blair Moore on. I have been giving pain reliever and muscle relaxers. They gave me an x-ray. My forearm is still inflammed and not able to bend. When I move it it sends a shooting pain through out my arm. It hurts so bad. Im Not able to move it at times. Extreme and chronic ⊕ inflammation to the right humeros area. I would like to be seen by a doctor. I closed my right forearm in CK working on the dishwasher around November or Oct. They gave me Iboprofuen to reduce inflammation. The swollen is still there till this day. I believe I may have injured muscel. The Pain still chronic, at this point I thought at this ~~pant~~ it would be at an acute level. Which as me deeply concerned, I think I need to see a specialist specifly a ~~or~~ orthopedic. Thanks *Denise Difox OT5426*

9. Response: (This Section for Staff Response Only)

**This is an issue for P.A.'s or M.D. please sign up for sick call**

Thank you.
CHCA Rub

| To DC-14 CAR only ☐ | To DC-14 CAR and DC-15 IRS ☐ |
|---|---|

Staff Member Name _____
                    Print                    Sign            Date

Revised July 2000



EXHIBIT
3



EXHIBIT

4

| Form DC-135A **INMATE'S REQUEST TO STAFF MEMBER** | Commonwealth of Pennsylvania Department of Corrections |
|---|---|
| | **INSTRUCTIONS** Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently. |

| 1. To: (Name and Title of Officer) Mrs. Bryant | 2. Date: 9/16/15 |
|---|---|
| 3. By: (Print Inmate Name and Number) Denise Dixon OT5426 _Thomas Clayton_ Inmate Signature | 4. Counselor's Name Mrs. Fossold |
| | 5. Unit Manager's Name Mr. Farrell |
| 6. Work Assignment | 7. Housing Assignment JB 1005 |

8. Subject: State your request completely but briefly. Give details.

I would like to work in the Kitchen. Mr. Wheeler told me to write you. Thanks Ma'am.

9. Response: (This Section for Staff Response Only)

To DC-14 CAR only ☐        To DC-14 CAR and DC-15 IRS ☐

Staff Member Name _____ / _____ Date _____
Print                    Sign

DEF.DOC000655

Revised July 2000

## Declaration of Denise Dixon

1. I am the Plaintiff in Dixon v. Dep't of Corrections, et al., M.D. Pa. 17-cv-01827.

2. After the incident in the Central Kitchen which is described in this lawsuit, I complained to staff members at SCI Muncy about what had happened.

3. I filed Grievance number 605287 on or about December 31, 2015.

4. This grievance was returned to me through the Inmate Mail system at SCI-Muncy.

5. I did not receive any information or document stating why this grievance was returned to me.

6. I did not receive any instructions as to what steps to take after this grievance was returned to me.

7. I did not appeal this grievance because I did not know that I could do so.

8. I filed grievance number 607412 on or about January 14, 2016.

9. In this grievance and in later grievances I complained about the safety problem with the broken dishwasher door. It was still broken when I filed these grievances. I think that it was still broken at the time I left Muncy in November 2017.

10. I also complained about the denial of medical care and pain medication in this grievance, which was still happening.

11. After Grievance 607412 was denied, I was told by SCI Muncy staff members to file the grievance appeal form with my Unit Manager instead of with the Superintendent's Office, so this is what I did for this grievance and others.

12. Sometimes the appeal forms would be returned to me, but they would not have any information about what I needed to do next.

1



EXHIBIT

5

13. Much later, I found out that I was supposed to turn in the appeal forms to Superintendent Smith.

14. I did not know who was in charge of safety issues in the Central Kitchen or who was responsible for safety policies and procedures at SCI Muncy during the time when I was filing my grievances, so I could not include the names of these people in my grievances.


I declare under penalty of perjury that the foregoing is true and correct.


Executed on ___5/17/18___ (date)

_____ (signature)
Denise Dixon

2

DC-804
Part 1

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**1920 TECHNOLOGY PARKWAY**
**MECHANICSBURG, PA 17050**

FOR OFFICIAL USE
607412
GRIEVANCE NUMBER

**OFFICIAL INMATE GRIEVANCE**

| TO: FACILITY GRIEVANCE COORDINATOR Mrs. Shrimp | FACILITY: MYACV | DATE: 1/14/16 |
|---|---|---|
| FROM: (INMATE NAME & NUMBER) DENISE DIXON OT5426 | SIGNATURE OF INMATE: (signature) | |
| WORK ASSIGNMENT: N/A | HOUSING ASSIGNMENT: BB3 | |

INSTRUCTIONS:
1. Refer to the DC-ADM 804 for procedures on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. List in Block B any action you may have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Provide a brief, clear statement of your grievance. Additional paper may be used, maximum two pages (one DC-804 form and one one-sided 8½" x 11" page). State all relief that you are seeking.

ON January 13 2016 I went to Sick call because I am still having problems bending my arm. During the nurses and physicians looking through my files they noticed that my xray was wrong that the man who gave me my x-ray actually Submitted my left forearm. So this whole time since 11/11/2015 I been complaining about being in Pain. And medical kept saying my x-ray says that Im fine it's because it's somebody else's x-ray. My right arm is Severly in Pain. The dishwasher was brown in the middle handler, so when I was cleaning it, it came down on my arm. Ms. Paez said I was going to be on the Call-out tomorrow to get my x-ray done. When I was getting my x-ray done the first time They never did my left arm. So for them to have an x-ray of an left forearm is unaccurate! I AM in Severe Pain and need to be Seen by a doctor. I go for my new x-ray supposely 1/15/16!

B. List actions taken and staff you have contacted, before submitting this grievance.
Sickcall, LT Sissiy, Sgt Johnson, McKinley, Mr.Smith, I have been Screaming For help Since the incident occurred! Nurse Jean, Nurse Rowe, and 2 other Nurses!

Your grievance has been received and will be processed in accordance with DC-ADM 804.

R. Shrimp / dkg                                    1/20/16
Signature of Facility Grievance Coordinator                Date

WHITE Facility Grievance Coordinator Copy    CANARY File Copy    PINK Action Return Copy
GOLDEN ROD Inmate Copy



EXHIBIT
6

*Attachment 1-A*

DEF.DOC000250

# INITIAL REVIEW RESPONSE
SCI-Muncy
PO Box 180
Muncy PA  17756



This serves to acknowledge receipt of your grievance to the assigned Grievance Officer. The response is as follows.

| Inmate Name: | Denise Dixon | Inmate Number: | OT5426 |
|---|---|---|---|
| Facility: | SCI-Muncy | Unit Location: | BB |
| Grievance #: | 607412 | Grievance Date: | 1.14.2016 |

| Publication (if applicable): | |
|---|---|
| | |
| | |

| Decision: | ☐ Uphold Inmate |
|---|---|
| | ☒ Grievance Denied |
| | ☐ Uphold in part/Denied in part |

*It is the decision of this grievance officer to uphold, deny or uphold in part/deny in part the inmate's initial grievance. This response will include a brief rationale, summarize the conclusion, any action taken to resolve the issue(s) raised in the grievance and, relief sought.*

| Response: | | *Frivolous* | |
|---|---|---|---|

Ms. Dixon:

I am in receipt of your grievance and have the following response:

I reviewed your medical records.  You were seen in the medical department on the following dates: 11/2/16, 11/6/15, 11/25/15, and 1/22/16.  The last x-ray of your right elbow was completed on 1/15/16 and indicated soft tissue swelling, no fracture, dislocation, or joint effusion.

Ms. Dixon you have been prescribed Motrin 600 for pain.  Upon last medical review with the provider on 1/22/16 a consult was placed for physical therapy.

Ms. Dixon medical care and services have been provided to you for your medical concern.

This Grievance is lacking arguable facts and is therefore denied

| Signature: | |
|---|---|
| Title: | L. Blair-Morrison, CHCA |
| Date: | 1/29/16 |

:c:   Superintendent
Facility Grievance Coordinator
DC-15
File

DEF.DOC000249

2017



## Secretary's Office of Inmate Grievances & Appeals
Pennsylvania Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050

JAN 26 ____

SUPT'S OFFICE
SCI-MUNCY

This serves to acknowledge receipt of information associated with your intent to appeal a grievance (identified below, if available) to final review, to communicate your concern(s) to the Secretary's Office of Grievances and Appeals, and/or to check the status of review related to your matter.

| Inmate Name: | Denise Dixon | | Inmate Number: | OT5426 |
|---|---|---|---|---|
| SCI Filed at: | Muncy | | Current SCI: | Muncy |
| Grievance # (if available): | 607412, 605287, 646943, 628499, 656786 | | | |

| | | |
|---|---|---|
| | | a) You have already received final disposition/review on this issue through this Office. |
| | | b) This Office has no prior record of receipt of an appeal from you regarding this issue. |
| | | c) You have already filed a grievance to seek review and resolution of this matter. |
| | | d) You are encouraged to work through institutional channels to resolve your complaint initially.  If unable to resolve your complaint informally, be advised that DC-ADM 804 provides a mechanism for all inmates to seek formal resolution for concerns. |
| | | e) You failed to provide the official grievance number for identification purposes. |
| | | f) Your claim to have grieved and/or appealed this concern at the institutional level without response does not entitle you to direct appeal to final review.  Rather, contact the Grievance Coordinator or Facility Manager's office regarding the status of your appeal. |
| | X | g) You have not yet appealed this issue to the Facility Manager.  Final review will not be granted until you do so.  Upon receiving a response from the Facility Manager at the respective facility, you may once again submit a timely written appeal to this Office for final review.  Be sure that your appeal to this office includes all the necessary documents as outlined in DC ADM 804.  If all documents are not received with your appeal, it may be dismissed.  This response does not grant you a right to an appeal if it would otherwise have been untimely to pursue that appeal to the Superintendent. |
| | | h) Your grievance and/or correspondence is being filed without further action for the reason(s) specified in the Comments/Action Taken section below. |
| | | i) The following action has been taken in response to the inquiry, request, or concern communicated in your letter. |

### Comments/Action Taken:

Ms. Dixon this is in response to your letter to this office regarding your medical concerns. You indicate that you have filed the above referenced grievances regarding these concerns.  Upon review, records reflect that you have not appealed any of the initial review responses/rejections to the superintendent.  In accordance with the DC ADM 804, if you are not satisfied with the initial review response/rejection that you received, you have the opportunity to appeal them to the superintendent within 15 working days. Once you receive a response from the superintendent and if you are still not satisfied, you may then appeal to this office for final review.  Since you used the grievance system to address your concerns, they will not be re-addressed in this forum.

| Signature: | Keri Moore | | Title: | Assistant Chief Grievance Officer |
|---|---|---|---|---|
| Date: | 1/12/17 | | | |

KLM

cc:   DC-15/Superintendent Smith (Mun)
      Grievance Office

DEF.DOC000248