## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DENISE DIXON, | : | Civil No. 3:17-CV-1827 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | (Magistrate Judge Carlson) |
| PENNSYLVANIA DEPARTMENT | : | |
| OF CORRECTIONS, *et al.,* | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

### I.   Introduction

This civil rights case involves a former state inmate, Denise Dixon, who alleges that, while working in the central kitchen of State Correctional Institution Muncy (SCI Muncy), a dishwasher door slammed closed onto her arm, causing her injury that has persisted since this 2015 incident. She brings her claims in federal court under 42 U.S.C. § 1983, arguing both that the defendants were deliberately indifferent to the risk of harm posed by the defective dishwasher, and to her medical needs after she was injured, in violation of the Eight Amendment to the United States Constitution. She has also lodged a Pennsylvania tort law claim of negligence against the Pennsylvania Department of Corrections (DOC).

After consideration of the record, we find that no issue of material fact exists as to the plaintiff's Eight Amendment deliberate indifference claims, however, the plaintiff's negligence claim is marked by disputed issues of fact which preclude summary judgment. Thus, this longstanding medical negligence claim is most appropriately decided by a jury and, given the long procedural history of this case, the parties should have the opportunity to have this claim decided on its merits in federal court despite all federal claims being dismissed.

## II.    **Factual Background**[1]

Dixon's complaint arises out of an incident that occurred while she was working in the central kitchen of SCI Muncy in November of 2015. Dixon spent two periods incarcerated with the DOC at SCI Muncy. She was first incarcerated November 29, 2012[2] through December 23, 2013, (Doc. 147, ¶ 7, Doc. 139, ¶ 9), and returned to SCI Muncy for a second term of incarceration on or about July 7, 2015 through November 27, 2017. (Doc. 139, ¶ 10, Doc. 147, ¶ 121). During both periods at SCI Muncy, she worked in the central kitchen where her duties included

---

[1] Dixon's medical records have been filed under seal pursuant to this Court's Order of September 23, 2021. (Doc. 134). To the extent that medical records are referenced herein, the citation will be to the appropriate Statement of Material Facts rather than the medical record itself.

[2] This date is from Dixon's Initial Reception Screening form referenced in Defendants Freeland, Rishel, and Correct Care Solutions' Statement of Material Facts. (Doc. 147, ¶ 1). Dixon admits she erred in indicating her initial incarceration as occurring in 2011 during her deposition. (Doc. 153, ¶ 1).

cleaning out the buckets located inside the dishwasher's middle door. (Doc. 139, ¶¶ 2-3, 11-12). According to the plaintiff, there was a dent in the middle door that prevented it from opening properly and interfered with the door's ability to stay in an open position. (Doc. 153, ¶ 49). The problem required inmates to use a screwdriver to "pop" the dent out of the door so they could lift it when they had to clean the inside of the dishwasher. (Id.) The screwdriver had to be signed out from a food service instructor using a form that was reviewed by kitchen supervisors. (Id.) Defendant Anthony, a correctional food service instructor at SCI Muncy, testified that she was aware that the dishwasher door needed to be opened and closed with a screwdriver. (Doc. 153-6, at 43).

On November 2nd, 2015, Dixon was removing a bucket from the dishwasher with her right hand when the door closed on the crease of her forearm, just above the elbow. (Doc. 139, ¶¶ 16-17). Dixon's arm became swollen, and she asked Defendant Anthony for permission to go to medical, which she initially denied. (Id., ¶¶ 18-19). Dixon then asked Defendant Shaeffer, Kitchen Supervisor, for permission to go to medical, which he granted. (Id., ¶ 21). According to Dixon's testimony and the medical records, Dixon was seen in medical within thirty minutes of the incident and was treated with ice and ibuprofen by Defendant Young. (Id., ¶¶ 22-23). No X-ray was initially taken, despite Dixon being unable to extend her right arm, as Defendant Young testified that Dixon performed a full range of motion exercises

and exhibited only a small amount of edema forming around the area with no laceration, hematoma, or abrasion present. (Id., ¶¶ 24-27).

Dixon was seen again by medical staff four days later, on November 6, 2015. (Doc. 139, ¶ 28). A physician's assistant noted some edema to the right elbow, reduced range of motion, and that Dixon was not able to fully extend her elbow, which was tender to the touch. (Doc. 147, ¶ 24). The physician's assistant ordered an X-ray[3] and prescribed a ten-day supply of Motrin. (Id., ¶ 29). She was seen again by medical on November 25, 2015, where she reported to PA Rishel that she had injured her right arm and was experiencing ongoing pain and limited range of motion since that time. (Id., ¶ 27). PA Rishel noted Dixon had strong grip, distal sensation and strength, and that her right elbow flexion and extension were limited due to muscle tension and pain. (Id.) She also noted tenderness and swelling over the olecranon. (Id.) PA Rishel prescribed 600 mg of Motrin for one month and Robaxin 750 mg b.i.d. for seven days. She also advised Ms. Dixon to stretch and move her right arm every day. (Id.) Another X-ray was ordered by PA Mullins on January 14,

---

[3] The parties dispute the circumstances surrounding the elbow x-ray taken on November 11, 2015. The defendants claim an x-ray of Dixon's left elbow was taken inadvertently and that Dixon did not advise radiology that the x-ray was to be taken of her right elbow instead. (Doc. 147, ¶ 25). Dixon claims that radiology *did* take an x-ray of her right arm, but that an x-ray of someone else's left arm was filed in her medical records instead of the correct x-ray. (Doc. 158, ¶ 25). It is unclear from the medical records which account is true but this discrepancy does not affect our analysis of these claims.

2016, noting "wrong X-ray last time." (Id., ¶ 30). The January 2016 X-ray showed soft tissue swelling with no fracture, dislocation, or join effusion. (Id., ¶ 31). She was seen again on sick call on January 22, 2016, and a consult was placed for physical therapy to be scheduled within 30 days. (Id., ¶ 32). Defendant Dr. Freeland, Medical Director, approved the consult. (Id.) By January 2016, Dixon had been to sick call six times. (Id., ¶ 32).

Dixon began onsite physical therapy on February 15, 2016. (Doc. 147, ¶ 33). Her medical records indicate she continued participating in onsite physical therapy approximately one time per week until June 22nd, 2016, when Dr. Freeland recommended PT increase from one to two times per week. (Id., ¶ 46). Dr. Freeland also examined Dixon on July 11, 2016, after she complained her elbow was frozen in flexion, and her assessment was biceps tendinopathy/frozen. (Id., ¶ 48). She recommended a PT note and possible referral to an orthopod. (Id.)

Over the following year, Dixon continued complaining of pain and lack of range of motion in her arm and Dr. Freeland worked closely with Dixon, until her sentence was completed in November of 2017, to treat her injury. This included Dr. Freeland requesting orthopedic consults and appointments off-site at Geisinger Medical Center (Doc. 147, ¶¶ 55, 82, 95), following up with Dixon after appointments to explain the assessments, (Id., ¶¶ 64, 89, 92, 103, 114), getting approval from the State and Regional DOC Medical Directors for Dixon to receive

off-site physical therapy, which Dixon received through June 2017, to enable modalities to embrace a range of motion and recovery to which onsite physical therapy did not have access, (Doc. 147, ¶¶ 66-68), ordering a blood panel to test for rheumatoid arthritis, (Id., ¶ 92), and recommending Dixon seek a second opinion and change her medication when treatments were not resolving her pain. (Id., ¶ 103). Dixon also received cortico-steroid injections through her orthopod, (Id., ¶¶ 85). In October of 2017, Dr. Freeland discussed Dixon's case with the Regional Medical Director who recommended a physical medicine and rehabilitation evaluation for neurosurgical options since the orthopod was offering only injections which Dixon refused indicated they did not work. (Id., ¶¶ 114, 117). Noting that Dixon was set to be released, Dr. Freeland encouraged Dixon to seek a second opinion to gain mobility. (Id. ¶ 120).

Dixon's sentence was completed on November 27, 2017. (Id., ¶ 121). Following her release, she worked various jobs as a housekeeper, in packaging, as a banquet server, as a home health aide. (Doc. 147, ¶¶ 122-124, 129, 130). She continued seeking treatment for her elbow pain and stiffness. Her providers continued to assess her as having posttraumatic arthritis to be treated with nonoperative measures such as physical therapy. (Doc. 147, ¶¶ 156, 158, 160). She reported improving symptoms in October 2019 with physical therapy and pain medication. (Id., ¶ 166). She was eventually discharged from her physical therapist

in November 2019 for treatment non-compliance. (Id., ¶ 175). She continued visiting an orthopedic specialist with recurring elbow pain and stiffness and was treated with pain medication and the use of a brace. (Id., ¶¶ 181-190).

Prior to the November 2nd incident, Dixon's medical record indicates she had other medical issues with her right arm, including a right shoulder dislocation sustained years prior to her incarceration in a motorcycle accident, (Doc. 147, ¶ 11), and apparent muscle tendinitis in her right forearm which was diagnosed by PA Rishel in October of 2015. (Id., ¶ 19).

Dixon filed a complaint with this Court on October 5th, 2017, (Doc. 1), and the parties consented to Magistrate Judge jurisdiction on September 24, 2021. (Doc. 135). Dixon twice amended her complaint with her most recent iteration being filed on March 19, 2021. (Doc. 121). Following the submission of her second amended complaint, the defendants filed two separate motions for summary judgment. Defendants Freeland, Rishel, and Correct Care Solutions filed a motion for summary judgment, (Doc. 145), while the remaining DOC defendants Anthony, Blair-Morrison, Frantz, Lowe, Minnig, Nicholas, Oppman, PA DOC, Schaeffer, Smith, Wetzel, and Young submitted a separate motion. (Doc. 138).[4] We consider both motions jointly in the instant memorandum. The defendants have submitted separate

---

[4] We do not consider the plaintiff's claim of negligence against Hobart Corporation as they have not joined in any of the instant motions.

statements of material facts, (Docs. 139, 147), and both motions are fully briefed and ripe for disposition. (Docs. 140, 146, 152, 157, 168, 171). For the reasons that follow, the defendants' motions for summary judgment will be granted in part and denied in part as follows: The motions shall be granted as to the plaintiff's Eighth Amendment claims of dangerous working conditions and delay/denial of medical care as to all defendants. The motions shall be denied as to the plaintiff's claim of negligence against the PA DOC.

## II.   <u>Discussion</u>

### A. <u>Motion for Summary Judgment – Standard of Review</u>

The defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, which provides that the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Through summary adjudication, a court is empowered to dispose of those claims that do not present a "genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), and for which a trial would be "an empty and unnecessary formality." <u>Univac Dental Co. v. Dentsply Int'l, Inc.</u>, 702 F.Supp.2d 465, 468 (M.D. Pa. 2010). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A

dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id., at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006), accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. Id., at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In making this determination, the

Court must "consider all evidence in the light most favorable to the party opposing the motion." <u>A.W. v. Jersey City Pub. Schs.</u>, 486 F.3d 791, 794 (3d Cir. 2007).

Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist. Further, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." <u>Countryside Oil Co., Inc. v. Travelers Ins. Co.</u>, 928 F. Supp. 474, 482 (D.N.J. 1995). Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials." <u>Thimons v. PNC Bank, NA</u>, 254 F. App'x 896, 899 (3d Cir. 2007) (citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." <u>Fireman's Ins. Co. of Newark New Jersey v. DuFresne</u>, 676 F.2d 965, 968 (3d Cir. 1982); <u>see Sunshine Books, Ltd. v. Temple University</u>, 697 F.2d 90, 96 (3d Cir. 1982). "[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." <u>Lockhart v. Hoenstine</u>, 411 F.2d 455, 458 (3d Cir. 1969). Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." <u>Gans v. Mundy</u>, 762 F.2d 338, 341 (3d Cir. 1985) (citing <u>Ness v. Marshall</u>, 660 F.2d 517, 519 (3d Cir. 1981)).

Finally, it is emphatically not the province of the court to weigh evidence or assess credibility when passing upon a motion for summary judgment. Rather, in adjudicating the motion, the court must view the evidence presented in the light most favorable to the opposing party, Anderson, 477 U.S. at 255, and draw all reasonable inferences in the light most favorable to the non-moving party. Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992). Where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true. Id. Additionally, the court is not to decide whether the evidence unquestionably favors one side or the other, or to make credibility determinations, but instead must decide whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. Anderson, 477 U.S. at 252; see also Big Apple BMW, 974 F.2d at 1363. In reaching this determination, the Third Circuit has instructed that:

> To raise a genuine issue of material fact . . . the opponent need not match, item for item, each piece of evidence proffered by the movant. In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. It thus remains the province of the fact finder to ascertain the believability and weight of the evidence.

Id. In contrast, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal

quotation marks omitted); <u>NAACP v. North Hudson Reg'l Fire & Rescue</u>, 665 F.3d 464, 476 (3d Cir. 2011).

### B.  <u>Guiding Principles: Eighth Amendment Claims</u>

Several overarching and animating constitutional considerations govern analysis of any Eighth Amendment claim. As the Court of Appeals has observed:

> The Eighth Amendment protects against infliction of "cruel and unusual punishment." However, "not every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny." <u>Whitley v. Albers</u>, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). "After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment." <u>Id.</u> (citation and internal quotations omitted). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." <u>Id.</u>
>
> Resolution of an Eighth Amendment claim therefore "mandate[s] an inquiry into a prison official's state of mind." <u>Wilson v. Seiter</u>, 501 U.S. 294, 299, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). Two considerations define that inquiry. We must first determine if the deprivation was sufficiently serious to fall within the Eighth Amendment's zone of protections. <u>Id.</u> at 298, 111 S. Ct. 2321. If not, our inquiry is at an end. However, if the deprivation is sufficiently serious, we must determine if the officials acted with a sufficiently culpable state of mind. <u>Id.</u> In other words, we must determine if they were motivated by a desire to inflict unnecessary and wanton pain. "What is necessary to establish an 'unnecessary and wanton infliction of pain ...' varies according to the nature of the alleged constitutional violation." <u>Hudson v. McMillian</u>, 503 U.S. 1, 5, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).

<u>Fuentes v. Wagner</u>, 206 F.3d 335, 344–45 (3d Cir. 2000).

Thus, while prison officials may violate an inmate's rights under the Eighth Amendment to the United States Constitution by displaying deliberate indifference to a substantial risk of serious harm to an inmate, to sustain such a claim an inmate must:

> [M]eet two requirements: (1) "the deprivation alleged must be, objectively, sufficiently serious;" and (2) the "prison official must have a sufficiently culpable state of mind." Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quotation marks and citations omitted). In prison conditions cases, "that state of mind is one of 'deliberate indifference' to inmate health or safety." Id. "Deliberate indifference" is a subjective standard under Farmer-the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety.

Beers-Capitol v. Whetzel, 256 F.3d 120, 125 (3d Cir. 2001).

This deliberate indifference standard is an exacting benchmark for constitutional tort liability under the Eighth Amendment. As we have observed:

> As explained in Beers–Capitol, in cases based on allegations of deliberate indifference on the part of prison officials or other supervisory defendants, the Supreme Court has "rejected an objective test for deliberate indifference; instead it looked to what the prison official actually knew rather than what a reasonable official in his position would have known." Id. at 131. Specifically, the Supreme Court "held that 'a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety.' " Id. (quoting Farmer, 511 U.S. at 837, 114 S.Ct. 1970). This requirement of actual knowledge on the part of supervisory officials "means that 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " Id. (quoting Farmer, 511 U.S. at 837, 114 S.Ct. 1970).

13

At the same time, this subjective standard does not insulate officials from liability where such officials choose to remain deliberately indifferent to an excessive or substantial or serious risk of harm to inmates. The Supreme Court explained:

> We are no more persuaded by petitioner's argument that, without an objective test for deliberate indifference, prison officials will be free to ignore obvious dangers to inmates. Under the test we adopt today, an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm would actually befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.

Farmer, 511 U.S. at 842, 114 S.Ct. 1970. The Supreme Court also noted that a supervisory defendant's knowledge of a risk may be proved through circumstantial evidence, so that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id.

Quarles v. Palakovich, 736 F.Supp.2d 941, 947–48 (M.D. Pa. 2010).

Thus, the Eighth Amendment deliberate indifference standard, at a minimum, calls for knowledge of some substantial risk to the health and safety of inmates, and a failure to act in the face of that known danger. There is a necessary corollary to this deliberate indifference standard. Specifically, it is clear that the concept of "deliberate indifference entails something more than mere negligence." Farmer, 511 U.S. at 835. Therefore, a mere accident or inadvertence on the part of corrections officials does not violate the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 105, 97 S. Ct. 285, 292 (1976). Even where a plaintiff has presented sufficient evidence to allow a factfinder to reach the inference that a prison official had

knowledge of the risk on the basis that risk was obvious, it is clear that an inference may not be compelled, and that the prison official must be permitted to show that he was actually unaware of the risk in question. Beers–Capitol, 256 F.3d at 132. Lastly, a prison official who is shown to have been actually aware of a risk to a prisoner-plaintiff can avoid liability if he shows that he responded reasonably to the risk, even if the response did not avoid the ultimate harm. Id.

The same guiding principles apply to inmate complaints, like those made here, regarding conditions of confinement. "When an Eighth Amendment claim arises in the context of a challenge to conditions of confinement, we must determine if prison officials acted with 'deliberate indifference' to the inmate's health." Fuentes, 206 F.3d at 345 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). "The objective inquiry is whether the inmate was 'denied the minimal civilized measure of life's necessities.' " Id. (quoting Hudson v. McMillian, 503 U.S. 1, 9 (1991)). In this setting, it is clear that:

> The Eighth Amendment prohibits punishments inconsistent with "evolving standards of decency that mark the progress of a maturing society." Estelle v. Gamble, 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting Trop v. Dulles, 356 U.S. 86, 101, 78 S. Ct. 590, 2 L.Ed.2d 630 (1958)). Conditions of prison confinement violate the Eighth Amendment only if they "deprive inmates of the minimal civilized measure of life's necessities." Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981).

Atkinson v. Taylor, 316 F.3d 257, 272 (3d Cir. 2003). Thus, these claims also require proof of a both culpable state of mind and objective proof of physical conditions of

confinement that shock the conscience and depart from minimal civilized standards of life's necessities. Simply put, "[t]o violate the Eighth Amendment, conditions of confinement must be dangerous, intolerable or shockingly substandard." <u>Hammond v. Bledsoe</u>, 2013 WL 5797647, at \*10 (M.D. Pa. Oct. 28, 2013) (citing <u>Riley v. Jeffes</u>, 777 F.2d 143, 147 (3d Cir. 1985)); <u>Inmates of Allegheny Cnty. Jail v. Pierce</u>, 612 F.2d 754, 757 (3d Cir. 1979).

## C. <u>Dixon's Claims Against Correct Care Solutions, LLC Fail as a Matter of Law.</u>

Beyond these guiding Eighth Amendment principles, there are a separate set of legal guideposts which apply to claims, like those made here by Dixon, which seek to hold some institutional or organizational defendant liable for civil rights violations. The principles which define institutional, agency civil rights liability are both exacting and well-settled. As we have observed in the past:

> In <u>Monell v. Department of Social Services of the City of New York</u>, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ("Monell"), the Supreme Court held that a municipality may be held liable under 42 U.S.C. § 1983 for a constitutional injury that directly resulted from a municipality's policy, custom, or practice. <u>Id</u>. at 695, 98 S.Ct. 2018. Accordingly, a Monell claim seeks to impose municipal liability for a constitutional injury that was causally connected to a municipal policy, custom, or practice. <u>See id.; see also Carreno v. City of Newark,</u> 834 F.Supp.2d 217, 231 (D.N.J. 2011). "Under <u>Monell</u>, a municipality cannot be subjected to liability solely because injuries were inflicted by its agents or employees." <u>Jiminez v. All American Rathskeller, Inc</u>., 503 F.3d 247, 249 (3d Cir. 2007). Instead, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy,

16

inflicts the injury that the government as an entity is responsible under
§ 1983." Id. (quoting Monell, 436 U.S. at 694, 98 S.Ct. 2018). It is
essential to a Monell claim that there be a "direct causal link between a
municipal policy or custom and the alleged constitutional deprivation"
in order to establish municipal liability. City of Canton v. Harris, 489
U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

Hunter v. Prisbe, 984 F. Supp. 2d 345, 353 (M.D. Pa. 2013).

While Monell initially addressed the question of *governmental* institutional

liability, subsequent case law has extended these legal tenets to claims of *corporate*

institutional civil rights liability. On this score it is well-settled that:

[P]rivate corporations that contract with the state to provide services
also cannot be subjected to liability under § 1983 on the basis of
*respondeat superior.* See Natale v. Camden County Corr. Facility, 318
F.3d 575, 583-84 (3d Cir. 2003); see also Monell v. Dep't of Soc.
Servs., 436 U.S. 658, 691-94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)
(holding that a municipality cannot be liable under § 1983 on a theory
of *respondeat superior*). Instead, in order to hold a private corporation
liable under § 1983, a plaintiff must prove that he suffered a
constitutional deprivation as a result of an official corporate policy or
custom. Natale, 318 F.3d at 583-84; see also Bd. of the County
Comm'rs v. Brown, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d
626 (1997); Griggs v. Dauphin County Prison, No. 1:06-0823; 2008
WL 2518090, at *4 (M.D. Pa. June 19, 2008); Miller v. City of Phila.,
No. 96-3578, 1996 U.S. Dist. LEXIS 17514, 1996 WL 683827, at *4
(E.D. Pa. Nov. 26, 1996) (in order to establish liability for a private
corporation, a plaintiff must show that the corporation, "with
'deliberate indifference to the consequences, established and
maintained a policy, practice or custom which directly caused
[plaintiff's] constitutional harm.' ") (quoting Stoneking v. Bradford
Area Sch. Dist., 882 F.2d 720, 725 (3d Cir. 1989)). As the Third Circuit
has explained, a:

policy or custom can be established in two ways. Policy is made
when a "decisionmaker possessing final authority to establish
municipal policy with respect to the action" issues an official
proclamation, policy, or edict. A course of conduct is considered

17

> to be a "custom" when, though not authorized by law, "such practices of state officials [are] so permanent and well-settled" as to virtually constitute law.

Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996) (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990)). Custom may also be established by evidence that demonstrates knowledge or acquiescence. Beck, 89 F.3d at 971 (citing Fletcher v. O'Donnell, 867 F.2d 791, 793 (3d Cir. 1989)).

Midgley v. McMillian, No. 3:13-CV-1941, 2017 WL 3431917, at *8 (M.D. Pa. July 13, 2017), report and recommendation adopted, No. 3:13-CV-1941, 2017 WL 3427981 (M.D. Pa. Aug. 9, 2017).

Judged by these legal benchmarks, Dixon's Eighth Amendment corporate liability claims against Correct Care Solutions appear to fail on several scores. First, as discussed below, the undisputed evidence rebuts Dixon's claims of medical deliberate indifference. Quite the contrary, it seems clear that Dixon was frequently seen and treated, both by Correct Care Solutions staff and by outside physicians during her incarceration at SCI Muncy. The nature, scope, and extent of this treatment undermines any claim of deliberate indifference by the medical defendants.

Additionally, Dixon has not shown any policy or practice that would tend to implicate Correct Care Solutions in the allegations in her complaint. In her reply brief, Dixon attempts to construe the SCI Muncy's system for handling sick call as the policy which resulted in her constitutional deprivation, arguing that it was

ineffective and resulted in delays of treatment. Dixon has provided no support for such an assertion beyond to the testimony of another former inmate, Aimee Davis, who testified that she was delayed treatment at Muncy. But the fact that Dixon received treatment within thirty minutes of her injury and was seen by a physician's assistant six times during the period which she complains her medical care was delayed undermines her assertion that this system is ineffective. Moreover, in our view, one inmate's complaint cannot constitute a "longstanding custom[ ] of delay and denial of inmates' access to medical care" as the plaintiff asserts. For this reason, the defendant's motion to dismiss all institutional, corporate liability claims against Correct Care Solutions will be granted.

### D. **Dixon's Eighth Amendment Claims Fail as a Matter of Law.**[5]

‼

In support of her Eighth Amendment claim, the plaintiff first asserts that the dangerous working conditions she was subjected to – namely the faulty, dented dishwasher – rose to the level of deliberate indifference by staff at SCI Muncy, including Defendant Smith, Superintendent, Defendant Lowe, Food Service Department Manager, Defendant Minnig, Safety Manager, and Defendant Schaffer,

---

[5] Dixon's complaint alleges constitutional claims under the Eighth and Fourteenth Amendments. In her reply brief, the plaintiff clarifies that she does not allege a Substantive Due Process claim under the Fourteenth Amendment, but merely mentions the Fourteenth Amendment in her complaint in acknowledgement that the Eighth Amendment applies to the states through the Fourteenth Amendment.

Kitchen Supervisor.[6] As previously noted, a claim of deliberate indifference under the Eighth Amendment requires a plaintiff to show that "(1) the deprivation alleged must be, objectively, sufficiently serious; and (2) the prison official must have a sufficiently culpable state of mind." <u>Farmer v. Brennan</u>, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In our view, the plaintiff has failed to meet this exacting constitutional standard.

First, the plaintiff argues that Smith, Lowe, Minnig, and Schaeffer knew the dishwasher presented a substantial risk of harm to her because the dent was obvious and inmates had to sign out a screwdriver from a prison official each time they wanted to open the dishwasher. Despite all the defendants testifying that they were not aware of any issues with the dishwasher, viewing the evidence in the light most favorable to the plaintiff, a factfinder could determine that the defendants may have been generally aware that the dishwasher was dented and required a screwdriver to open. Nonetheless, this sort of alleged general awareness of some defect in this piece of equipment is insufficient to meet the Eighth Amendment deliberate indifference standard.

As previously discussed, although "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was

---

[6] In her reply brief to the defendants' motion, the plaintiff withdrew her Eighth Amendment claims against Defendants Frantz and Nicholas. (Doc. 152, at 8 n.1).

obvious," <u>Farmer</u> at 842, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" <u>Id.</u> at 837. Thus, even where a plaintiff has presented sufficient evidence to allow a factfinder to reach the inference that a prison official had knowledge of the risk on the basis that risk was obvious, it is clear that an inference may not be compelled, and that the prison official must be permitted to show that he was actually unaware of the risk in question. <u>Beers–Capitol</u>, 256 F.3d at 132. So it is here. Even if the dent in the dishwasher was obvious and the defendants knew of the "screwdriver procedure" used to operate it, there is no evidence that the defendants knew of the precise risk in question, that the dishwasher door would suddenly slam closed, injuring the plaintiff. In fact, one former employee with actual knowledge of the defect testified that the screwdriver was needed to open the door, but that the door stayed up on its own, (<u>See</u> Doc. 153-6, at 66)[7], although

---

[7] This is according to the testimony of Heather Anthony, a former Corrections Food Service Instructor at SCI Muncy:

> Q: So they used a screwdriver to get the door up. Did they have to keep the screwdriver in the door to keep it up or did the door just stay up?
> A: No. No. The door just stayed up once they gave it some umph and got the door up, and it went right up.
> . . .
> Q. Did the door ever come down after it had been in the up position and then they had to do the whole process all over again?
> A. No

Dixon testified that the latch never worked correctly and that the door held itself up due to the jam on the right-hand side. (Doc. 146-1, at 38).

Further, while, as discussed below, the failure of prison kitchen staff to address the defective dishwasher could rise to the level of negligence, "deliberate indifference entails something more than mere negligence," Farmer, 511 U.S. at 835, and requires "the prison official [to] have a sufficiently culpable state of mind." Beers-Capitol 256 F.3d at 125. On this score, "[i]t is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause . . ." Whitley, 475 U.S. at 319. The record is simply devoid of any indication from any defendant that they disregarded a known risk of serious harm that could rise to the level of a constitutional violation. There is no evidence that the door had fallen before. And while Dixon testified that, on one occasion she asked Minnig, "why you don't fix the middle door," (Doc. 146-1, at 154), she never filed a grievance regarding the need to fix the door or any of the defendants' failure to fix the door. (Doc. 139, ¶ 36). There is also no evidence that any inmate complained that it was dangerous to operate the dishwasher. Thus, while, again, a factfinder could determine that the

_____

(See Doc. 153-6, at 66)

defendants were aware there was a dent in the dishwasher door and it needed to be opened with a screwdriver, from that alone we cannot infer that they acted with a wanton disregard to Dixon's safety. Accordingly, her claims of dangerous working conditions under the Eighth Amendment fail.

The plaintiff also argues that Defendants Young, Registered Nurse, Blair-Morrison, Corrections Health Care Administrator, and Dr. Freeman, Medical Director, denied her medical care, making them deliberately indifferent to her medical needs in violation of the Eighth Amendment.[8] Because the undisputed factual record demonstrates that Dixon's claims fail to meet the deliberate indifference standard under the Eighth Amendment, the defendants' motion for summary judgment on these claims is granted.

Deliberate indifference to a serious medical need involves the "unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 104 (1976). Such indifference may be evidenced by an intentional refusal to provide care, delayed

---

[8] Dixon's amended complaint, (Doc. 121), included claims for delay/denial of medical care against Defendants Wetzel, DOC, Oppman, Blair-Morrison, Schaeffer, Anthony, Rishel, and Young. In her reply brief to the defendants' motion, the plaintiff withdrew her Eighth Amendment delay/denial of medical care claims against Defendants Rishel, (Doc. 157, at 5 n.1), Wetzel, and Oppman (Doc. 152, at 22 n.6), and apparently did not oppose summary judgment on this count as to Defendants DOC, Schaeffer, and Anthony. Thus, we only address the delay/denial of medical care claims against Defendants Young, Freeman and Blair-Morrison, although to the extent that she still asserts this claim against DOC, Schaeffer, and Anthony, we find these claims also fail for the reasons set forth herein.

provision of medical treatment for non-medical reasons, denial of prescribed medical treatment, denial of reasonable requests for treatment that results in suffering or risk of injury, Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury." White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990).

However, it is also clear that the mere misdiagnosis of a condition or medical need, or negligent treatment provided for a condition, is not actionable as an Eighth Amendment claim because medical malpractice standing alone is not a constitutional violation. Estelle, 429 U.S. at 106. "Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." Durmer, 991 F.2d at 67 (citations omitted). Furthermore, in a prison medical context, deliberate indifference is generally not found when some significant level of medical care has been offered to the inmate. Clark v. Doe, 2000 U.S. Dist. LEXIS 14999, 2000 WL 1522855, at *2 (E.D. Pa. Oct.13, 2000) ("[C]ourts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care"). Thus, such complaints fail as constitutional claims since "the exercise by a doctor of his professional judgment is never deliberate indifference." Gindraw v. Dendler, 967 F.Supp. 833, 836 (E.D. Pa.1997) (citing Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir.1990) ("[A]s long as a physician exercises professional judgment his behavior

will not violate a prisoner's constitutional rights"). Under this standard, courts have frequently rejected Eighth Amendment claims that are based upon the level of professional care that an inmate received, particularly where it can be shown that significant medical services were provided to the inmate, but the prisoner is dissatisfied with the outcome of these services. See e.g., Ham v. Greer, 269 F. App'x 149 (3d Cir. 2008); James v. Dep't of Corrections, 230 F. App'x 195 (3d. Cir. 2007); Gillespie v. Hogan, 182 F. App'x 103 (3d Cir. 2006); Bronson v. White, No. 05–2150, 2007 WL 3033865 (M.D. Pa. Oct.15, 2007); Gindraw v. Dendler, 967 F.Supp. 833 (E.D. Pa. 1997).

Instead, courts have defined the precise burden which an inmate must sustain in order to advance an Eighth Amendment claim against a healthcare professional premised on allegedly inadequate care, stating that:

> The district court [may] properly dis[miss an] Eighth Amendment claim, as it concerned [a care giver], because [the] allegations merely amounted to a disagreement over the proper course of his treatment and thus failed to allege a reckless disregard with respect to his . . . care. The standard for cruel and unusual punishment under the Eighth Amendment, established by the Supreme Court in Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), and its progeny, has two prongs: 1) deliberate indifference by prison officials and 2) serious medical needs. "It is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.'" "Nor does mere disagreement as to the proper medical treatment support a claim of an eighth amendment violation." . . . [The inmate] alleged no undue delay in receiving treatment and, as the district court

noted, the evidence he presented established that he received timely care.... Although [an inmate plaintiff] may have preferred a different course of treatment, [t]his preference alone cannot establish deliberate indifference as such second-guessing is not the province of the courts.

James, 230 F. App'x. at 197–198. (citations omitted).

Furthermore, it is well-settled that an inmate's dissatisfaction with a course of medical treatment, standing alone, does not give rise to a viable Eighth Amendment claim. See Taylor v. Norris, 36 F. App'x 228, 229 (8th Cir. 2002) (deliberate indifference claim failed when it boiled down to a disagreement over recommended treatment for hernias and decision not to schedule a doctor's appointment); Abdul–Wadood v. Nathan, 91 F.3d 1023, 1024–35 (7th Cir. 1996) (inmate's disagreement with selection of medicine and therapy for sickle cell anemia falls well short of demonstrating deliberate indifference); Sherrer v. Stephen, 50 F.3d 496, 497 (8th Cir. 1994) (inmate's "desire for a replacement joint instead of fusion surgery is merely a disagreement with the course of medical treatment and does not state a constitutional claim"); Smith v. Marcantonio, 910 F.2d 500, 502 (8th Cir. 1990) (inmate failed to prove deliberate indifference where his complaints represented nothing more than mere disagreement with course of his medical treatment). Therefore, where a dispute, in essence, entails nothing more than a disagreement between an inmate and caregivers over alternate treatment plans, the inmate's complaint will fail as a constitutional claim. See e.g., Gause v.

26

Diguglielmo, 339 F. App'x 132 (3d Cir. 2009) (dispute over choice of medication does not rise to the level of an Eighth Amendment violation); Innis v. Wilson, 334 F. App'x 454 (3d Cir. 2009) (same); Rozzelle v. Rossi, 307 F. App'x 640 (3d Cir. 2008) (same); Whooten v. Bussanich, 248 F. App'x 324 (3d Cir. 2007) (same); Ascenzi v. Diaz, 247 F. App'x 390 (3d Cir. 2007) ("[T]he exercise . . . of . . . professional judgment is never deliberate indifference." Gindraw v. Dendler, 967 F.Supp. 833, 836 (E.D. Pa. 1997) (citations omitted).

Dixon's claim that her medical treatment was delayed primarily focuses on the period from the date of her injury, November 2, 2015, through January 15, 2016. She argues that Defendants Blair-Morrison and Dr. Freeland, failed to oversee and supervise the implementation of a comprehensive treatment plan for her arm, and failed to supervise and review her encounters with Defendant Young, a registered nurse at SCI Muncy. Dixon also argues that Young did not exercise professional judgment in assessing her medical needs because she conducted only a "cursory evaluation" and failed to notify a physician about the injury. She alleges that the failure of the defendants to timely develop a treatment plan, and their treatment of her injuries on an "*ad hoc*" basis resulted in pain and suffering and exacerbated her injury.

However, the undisputed record shows that Dixon received significant medical care during this period. Not only did Dixon receive treatment within thirty

minutes of her initial injury, but she was also seen at sick call six times by January 2016. During the time period Dixon claims her care was delayed, she received two X-rays, was examined and evaluated by physicians' assistants at least four times and was prescribed pain medication. Further, despite the plaintiff's allegations that it took eight months for her to be seen by a doctor, the medical record demonstrates that by January 22, 2016, Dr. Freeman approved a consult for her to receive physical therapy for her arm.

Furthermore, following her initial evaluations and continued complaints of pain, Dr. Freeman worked extensively with Dixon to alleviate the pain and discomfort in her elbow, even consulting regularly with the State and Regional Medical Directors to get Dixon outside physical therapy and multiple outside medical opinions on her diagnosis and treatment. Dixon regularly received treatment at sick call and received physical therapy until her sentence was completed. Thus, clearly, Dixon received some level of medical care shortly after her accident, and, "deliberate indifference is generally not found when some significant level of medical care has been offered to the inmate." Clark v. Doe, 2000 U.S. Dist. LEXIS 14999, 2000 WL 1522855, at *2 (E.D. Pa. Oct.13, 2000). Instead, it appears the crux of Dixon's Eighth Amendment claim is her dissatisfaction with the course of medical treatment she received while incarcerated. This is insufficient to prevail on a claim

of deliberate indifference to a medical need resulting in an Eighth Amendment violation.

Further, to the extent that the plaintiff attempts to impute supervisory liability upon Dr. Freeman and Blair-Morrison for their failure to intervene despite their awareness that Dixon was not receiving adequate medical care during the period complained of, November 2, 2015 through January 15, 2016, these claims fails for two reasons. First, as previously discussed, Dixon's underlying Eighth Amendment claims for deliberate indifference fail as to the medical personnel that treated her. Further, as to Defendant Blair-Morrison, the Third Circuit has recognized that, "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004). Here, clearly Blair-Morrison was aware that Dixon was being treated by medical personnel, as Dixon acknowledges that Blair-Morrison responded to her complaints but advised her to sign up for sick call. This response by Blair-Morrison does not violate Eighth Amendment standards. In fact, Dixon was seen and treated by medical personnel six times over the period she alleges care was delayed and Blair-Morrison had no duty to intervene and overrule the medical treatment of the prison medical

staff. Thus, to the extent that Dixon alleges Blair-Morrison was deliberately indifferent to her medical needs, her claims fail on the merits.

Dr. Freeman also points out that Dixon makes no factual allegation alleging she had personal involvement in her care between November 2, 2015 and January 15, 2016. Thus, to the extent that Dixon attempts to impute liability on Dr. Freeman based solely on her role as Medical Director at SCI Muncy, it is well established that a supervisory defendant in a § 1983 action may not be liable based merely on the theory of *respondeat superior*. Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). Instead, the plaintiff must allege that the supervisory defendant was personally involved in the incident at hand. Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity." Rode, 845 F.2d at 1207-08 (Comparing Boykins v. Ambridge Area School District, 621 F.2d 75, 80 (3d Cir.1980) (civil rights complaint adequate where it states time, place, persons responsible); Hall v. Pennsylvania State Police, 570 F.2d 86, 89 (3d Cir.1978) (same)).

Dixon has failed to present evidence showing Dr. Freeland's actual knowledge and acquiescence to a delay or denial of medical care. At the outset, it is clear Dixon received medical care in a timely manner after her injury. Moreover, the

plaintiff has not alleged Dr. Freeland's knowledge and acquiescence with particularity, simply stating in her reply brief that Dr. Freeland's general failure to oversee the work of her PAs. She further argues that "the risk of harm posed by inmates X rays being put in the wrong files is obvious such that Dr. Freeland's awareness of this risk could be inferred." (Doc. 157, at 15). This is clearly not sufficient for a factfinder to impute liability upon Dr. Freeland based on the theory of *respondeat superior*.

Because no factfinder could determine the defendants denied or delayed Dixon medical care, either directly or through their knowledge and acquiescence, this Eighth Amendment claim also fails.

### E. **The Department of Corrections Defendants Are Entitled To Qualified Immunity**[9]

!

In any event, even if we determined that Dixon had stated a colorable constitutional claim, we believe that the defendants would still be entitled to qualified immunity from damages as to these federal claims. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Reichle v. Howards, 566 U.S. 658, 664 (2012). A qualified immunity analysis involves two questions: whether the official violated a statutory

---

[9] We note that in proper cases the court may consider the question of qualified immunity *sua sponte*. See Doe v. Delie, 257 F.3d 309, 312 (3d Cir. 2001).

or constitutional right, and whether that right was clearly established at the time of the challenged conduct. Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011). Lower courts have the discretion to decide which question to analyze first. Pearson v. Callahan, 555 U.S. 223, 236 (2009). The Supreme Court has cautioned courts to "think carefully before expending scarce judicial resources to resolve difficult and novel questions of constitutional or statutory interpretation that will have no effect on the outcome of the case." Id. (internal quotations omitted); see also al-Kidd, 563 U.S. at 735.

An official's conduct violates clearly established law when, "at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.' " al-Kidd, 563 U.S. at 741 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). The Supreme Court has stated that this standard does not require a case directly on point, but requires that "existing precedent must have placed the statutory or constitutional question beyond debate." al-Kidd, 563 U.S. at 741. "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." Id. at 743 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)); see also Taylor v. Barkes, 135 S. Ct. 2042, 2044 (2015).

The dispositive question that the court must ask is "whether the violative nature of *particular* conduct is clearly established." Mullenix v. Luna, 136 S. Ct.

305, 308 (2015) (quoting <u>al-Kidd</u>, 563 U.S. at 742). The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." <u>Id.</u>; <u>see also</u> <u>Davenport v. Borough of Homestead</u>, 870 F.3d 273, 281 (3d Cir. 2017). This "clearly established" standard ensures that an official can reasonably anticipate when his or her conduct may give rise to liability, and "protects the balance between vindication of constitutional rights and government officials' effective performance of their duties." <u>Reichle</u>, 566 U.S. at 664.

In the instant case, based on our analysis of Dixon's Eighth Amendment claim, we conclude that the Department of Corrections defendants are entitled to qualified immunity. Against the backdrop of our finding that the unanticipated nature of this mishap defeats any claim of deliberate indifference, it follows that the defendants' conduct in failing to anticipate an unknown hazard presented by the dishwasher door falling on Dixon's arm could not have transgressed clearly established caselaw. Accordingly, the DOC defendants are also entitled to qualified immunity, and the defendants' motion for summary judgment will be granted.

**F.** **<u>A Question of Fact Exists as to the Plaintiff's State Law Negligence Claim and We Should Exercise Supplemental Jurisdiction Over That Claim.</u>**

Finally, Dixon asserts a state law claim for negligence against the Department of Corrections. Having dismissed all the plaintiff's federal claims, the defendants invite us to decline to exercise jurisdiction over the plaintiff's remaining state law

negligence claim. To be sure, in a case such as this, where the jurisdiction of the federal court was premised on alleged federal claims which are found to be subject to dismissal, the court may decline to exercise supplemental jurisdiction over the plaintiff's state law claims. 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if-... the district court has dismissed all claims over which it has original jurisdiction."); United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (holding that when federal causes of action are dismissed, federal courts should not separately entertain pendent state claims).

As the text of §1367 implies, decisions regarding whether to exercise supplemental jurisdiction over state law claims once the federal claims in a lawsuit have been dismissed rests in the sound discretion of the court and may only be reviewed for an abuse of discretion. Talley v. Wetzel, 15 F.4th 275, 288 n. 8 (3d Cir. 2021); Bright v. Westmoreland Cnty., 443 F.3d 276, 286 (3d Cir. 2006). However, certain principles guide the exercise of this discretion. As the Third Circuit instructs, "under Gibbs jurisprudence, where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims *unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so*." Borough of W. Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995) (emphasis added) (citing

<u>Lovell Mfg. v. Export-Import Bank of the United States</u>, 843 F.2d 725 (3d Cir. 1988); <u>Growth Horizons, Inc. v. Delaware County</u>, 983 F.2d 1277 (3d Cir. 1993)).

When examining whether considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for exercising continued supplemental jurisdiction over a state law claim, courts often looks to how far advanced the federal proceedings are. Thus, where the parties have engaged in extensive discovery and motions practice prior to the dismissal of the federal claims, retention of supplemental jurisdiction over the remaining state law claims has been deemed appropriate. <u>Lopresti v. Cnty. of Lehigh</u>, 572 F. App'x 133, 135 (3d Cir. 2014) Moreover, the district court also has the discretion to retain state law claims when it finds that to remand those "claims to state court and start anew, after the time and resources the parties and the Court have expended, would be against the interests of judicial economy, fairness and convenience." <u>Williams v. Newark Beth Israel Med. Ctr.</u>, 322 F. App'x 111, 113 (3d Cir. 2009).

This is a rare case in which such affirmative justification exists to retain jurisdiction over this state law claim. This case was filed nearly five years ago and has a lengthy procedural history in federal court, beginning when the plaintiff filed her original complaint in October 2017. This litigation involves an incident that occurred nearly seven years ago in October 2015.  The parties have heavily litigated this case under several federal judges who have presided over numerous motions to

35

dismiss, amended complaints, and motions for summary judgment. The case persisted in federal court through the COVID-19 pandemic and continues to await a resolution nearly five years after the complaint was filed. Clearly the considerations of judicial economy, convenience, and fairness to the parties all weigh in favor of allowing this case to be resolved in the current forum, rather than requiring the plaintiff to begin anew in a state court which, as the plaintiff points out, is already heavily backlogged. Given this Court's familiarity with the case, and the existing analysis of the related federal claims, we find it would be prudent for this Court to exercise supplemental jurisdiction over the remaining state law negligence claim, despite the federal claims being dismissed.

As to the merits of this claim, the DOC has argued only that it is entitled to summary judgment based on the plaintiff's failure to present evidence to prove the elements of her negligence claim,[10] On this score, as a federal court adjudicating a Pennsylvania tort claim, we are bound to follow the tort law of Pennsylvania. "[U]nder settled Pennsylvania tort law, in order to establish a cause of action for negligence, a plaintiff must prove the following elements: (1) a duty or obligation to the plaintiff recognized by law; (2) a breach of that duty to the plaintiff; (3) a

---

[10] The plaintiff asserts her claims against the Pennsylvania Department of Corrections claiming it has waived sovereign immunity for claims of damages caused by its employees pursuant to 42 Pa. C.S. §§ 8522(b)(3) and (4). The Department of Corrections has not challenged this waiver in its motion.

causal connection between the conduct and plaintiff's resulting injury; and (4) actual damages suffered by the plaintiff." <u>Stamper-Murray v. U.D.H. Mgmt. Corp.</u>, No. 1:14-CV-1360, 2015 WL 3840937, at *2 (M.D. Pa. June 22, 2015) (citing <u>Pittsburgh Nat'l Bank v. Perr</u>, 431 Pa.Super. 580, 637 A.2d 334, 336 (Pa. Super. Ct. 1994)). Thus, Pennsylvania tort liability is also defined through consideration of factual issues of negligence and questions of causation. By its nature, many of these considerations of negligence and causation are inherently fact-bound determinations which typically are not amenable to resolution through a motion for summary judgment.

As we have noted in the past when addressing questions of negligence and in a summary judgment context, there is a compelling factual component to these issues, and "[o]nly in exceptional cases will questions of negligence [and] contributory negligence ... pass from the realm of fact to one of law." <u>Doland v. Berrios</u>, No. 1:11-CV-01783, 2014 WL 3809962, at *7 (M.D. Pa. Aug. 1, 2014) (citations omitted); <u>Njos v. United States</u>, No. 3:12-CV-1252, 2015 WL 5693120, at *4 (M.D. Pa. Sept. 28, 2015).

Notwithstanding the fact-bound nature of these determinations, the DOC argues that it is entitled to summary judgment in its favor on this negligence claim because the plaintiff cannot show that it breached its duty of care to Dixon because it was not on notice of any defect or that, if the defect in the dishwasher was so

obvious the defendant should have known of its existence, Dixon assumed the risk of leaning on the frame of the dishwasher when the door was not secured. The DOC also argues that the dishwasher door falling on Dixon's arm was not the proximate cause of her injuries. Mindful that these questions of negligence and causation are inextricably intertwined with the facts of a given case, and are therefore subject to summary judgment resolution only in extremely rare cases, and viewing the evidence in the light most favorable to the plaintiff, we find the parties have presented conflicting factual narratives as to whether the Department of Corrections was negligent in this case and thus resolution of this claim is inappropriate at the summary judgment stage.

As to the defendant's argument that it did not breach its duty of care to Dixon, Pennsylvania courts treat the duty of care owed by prison officials as analogous to invitees, See Cochrane v. Kopko, 975 A.2d 1203, 1206 (Pa. Commw. Ct. 2009), meaning they have a duty to protect inmates from "foreseeable harm." Carrender, 503 Pa. at 185, 469 A.2d at 123 (citing Restatement (Second) of Torts §§ 341A, 343 and 343A (1965)). On this score:

> Regarding conditions on the land which are either known to or discoverable by the possessor, the possessor is subject to liability only if he
>> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

38

(c) fails to exercise reasonable care to protect them against the danger.

Restatement (Second) of Torts § 343.

Section 343A of the Restatement expands upon the significance of dangers that are known or obvious to an invitee:

> A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.

Cochrane v. Kopko, 975 A.2d 1203, 1206-07 (Pa. Commw. Ct. 2009). Further, according to the Supreme Court of Pennsylvania:

> A danger is deemed to be "obvious" when "both the condition and the risk are apparent to and would be recognized by a reasonable man, in the position of the visitor, exercising normal perception, intelligence, and judgment." Restatement, supra, § 343A comment b. For a danger to be "known," it must "not only be known to exist, but ... also be recognized that it is dangerous and the probability and gravity of the threatened harm must be appreciated." Id. Although the question of whether a danger was known or obvious is usually a question of fact for the jury, the question may be decided by the court where reasonable minds could not differ as to the conclusion. See Restatement, supra, § 328B comments c and d.

Carrender v. Fitterer, 503 Pa. 178, 185–86, 469 A.2d 120, 123–24 (1983).

In contrast to the Eighth Amendment paradigm, in the framework of negligence, viewing the evidence in the light most favorable to the plaintiff, reasonable minds could differ as to whether the danger was known or obvious to the DOC defendants. The parties have competing factual narratives as to whether DOC

employees knew the dishwasher was dented and was being operated with a screwdriver, which, while not enough to rise to the level of a constitutional violation, is enough to create a question of fact under the negligence standard that is most appropriately addressed by a jury, and thus cannot be resolved on summary judgment.

The defendant also argues that, if the risk was so obvious that the defendants should have known of its existence, then Dixon assumed the risk of leaning on the dishwasher frame. Pennsylvania courts have also addressed this relationship between the possessor's knowledge of an obvious defect and the invitee's assumption of the risk:

> The Pennsylvania Supreme Court has "in essence" abolished assumption of the risk as an affirmative defense, except in strict liability cases, cases in which the doctrine is preserved by statute, or cases involving an express assumption of risk. Howell v. Clyde, 620 A.2d 1107, 1113 n.10 (Pa. 1993) (plurality opinion). Here, Defendants assert that [the plaintiff] expressly assumed the risk of her actions, making application of the doctrine appropriate. For this argument to succeed, the record must establish, as a matter of law, that: (1) [the plaintiff] consciously appreciated the risks attending her action; (2) she assumed the risk of injury by engaging in the action despite appreciating its risks; and, (3) the injury she sustained was the same as that which she appreciated and assumed. Bolyard v. Wallenpaupack Lake Estates, Inc., 2012 WL 629391, at *5 (M.D. Pa. Feb. 27, 2012). "The mere fact one engages in activity that has some inherent danger does not mean that one cannot recover from a negligent party when injury is subsequently sustained." Bullman v. Giuntoli, 761 A.2d 566, 572 (Pa. Super. 2000). Rather, assumption of risk may be established as a matter of law only where "it is quite clear that the specific risk that occasioned injury was both fully appreciated and voluntarily accepted." Id. at 571; Barrett v. Fredavid Builders, Inc., 685 A.2d 129,

131 (Pa. Super. 1996) (assumption of risk doctrine applied "only where it is beyond question that the plaintiff voluntarily and knowingly proceeded in the face of an obvious and dangerous condition"); <u>see also Barillari v. Ski Shawnee, Inc.</u>, 986 F. Supp.2d 555, 563 (M.D. Pa. 2013) (plaintiff "must be aware of 'the *particular* danger' from which he is subsequently injured in order to voluntarily assume that risk as a matter of law" (quoting <u>Bolyard</u>, 2012 WL 629391, at \*6)).

<u>CAROL DALTON AND PAUL DALTON, h/w, Plaintiffs, v. THE LITTLE LION AND CPJD HOLDINGS, LLC, Defendants.</u>, No. CV 19-5358, 2021 WL 1293424, at \*4 (E.D. Pa. Apr. 7, 2021). Just as we have determined that it cannot be concluded as a matter of law that the defendants were unaware of the risk presented to the plaintiff by the dishwasher door being dented and operated with a screwdriver, similarly we cannot hold as a matter of law that the plaintiff was aware of and appreciated the specific risk that the dishwasher door would fall on her arm. It is simply not within the court's province to weigh issues of fact and credibility in situations such as this, where the plaintiff alleges the defendants were aware that the dishwasher was unsafe for operation and the defendants allege they were unaware, or that if they were aware then so, too, should have been plaintiff.

Finally, the DOC argues that Dixon cannot establish proximate cause between the dishwasher door falling on her arm and her current injuries because she was complaining of similar pain in the same arm one month prior to the incident. This argument calls upon us to consider the legal standards defining causation under Pennsylvania tort law. In this regard:

Under Pennsylvania law, [questions of] causation involves *both* cause in fact (or physical cause) and proximate (or legal) cause. There is much confusion regarding the concept of causation because the term "proximate cause" is often used to embody both cause in fact and legal cause. However, cause in fact and proximate cause are separate and distinct concepts and both must be proved by a plaintiff. Redland Soccer Club, Inc. v. Department of Army, 55 F.3d 827, 851 (3d Cir. 1995), cert. denied, 516 U.S. 1071, 116 S.Ct. 772, 133 L.Ed.2d 725 (1996); Estate of Flickinger v. Ritsky, 452 Pa. 69, 305 A.2d 40, 42–43 (1973). Cause in fact, or "but for" causation, requires proof that the alleged injury would not have occurred but for the negligent conduct of the defendant. Robertson v. Allied Signal, Inc., 914 F.2d 360, 366 (3d Cir. 1990). The question of whether cause in fact has been shown involves "a *de minimis* standard of causation under which even the most remote and insignificant force may be considered the cause of an occurrence." Herman v. Welland Chem., Ltd., 580 F.Supp. 823, 827 (M.D. Pa. 1984) (quoting Takach v. B.M. Root, Co., 279 Pa. Super. 167, 420 A.2d 1084 (1980)).

Proximate cause, on the other hand, assumes the presence of cause in fact and serves as a means by which courts are able to place practical limits on liability as a matter of policy. Wisniewski v. Great Atl. & Pac. Tea Co., 226 Pa. Super. 574, 323 A.2d 744 (1974). It involves a determination that the nexus between a defendant's wrongful acts or omissions and the injury sustained is of such a nature that it is socially and economically desirable to hold that defendant liable. In determining whether a defendant's negligence is the proximate cause of a plaintiff's injury, Pennsylvania has adopted the "substantial factor" test set forth in Section 431 of the Restatement (Second) of Torts (1965). Under this test, a defendant's negligent conduct is not the proximate cause of plaintiff's injury unless "the alleged wrongful acts were a substantial factor in bringing about the plaintiff's harm." E.J. Stewart, Inc. v. Aitken Prods., Inc., 607 F.Supp. 883, 889 (E.D. Pa. 1985), aff'd, 779 F.2d 42 (3d Cir. 1986).

Galullo v. Fed. Exp. Corp., 937 F. Supp. 392, 394–95 (E.D. Pa. 1996) (footnotes omitted).

Only in rare instances, where the underlying facts are undisputed, are issues of factual causation like those presented here subject to resolution on summary judgment. "While the question of causation in Pennsylvania is normally [a question of fact for the fact-finder], 'if the relevant facts are not in dispute and the remoteness of the causal connection between the defendant's negligence and the plaintiff's injury clearly appears, the question becomes one of law.' " <u>Pavlik v. Lane Ltd./Tobacco Exporters Int'l</u>, 135 F.3d 876, 881 (3d Cir. 1998) (quoting <u>Liney v. Chestnut Motors, Inc</u>., 421 Pa. 26, 218 A.2d 336, 338 (Pa. 1966)). In contrast, when the relevant facts are disputed, questions of causation present issues of fact for trial which may not be resolved through summary judgment. <u>See</u> <u>Hittle v. Scripto-Tokai Corp.</u>, 166 F. Supp. 2d 142, 154 (M.D. Pa. 2001). Although the defendants presented evidence that the plaintiff complained of arm pain and tendonitis prior to the dishwasher incident, the relevant facts surrounding the plaintiff's injury and whether and to what extent it was caused by the dishwasher door are clearly in dispute. Thus, it would be inappropriate in this circumstance for the Court to rule on this issue of disputed fact.

Since it is well settled that the question of negligence is generally one left to the jury, absent extraordinary circumstances which are not present here, summary judgment as to this claim is denied.

## III.   <u>Conclusion</u>

Accordingly, for the foregoing reasons, the defendants' motion for summary judgment, (Docs. 138, 145), will be GRANTED in part and DENIED in part as follows:

The defendants' motions shall be GRANTED as to the plaintiff's Eighth Amendment claims against the Department of Corrections, Correct Care Solutions, and Defendants Smith, Lowe, Minnig, Schaeffer, Blair-Morrison, Freeman, Anthony, and Young.

The defendants' motion shall be DENIED as to the plaintiff's state law negligence claim against the Department of Corrections.

The parties are also directed to notify the Court within 30 days if they wish to pursue mediation in this case or whether we should set a pretrial and trial schedule in this case.

An appropriate order follows.

Submitted this 11th day of August 2022.


*S/ Martin C.  Carlson*
Martin C. Carlson
United States Magistrate Judge